UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SUSAN CHEN, et al.,

                    Plaintiffs,

        v.

NATALIE D'AMICO, et al.,

                    Defendants.

CASE NO. C16-1877JLR

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

## I.    INTRODUCTION

Before the court are:  (1) Defendants City of Redmond ("the City") and Natalie

D'Amico's (collectively, "City Defendants") motion for summary judgment against

Plaintiff Susan (Shiying) Chen (1st MSJ (Dkt. # 106)); City Defendants' motion for

summary judgment against Plaintiffs Naixing (Nash) Lian, J.L., and L.L. (Ms. Chen, Mr.

Lian, J.L., and L.L. are collectively referred to as "Plaintiffs") (2d MSJ (Dkt. # 108)); and

Plaintiffs' motion for summary judgment against City Defendants (3d MSJ (Dkt. # 141)).

The parties filed responses and replies to the motions.  (*See* 1st Resp. (Dkt. # 155); 2d

Resp. (Dkt. # 151); 3d Resp. (Dkt. # 142); 1st Reply (Dkt. # 166); 2d Reply (Dkt. # 165); 3d Reply (Dkt. # 143); *see also* Joinder (Dkt. # 144).) The court has considered the motions, the parties' submissions concerning the motions, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court GRANTS City Defendants' summary judgment motion against Ms. Chen; GRANTS in part, DENIES in part, and DENIES as moot in part City Defendants' summary judgment motion against Mr. Lian, J.L., and L.L.; and GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment against City Defendants.

## II. BACKGROUND

### A. J.L.'s Medical History

Ms. Chen and Mr. Lian are the parents of J.L. and L.L. (FAC (Dkt. # 96) ¶¶ 3-7; Lian Decl. (Dkt. # 122) ¶ 2; Chen Decl. (Dkt. # 131) ¶ 1.) J.L. was born in 2008, and

---

[1] Ms. Chen requests oral argument on City Defendants' first summary judgment motion. (*See* 1st Resp. at 1.) The general rule is that the court should not deny a request for oral argument made by a party opposing a motion for summary judgment unless the motion is denied. *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964). However, a district court's denial of a request for oral argument on summary judgment does not constitute reversible error in the absence of prejudice. *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (citing *Fernhoff v. Tahoe Reg'l Planning Agency*, 803 F.2d 979, 983 (9th Cir. 1986)). There is no prejudice in refusing to grant oral argument where the parties have ample opportunity to develop their legal and factual arguments through written submissions to the court. *Id.* ("When a party has an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument] . . . .") (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*). Ms. Chen has provided the court lengthy written submissions in opposition to City Defendants' summary judgment motion (*see generally* 1st Resp.), as well as in support of Plaintiffs' summary judgment motion (*see generally* 3d MSJ; 3d Reply). The court has determined that oral argument would not be of assistance in deciding any of the pending summary judgment motions, *see* Local Rules W.D. Wash. LCR 7(b)(4), and thus DENIES Ms. Chen's request for oral argument.

L.L. was born in 2010.  (FAC ¶¶ 6-7.)  In 2012, J.L. was diagnosed with gastrointestinal

("GI") problems and Autism Spectrum Disorder.  (Chen Decl. ¶¶ 3-7; *see also* Lo Decl.

(Dkt. # 132) ¶ 2, Exs. B-L at RED00721.[2])  GI issues are common in children with

autism.  (*See* Green Decl. (Dkt. # 129) ¶ 6.)  From August 2012 to October 2013,

Plaintiffs took J.L. to several medical providers, including a naturopath, to address his GI

issues.  (*See* 1st Resp. at 5 (citing medical records).)

      One of J.L.'s medical providers is Dr. John Green, an autism specialist in Portland,

Oregon.  (*See* Green Decl. ¶¶ 2-11.)  J.L. first saw Dr. Green in October 2012.  (*Id.*)  At

this appointment, Dr. Green recommended a low carbohydrate diet for J.L.  (*See id.* ¶ 19

("[M]y Case Summary also discusses various low carbohydrate diets that I

recommended."); RED00575 ("No sugar, no potato, no rice, no yams or sweet

potatoes.").)  Because Dr. Green was in Portland and Plaintiffs are in Washington (*see*

Lian Decl. ¶ 1), Plaintiffs allege that Dr. Green referred J.L. to Dr. Hatha Gbedawo (*see*

Chen Decl. ¶ 10; Gbedawo Decl. (Dkt. # 158) ¶ 6; *but see* RED00565 (Dr. Green's case

summary, explaining that he "subsequently learned that [J.L.'s] care had been transferred

in April 2013 to Hatha Gbedawo ND.")).  Dr. Gbedawo is a "board certified naturopathic

physician," who saw J.L. nine times between April 2013 and October 2013.  (Gbedawo

Decl. ¶¶ 2, 7.)

//

---

[2] Documents cited solely as "REDXXXXX" are sealed documents that were part of Detective D'Amico's investigative file for the investigation of Ms. Chen.  (*See* Dkt. # 133.) These documents are attached to the declaration of T. Augustine Lo as exhibits B-L.  (*See* Lo. Decl. ¶ 2.)

On October 7, 2013, Ms. Chen took J.L. to see Dr. Kate Halamay at Pediatric Associates. (RED00351-53.) Dr. Halamay had seen J.L. previously. (*E.g.*, RED00339.) According to the notes from the October 7 appointment, J.L. had been experiencing abdominal pain for around six weeks. (RED00351.) Dr. Halamay recommended that Ms. Chen take J.L. to the GI department at Seattle Children's Hospital ("SCH"), but Ms. Chen declined, stating that "she has seen them for the past 14 months and they 'have not done anything for [J.L.]'" (RED00352.) Dr. Halamay's notes show that J.L. only visited the SCH GI department once in the prior year. (*Id.*) Ms. Chen then asked Dr. Halamay to order a number of labs, but Dr. Halamay refused because she was "unfamiliar with several of them and would not know how to interpret them." (RED00353.)

On October 19, 2013, Ms. Chen and Mr. Lian took J.L. to Dr. Julie Ellner at Mercer Island Pediatrics, in part hoping that Dr. Ellner would order the labs they were seeking. (*See* RED00107; Chen Decl. ¶ 27-28.) Dr. Ellner's notes state that Ms. Chen was worried that J.L. has a "severe problem with kidney or liver," that he was losing weight, and was eating poorly. (RED00107.) Ms. Chen told Dr. Ellner that J.L. had laboratory tests at a hospital in New York, as well as an ultrasound, which showed that there was something wrong with J.L.'s liver. (*Id.*) However, Ms. Chen did not bring the lab results to Dr. Ellner; nor was she able to remember the doctor or the hospital where the tests were performed. (*Id.*) Dr. Ellner referred J.L. to the emergency room. (*Id.*)

Later that day, instead of going to the emergency room, Ms. Chen took J.L. to Pediatric Associates. (*See* RED00356-58; D'Amico Decl. (Dkt. # 107) ¶ 3h, Ex. H ("CPS Docs") at RED00050-51.) Similar to Dr. Ellner, Dr. Roberta Winch at Pediatric

Associates told Ms. Chen to take J.L. to emergency care. (RED00358 ("IT IS VERY IMPORTANT [J.L.] BE SEEN FOR FURTHER EVAL IN THE ED [emergency department] AT SCH. I RECCOMEND [sic] THEY GO NOW. PARENTS AGREED TO BE SEEN AT SCH ED AND SAID THEY WILL GO THERE NOW.").) Ms. Chen says that she did not understand Dr. Winch's instruction. (*See* Chen Decl. ¶ 27.) Instead, Ms. Chen took J.L. to SCH's urgent care to have lab work done. (*Id.*; RED00853-55.)

Ms. Chen returned to SCH urgent care on October 20, 2013, to pick up J.L.'s lab work. (Chen Decl. ¶ 28.) Once there, doctors told Ms. Chen that J.L.'s lab work was abnormal, showing elevated levels of creatinine and blood urea nitrogen ("BUN"). (*Id.*) Ms. Chen then took J.L. to SCH emergency care. (*Id.*; CPS Docs at RED00050-51.) That day, Dr. Russell Migita in SCH's emergency department examined J.L. and performed additional tests, which showed J.L. improved since his October 19, 2013, lab results, but were still "not normal." (RED00370-75.) Dr. Migita also expressed that J.L. "would benefit from having a coordinated workup that includes endocrinology, gastroenterology, and nephrology." (RED00374.) However, Dr. Migita discharged J.L. from the hospital on October 20, 2013, because he did not have "hypertensive emergency at this time and d[id] not meet the eminent risk criteria for medical hold." (*See* RED00374-75.) Dr. Migita released J.L. on the understanding that Ms. Chen and Mr. Lian would follow-up with J.L.'s primary care provider. (RED00374-75 (noting "Plan" to see Dr. Halamay "[w]ithin 1 to 3 days").)

On October 23, 2013, Ms. Chen brought J.L. to see Dr. Gbedawo. (Chen Decl. ¶ 31; Gbedawo Decl. ¶ 8.) Dr. Gbedawo understood that J.L. had been to emergency and

urgent care a few days earlier and that he had been discharged "as non-emergent." (Gbedawo Decl. ¶ 8.)  At the appointment, Dr. Gbedawo "did not recommend that [Ms. Chen] take J.L. to the emergency department."  (*Id.*)  Rather, he recommended that Ms. Chen take J.L. "to a nephrologist and a nutritionist for additional consultations, and ordered additional labs and imaging."  (*Id.*)

Later that day, Ms. Chen took J.L. to Dr. Halamay, as she had been instructed by Dr. Migita.  (Chen Decl. ¶ 32.)  According to Dr. Halamay's notes, Dr. Hal Quinn at Mercer Island Pediatrics, who had seen J.L. previously, called Dr. Halamay before the appointment.  (RED00397; RED00105-06.)  Dr. Quinn:

> [E]xpressed great concern about this pt as well as family, feels that he his [sic] very sick, concern about failure to thrive, has lost several pounds since April, concerned that family has been going from dr to dr but that pt is not actually receiving appropriate medical attention.

(*Id.*)  At the October 23 appointment, Dr. Halamay noted that J.L. appeared "[v]ery tired" and continued to "have distended abdomen," though Ms. Chen said his condition was improving.  (RED00397.)  Dr. Halamay also noted that Ms. Chen was confused about doctors' instructions from October 19 and 20 to take J.L. to certain specialists.  (*Id.*)  Dr. Halamay recommended that Ms. Chen admit J.L. to the hospital "at once" so that he could be seen by renal, endocrine, and GI specialists.  (*Id.*)  Ms. Chen "refused to take [J.L.] for admission, even after [Dr. Halamay] stated that [she] felt admission was medically necessary given his abdominal distension, weight loss, and worsening lab values compared to those drawn a few weeks ago."  (*Id.*)

//

Ms. Chen recalls that she "felt as though Dr. Halamay and SCH were dismissive and had not provided proper care for [J.L.]" (Chen Decl. ¶ 32.) Further, Ms. Chen told Dr. Halamay at the October 23 appointment that she "would not go back to see [Dr. Halamay] anymore" and that she "would make a complaint against her." (*Id.*) Dr. Halamay told Ms. Chen that, if Ms. Chen did not admit J.L. to the hospital, then she was going to call the Child Protective Services ("CPS") division of the Washington State Department of Social and Health Services ("DSHS"). (*Id.*; RED00397.) Ms. Chen restated that she would not take J.L. to SCH and left Dr. Halamay's office. (*Id.*) Dr. Halamay then called CPS. (RED00397; CPS Docs at RED00051.)

Late at night on October 23, 2013, a CPS social worker arrived at Plaintiffs' home and took J.L. to SCH's emergency department. (*See* 3d MSJ at 7; *but see* Chen Decl. ¶ 33 (stating that "[a]t [CPS]'s recommendation, we took J.L. to SCH.").) J.L. was seen on October 24, 2013, by Dr. Virginia Sanders and Dr. Shannon Staples. (*See* RED00791.) According to Dr. Sanders's summary, J.L.'s showed a "failure to thrive . . . [and] gross malnutrition and muscle wasting. Concern for medical cause of wasting vs. neglect." (RED00792.) J.L. was then admitted to SCH's "general medicine service" to treat his malnutrition and receive a Suspected Child Abuse Network ("SCAN") consultation. (*Id.*)

While at SCH on October 24, 2013, providers gave J.L. Pedialyte even though Ms. Chen told them that "whenever [J.L.] eats sugar his belly gets big." (RED00927, RED00930.) Ms. Chen also told the SCH providers that J.L. "cannot eat many foods, including carbohydrates or sugar," but Ms. Chen was unable to "identify any food that he

does eat." (RED00927-28.) In addition, Ms. Chen interfered with providers' attempts to give J.L. Pedialyte. (D'Amico Decl. ¶ 3c, Ex. C ("D'Amico Report") at RED00015.) The doctors noted that Ms. Chen was "asked to leave" the hospital room "because of her erratic and obstructionist behavior." (RED00930.) However, after J.L. consumed several ounces of Pedialyte, J.L. "reaccumulated significant abdominal distention," which required the doctors to use a catheter to relieve the distention. (*Id.*)

**B.    J.L.'s Placement in Foster Care**

CPS removed J.L. and L.L. from Ms. Chen and Mr. Lian's custody on October 24, 2013. (*See* 3d MSJ at 7.) A 72-hour dependency hearing was held from October 28 to October 30, 2013, to determine if J.L. should be removed from Plaintiffs' home. (*See* FAC ¶ 59.) Dr. Green and Dr. Gbedawo provided testimony in support of Ms. Chen at the dependency hearing. (*See id.*) After the hearing, L.L. was returned to Ms. Chen and Mr. Lian, but J.L. remained in CPS's custody. (*Id.* ¶ 61; 3d MSJ at 7 n.8.) J.L. was kept at SCH until November 7, 2013, at which time he was placed into foster care. (*See* RED01139.) It appears that J.L. remained in CPS's custody until September 12, 2014, when the Attorney General's Office ("AGO") terminated his dependency proceedings. (*See* Lo Decl. ¶ 9, Ex. S; *see also* FAC ¶ 72; *but see* (Riensche Decl. (Dkt. # 110) ¶ 3, Ex. 3 ("Exception Justification") at 14 (explaining that J.L. was returned to Mr. Lian's care in July 2014).)

J.L.'s weight fluctuated during his first weeks in CPS's custody. (*See* RED01102-39.) For example, J.L. weighed 26.9 pounds when he was admitted to SCH on October 24, 2013, which is the third percentile. (RED00791.) By November 3, 2013,

J.L.'s weight increased to 32.19 pounds. (RED01126.) However, by the time J.L. was placed in foster care on November 7, 2013, his weight had decreased to 30.2 pounds. (RED01138.) On November 20, 2013, after J.L. had been in foster care for nearly two weeks, his weight had decreased even further to 29 pounds. (RED00109 (but noting that that J.L. is "doing much better now" and that his weight is in the thirteenth percentile).)

## C. Detective D'Amico's Investigation

Detective D'Amico was assigned to investigate Plaintiffs on October 24, 2013. (*See* D'Amico Report at RED00008-22.) Two month prior, Detective D'Amico had received 40 hours of specialized training in "Child Abuse Interviewing and Assessment." (Shickich Decl. (Dkt. # 167) ¶ 10, Ex. A.) Detective D'Amico started the investigation by following up on work done by RPD Officer Paul Chung and Seattle Police Department ("SPD") Officer Michael Severance. (D'Amico Report at RED00009-10.) As part of Officer Chung's initial investigation, he learned that CPS "believed [Ms. Chen] was suffering from Munchausen Syndrome[3] and therefore would purposely harm [J.L.] as a result of this to gain attention." (*Id.* at RED00010.)

On the morning of October 24, 2013, Detective D'Amico visited J.L. at SCH. (*Id.* at RED00011.) Afterward, Detective D'Amico went with Detective Lieutenant Matthew Peringer to Plaintiffs' residence and spoke with Ms. Chen and Mr. Lian. (*Id.* at

---

[3] It appears that CPS meant that it believed Ms. Chen was suffering from Munchausen by Proxy, which "is a psychological disorder marked by attention-seeking behavior by a caregiver through those who are in their care," rather than Munchausen Syndrome, which "is a type of mental illness in which a person repeatedly acts as if he or she has a physical or mental disorder when, in truth, he or she has caused the symptoms." (*See* 2d Resp. at 29 n.142.)

RED00011-12.)  Detective D'Amico and Detective Lieutenant Peringer interviewed Ms. Chen and Mr. Lian without the use of an interpreter even though English was their second language.  (*Id.* at RED00012; Chen Decl. ¶ 39; Lian Decl ¶ 14.)  Detective D'Amico focused the interview on J.L.'s diet.  (*Id.*)  According to Detective D'Amico, Ms. Chen said that J.L. was on a "special diet that was gluten free and lacked carbohydrates."  (D'Amico Report at RED00012.)  Ms. Chen and Mr. Lian contest this characterization, saying that they explained that they provided J.L. with fresh fruit and gluten-free bread.  (Chen Decl. ¶¶ 39-40.)  All agree, though, that it was explained at this meeting that Mr. Lian did most of the cooking.  (*See* D'Amico Report at RED00012; Lian Decl. ¶ 16.)  After the meeting, Detective D'Amico went back to SCH where she spoke with "several" physicians who explained that J.L.'s kidneys were in a pre-renal state caused by dehydration and that his liver was not functioning properly.  (*See* D'Amico Report at RED00013.)

On October 25, 2013, Ms. Chen and Mr. Lian went to a meeting at the CPS office. (Chen Decl. ¶ 42.)  Detective D'Amico attended the meeting.  (*Id.*; D'Amico Report at RED00013.)  Ms. Chen and Mr. Lian claim that, at the meeting, they told CPS about Dr. Green's dietary advice to restrict carbohydrates.  (Chen Decl. ¶ 42; Lian Decl. ¶ 17.) After the meeting, CPS reported that it was "concerned for the imm[edi]ate safety of [J.L.] in parents' care," and was "recommend[ing] out of home placement for [J.L.] upon his discharge from the hospital."  (CPS Docs at RED00069.)

On November 5, 2013, Detective D'Amico participated by telephone in a SCAN meeting at SCH.  (D'Amico Report at RED00014.)  According to Detective D'Amico's

notes, SCH medical staff advised that "there were no findings of a lack of tolerance with any food they had given J.L.," and that, even had J.L. been on a special diet, "he would not have been left malnourished and dehydrated." (*Id.*) SCH medical staff classified J.L.'s condition when he was first admitted as indicative of "serious bodily harm." (*Id.*)

On November 7, 2013, CPS provided Detective D'Amico with a list of J.L.'s 13 medical providers. (*Id.*) Detective D'Amico requested records from all the providers and "received all but three providers' medical records" by December 4, 2013. (*Id.*) Detective D'Amico summarized each provider's records in her police report and identified the three providers that had not responded to her records request: Pediatric Associates, Magnolia Behavioral Therapy, and Bothell Pediatric and Hand Therapy. (*Id.* at RED00014-18.) In addition, Detective D'Amico summarized and attached an email from CPS memorializing a phone call with a fourteenth provider, a speech pathologist who worked with J.L. (*Id.* at RED00018-19.)

On December 9, 2013, still lacking some of the medical records, Detective D'Amico determined:

> At this time, there is probable cause to believe [Ms. Chen] violated RCW 9A.42.030 Criminal Mistreatment 2nd degree for acting in a manner that created an imminent risk of great bodily harm to [J.L.] causing him to be admitted to Seattle Children's Hospital for approximately three weeks. There is also probable cause to believe [Ms. Chen] withheld basic necessities of life to include nutrition as [J.L.] was diagnosed as grossly malnourished and dehydrated upon arrival at Seattle Children's Hospital.

(*Id.* at RED00019.) That same day, Detective D'Amico signed a probable cause certification to file criminal charges against Ms. Chen and transmitted her investigative

//

file—which included J.L.'s available medical records—to the King County Prosecuting Attorney's Office ("the KCPAO"). (D'Amico Decl. ¶ 6, Ex. E ("PCC").)

After transmitting her investigative file and probable cause certification to the KCPAO, Detective D'Amico followed up with the medical providers who had not provided records. (D'Amico Report at RED00019.) In mid-December 2013, Bothell Pediatric and Hand Therapy and Magnolia Behavioral Therapy provided Detective D'Amico their records. (*Id.* at RED00019-20.) Pediatric Associates provided its records on January 23, 2014. (*Id.* at RED00021.) In addition, on January 27, 2014, Detective D'Amico requested updated records from SCH and Mercer Island Pediatrics, which the providers gave on February 10 and 12, 2014, respectively. (*Id.*) Detective D'Amico summarized these additional records and transmitted them to the KCPAO, along with an updated report. (*Id.* at RED00020-22; D'Amico Decl. ¶ 9.)

**D.  Criminal Charges Against Ms. Chen**

On January 31, 2014, the KCPAO charged Ms. Chen with one count of criminal mistreatment in the second degree for her actions between October 19 and 24, 2013. (Carlstrom Decl. (Dkt. # 111) ¶ 3, Ex. A.) No criminal charges were filed against Mr. Lian. (FAC ¶ 111.) Carla Carlstrom, a Senior Deputy Prosecuting Attorney with the KCPAO, "made the decision to file" the charge against Ms. Chen. (Carlstrom Decl. ¶¶ 2-7.) Before filing the charge, Ms. Carlstrom spoke with Detective D'Amico and was aware that J.L.'s medical records file was incomplete. (*Id.* ¶ 6.)

Ms. Chen was arraigned on February 18, 2014. (FAC ¶ 117.) On July 29, 2014, Ms. Chen's public defender, Twyla Carter, wrote to the KCPAO requesting dismissal of

the charge against Ms. Chen.  (Riensche Decl. ¶ 3, Ex. 2 ("Carter Letter"); *see also* Carter

Decl. (Dkt. # 127) ¶ 15.)  On September 19, 2014, the KCPAO dropped the criminal case

against Ms. Chen.  (Riensche Decl. ¶ 3, Ex. 5 ("Order of Dismissal").)

The KCPAO said that it dropped the charges against Ms. Chen in part because

"[r]ecords unavailable at the time of filing complete the timeline of events between

October 19, 2013, and October 24, 2013."  (Riensche Decl. ¶ 3, Ex. 3 ("Exception

Justification") at 14.)  The KCPAO explained that it based its initial charging decision on

three facts:  (1) that Ms. Chen failed to take J.L. to emergency care immediately when

recommended by physicians on October 19, 2013; (2) that Ms. Chen took Pedialyte away

from J.L. against SCH's medical providers' orders; and (3) Ms. Chen's pattern of taking

J.L. to see multiple providers who were not coordinating J.L.'s care.  (*Id.* at 13.)  The

records the KCPAO reviewed after filing the charge undermined its charging decision.

First, the records showed that Ms. Chen took J.L. to emergency care each time a

doctor requested it, even if she delayed the visit.  (*Id.* at 14 (explaining that two doctors

requested that Ms. Chen take J.L. to emergency care on October 19, 2013, and that she

took J.L. to emergency care on October 20, 2013).)  The KCPAO based its

misunderstanding on a report by Dr. James Metz from the SCAN team who "mistakenly

wrote in a report" that Ms. Chen "refused admittance to the ER" on October 20, 2013,

against Dr. Migita's advice.  (*Id.*)  In reality, Dr. Migita discharged J.L. on October 20,

2013, because J.L. did not have "hypertensive emergency at this time and d[id] not meet

the eminent risk criteria for medical hold."  (*Id.*; *see also* RED00374-75.)

//

Second, the records revealed that J.L. was on a special diet at the advice of medical providers and that Dr. Green advised Ms. Chen "never to give [J.L.] Pedialyte because it would cause distention." (Exception Justification at 14-15.) The KCPAO also noted that other doctors, including J.L.'s then-current pediatrician, did not believe that Ms. Chen starved J.L. and that J.L.'s weight continued to fluctuate while he was in foster care. (*Id.* at 15.) The KCPAO further stated that, since J.L. returned to Mr. Lian in July 2014, he "has been doing substantially better according to CPS reports." (*Id.*)

Third, the KCPAO maintained that even the updated records showed Ms. Chen had an "evasive" relationship with J.L.'s medical providers, which prevented them from coordinating J.L.'s care. (*Id.*) Ultimately, however, the KCPAO determined that it would be unable to meet its burden of proof against Ms. Chen at trial:

> Central to this case is [Ms. Chen's] decision to see multiple providers all at once who were not coordinating [J.L.'s] care. These issues were confounded by a language barrier and [Ms. Chen's] unwillingness to be completely transparent with doctors. On one instance when visiting Dr. Jeffrey Wright in August 2012, for example, [Ms. Chen] was downright evasive and likely dishonest with him. However, there is no clear evidence that [Ms. Chen] withheld food or medical care or that [Ms. Chen] knew [J.L.] was even facing great bodily harm because, after all, Dr. Migita released [J.L.] from the ER on 10/20/13.

(*Id.*)

**E. Procedural History**

Plaintiffs originally brought this action *pro se* in December 2016. (*See* Dkt.) In June 2017, the court appointed Plaintiffs *pro bono* counsel. (*See* 6/13/17 Am. Order (Dkt. # 15).) After extensive motions practice on the pleadings, in March 2018, the court granted in part and denied in part City Defendants' motion to dismiss Plaintiffs' claims

and granted Plaintiffs leave to amend.  (*See generally* 3/27/18 Order (Dkt. # 90); *see also* 10/16/17 Order (Dkt. # 53); 11/30/17 Order (Dkt. # 73).)  Plaintiffs filed the operative complaint on July 30, 2018.  (*See* FAC.)

On November 29, 2018, City Defendants brought two motions for summary judgment on all seven of Plaintiffs' claims that relate to them.  (*See* 1st MSJ; 2d MSJ.) Six of these claims are for various constitutional violations pursuant to 42 U.S.C. § 1983: (1) unlawful arrest; (2) fabrication/withholding of evidence; (3) selective enforcement; (4) malicious prosecution; (5) substantive due process; and (6) procedural due process. (*See* FAC ¶¶ 132-208.)  Plaintiffs' seventh claim alleges malicious prosecution under Washington State law.  (*Id.* ¶¶ 221-40.)  City Defendants' first motion for summary judgment is against Ms. Chen and concerns all seven of Plaintiffs' claims asserted against City Defendants.  (*See* 1st MSJ at 2.)  City Defendants' second motion for summary judgment is against Mr. Lian, J.L., and L.L., and concerns only the substantive and procedural due process claims because Mr. Lian, J.L., and L.L. do not have standing to assert the other five claims.  (*See* 2d MSJ at 2; 2d Resp. at 28 (Mr. Lian, J.L., and L.L. agreeing that they only assert the due process claims against City Defendants).)  In addition, City Defendants seek summary judgment against Mr. Lian, J.L., and L.L. on their malicious prosecution counterclaim.  (*See* 2d MSJ at 2; *see also* Countercl. (Dkt. # 97) at 23-28.)

On December 6, 2018, Plaintiffs brought a motion for relief under Federal Rule of Civil Procedure 56(d), in part requesting additional time to conduct discovery and to respond to City Defendants' motions for summary judgment.  (*See* 56(d) Mot. (Dkt.

# 116).)  Before the court ruled on Plaintiffs' Rule 56(d) motion, Plaintiffs filed their own motion for summary judgment on City Defendants' malicious prosecution counterclaim. (*See* 3d MSJ.)  Shortly thereafter, the court granted in part Plaintiffs' Rule 56(d) motion. (*See* 2/13/19 Order (Dkt. # 146).)

The court now addresses the three pending motions for summary judgment.

## III.    ANALYSIS

## A.    Preliminary Matters

### 1.  Motion to Strike

City Defendants move to strike certain material that Plaintiffs' rely upon in opposition to City Defendants' motions for summary judgment.  (*See* 2d Reply at 14-15.) The disputed material consists of:  (1) statements in Mr. Lian's declaration that City Defendants characterize as hearsay (*see id.* at 14; Lian Decl. ¶ 12); (2) statements in Ms. Carter's declaration that City Defendants claim lack foundation, are an unfounded expert opinion, are mere speculation, or are hearsay (*see* 2d Reply at 14; Carter Decl. ¶¶ 5, 12-13, 16-21); (3) statements in Dr. Green's declaration that City Defendants allege contradict his testimony at the 72-hour dependency hearing (*see* 2d Reply at 14-15; Green Decl. ¶¶ 10, 14, 20); and (4) statements in Ms. Chen's declaration that City Defendants characterize as legal conclusions and unfounded expert testimony (2d Reply at 15; Chen Decl. ¶ 48).

The court need not reach these issues because they do not change the court's determination.

//

**B. Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party will bear the ultimate burden of persuasion at trial, it must make a prima facie showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id.* at 1473. If the moving party meets its burden of production, the burden then shifts to the nonmoving

party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003). Nor can a party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes*, 783 F.3d at 1156 (quoting *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)). The court "rule[s] on each party's motion on an individual and separate basis,

determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes*, 783 F.3d at 1156 (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998)); *see also ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) ("We evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." (citations and internal quotation marks omitted)).

**C.      City Defendants' Motion Against Ms. Chen**

1. Malicious Prosecution Claims

To prove malicious prosecution, a plaintiff must show, *inter alia*, "that there was want of probable cause for the institution or continuation of the prosecution" that the plaintiff claims to be malicious. *Hanson v. City of Snohomish*, 852 P.2d 295, 298 (Wash. 1993). Accordingly, "probable cause is a complete defense to malicious prosecution." *Id.* City Defendants move for summary judgment on Ms. Chen's state law and § 1983 malicious prosecution claims because there was probable cause to charge her with criminal mistreatment in the second degree. (*See* 1st MSJ at 7-9.)

"The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). That said, "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Id.* (citing *Brinegar v. United States*, 228 U.S. 160, 175 (1949)). Courts require a "fair probability" on which "reasonable and prudent [people,] not legal technicians, act." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 231

1 (1983)) (alterations in original); *see also State v. Gaddy*, 93 P.3d 872, 875 (Wash. 2004)

2 (explaining that probable cause exists when "reasonably trustworthy information [is]

3 sufficient to cause a reasonable officer to believe a crime has been committed."

4 (emphasis omitted)). "There must be some objective evidence which would allow a

5 reasonable officer to deduce that a particular individual has committed or is in the process

6 of committing a criminal offense." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir.

7 1984). Further, "[a]t the time of arrest, the arresting officer need not have evidence to

8 prove each element of the crime beyond a reasonable doubt." *Gaddy*, 93 P.3d at 875.

9 But "[m]ere suspicion, common rumor, or even strong reasons to suspect are not

10 enough." *Id.* And police officers "may not disregard facts tending to dissipate probable

11 cause." *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (quotation marks

12 and citation omitted).

13       Probable cause "is a question of law to be determined by the court." *Act

14 Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). But the court should not

15 determine probable cause at the summary judgment stage if a genuine issue of material

16 fact exists. *Id.*

17       Here, Detective D'Amico determined that there was probable cause to charge Ms.

18 Chen with criminal mistreatment in the second degree pursuant to RCW 9A.42.030. (*See*

19 D'Amico Report at RED00019; PCC.) The KCPAO then charged Ms. Chen with this

20 crime. (*See* Carlstrom Decl. ¶ 3, Ex. A.) A person is guilty of criminal mistreatment in

21 the second degree if he or she acts with criminal negligence and "either (a) creates an

22 imminent and substantial risk of death or great bodily harm by withholding any of the

basic necessities of life, or (b) causes substantial bodily harm by withholding any of the basic necessities of life." RCW 9A.42.030(1). A person acts with criminal negligence "when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

City Defendants allege that the undisputed facts create probable cause that Ms. Chen was guilty of criminal mistreatment. (1st MSJ at 7-9.) City Defendants point out that: (1) J.L. lost two pounds between August 2013 and October 2013, was in the third percentile of weight for a three-year-old, and weighed less as a three-year-old than he weighed as a two-year-old; (2) that between October 19 and 23, 2013, multiple providers referred J.L. to emergency care; (3) that multiple physicians diagnosed J.L. as malnourished; and (4) that SCH determined that J.L. needed to be hospitalized for more than two weeks. (*See id.*) In addition, City Defendants argue that a reasonable person could infer that J.L.'s malnourished condition was caused by Ms. Chen withholding carbohydrates. (*Id.*) Moreover, City Defendants allege that a reasonable person could infer that Ms. Chen reduced J.L.'s carbohydrate intake even though she was aware of the substantial risk of harm to J.L. because, in April 2013, Dr. Green recommended that Ms. Chen increase J.L.'s carbohydrate intake. (*Id.*; *see also* RED00565 (Dr. Green's November 15, 2013, case summary, which notes that on April 1, 2013, Dr. Green had a phone consultation with Ms. Chen where he "recommended[] aiming to increase [J.L.'s] carbohydrate intake").) City Defendants also cite Ms. Chen's failure to take J.L. to the

emergency department on October 19, 2013, disregarding two medical providers'

referrals, as grounds for probable cause of criminal mistreatment.  (*Id.*)

Ms. Chen argues there was not probable cause because (1) there is no proof that

she caused "J.L. any harm, let alone 'substantial bodily harm,'" and (2) because J.L. was

never in any imminent risk of death or great bodily harm.  (1st Resp. at 17.)  Ms. Chen

points out that SCH's emergency department found that J.L. was in a "stable" condition

on both October 20 and October 24.  (*Id.* at 17-18 (citing RED00375, RED00931).)

Further, Ms. Chen argues that she did not act with criminal negligence because she

"diligently sought out medical advice to address J.L.'s conditions, and tried her best to

follow that advice."  (*Id.* at 18.)  Lastly, Ms. Chen argues that Detective D'Amico

consciously disregarded facts that undermined probable cause, including that J.L. was

unable to tolerate Pedialyte.  (*Id.*)

Even drawing all reasonable inferences in Ms. Chen's favor, the undisputed

evidence shows that there was probable cause that Ms. Chen committed criminal

mistreatment in the second degree pursuant to RCW 9A.42.030.  As explained above, on

October 23, 2013, Dr. Halamay recommended that Ms. Chen admit J.L. to the hospital

"at once."  (RED00397.)  Ms. Chen "refused to take him for admission," and J.L. was

only taken to the SCH emergency department after CPS intervened.  (*Id.*; Chen Decl.

¶ 33.)  Once at SCH on October 24, 2013, J.L. was diagnosed with "failure to thrive . . .

[and] gross malnutrition and muscle wasting."  (RED00792; *see also* D'Amico Decl.

¶ 3q, Ex. Q at RED01236 ("[J.L.] appeared grossly malnourished."); *id.* at RED01237

(noting J.L.'s "profoundly malnourished state.").)  J.L. also weighed 26.9 pounds as a

three-year-old, which is the third percentile for his age group. (RED00791.) Further, SCH medical staff classified J.L.'s condition when he was first admitted as indicative of "serious bodily harm." (D'Amico Report at RED00014.)

Importantly, medical providers implicated Ms. Chen in J.L.'s condition. (*See* RED00930 ("Clinical exam shows gross malnutrition and muscle wasting . . . . Given mother's resistance to medical evaluation in this ill child, he is currently in state custody.") Doctors specifically listed their "concern" that Ms. Chen was "unable to provide care/information and concern for intentional malnutrition." (*Id.*) The SCH providers also noted Ms. Chen's "erratic and obstructionist behavior." (*Id.*)

In addition, the SCAN team noted that the SCH medical staff did not find J.L. lacked "tolerance with food they had given" him, and that even had J.L. been on a special diet, "he would not have been left malnourished and dehydrated." (D'Amico Report at RED00014.) Notes from SCH medical providers support the SCAN team's discussion. (*See* D'Amico Decl. ¶ 3q, Ex. Q at RED001237 ("In general, [J.L.] was able to tolerate a full diet with no signs or symptoms of food allergy or intolerance.").)

These facts provide "objective evidence which would allow a reasonable officer to deduce that" Ms. Chen committed criminal mistreatment in the second degree. *McKenzie*, 738 F.2d at 1008 (9th Cir. 1984). Based on the objective evidence, a reasonable officer could find that Ms. Chen, through criminal negligence, created an imminent and substantial risk of great bodily harm to J.L. by withholding the basic necessities of life, or had already caused J.L. substantial bodily harm by withholding the basic necessities of life. RCW 9A.42.030(1); RCW 9A.08.010(1)(d). Although facts

weigh against probable cause—such as J.L.'s autism and its complex co-morbidities, as well as J.L.'s initial intolerance for Pedialyte and his low-carbohydrate diet—these facts do not negate that doctors considered J.L. to be grossly malnourished on October 24, 2013, that Ms. Chen had ignored medical providers' requests to seek help for J.L., that Ms. Chen only went to SCH on October 24, 2013, at the insistence of CPS, and that medical providers implicated Ms. Chen as a potential cause of J.L.'s condition.

Courts have found that a child's "failure to thrive and malnutrition" support a finding of probable cause. *See Baker v. Cty. of L.A.*, No. CV 11-5550-GHK (PJWx), 2013 WL 11323599, at *13 (C.D. Cal. Sept. 27, 2013); *Swinton v. City of N.Y.*, 785 F. Supp. 2d 3, 9 (E.D.N.Y. 2011). Here, J.L.'s "failure to thrive" (*see* RED00792), combined with the undisputed record the court just detailed, support a finding of probable cause of criminal mistreatment in the second degree against Ms. Chen.

To the extent that Detective D'Amico did not, according to Ms. Chen, sufficiently promote mitigating factors in her police report or probable cause certificate, the court finds that these mitigating factors do not "dissipate" probable cause. *See Lopez*, 482 F.3d at 1073. Further, the court recognizes that the KCPAO's decision to drop the charge against Ms. Chen casts doubt on the initial existence of probable cause. But the KCPAO's decision was made considering the beyond a reasonable doubt burden of proof, which is more demanding than the probable cause standard. (*See* Exception Justification at 15 ("The State will have to prove BRD [beyond a reasonable doubt] to jury unanimity")); *Pringle*, 540 U.S. at 371 ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials,

have no place in the [probable-cause] decision." (alteration in original) (citation omitted)).

In sum, the undisputed facts show that probable cause existed that Ms. Chen committed criminal mistreatment in the second degree. This finding is a "complete defense" to Ms. Chen's malicious prosecution claims. *See Hanson*, 852 P.2d at 298. Therefore, the court GRANTS City Defendants' motion for summary judgment against Ms. Chen on counts IV and VIII of the complaint.

2. Presumption of Prosecutorial Independence

City Defendants' second ground for summary judgment is directed at Ms. Chen's four constitutional tort claims brought against Detective D'Amico. (*See* 1st MSJ at 9-11; *see also* FAC ¶¶ 132-85.) These claims include unlawful arrest, fabrication/withholding of evidence, selective enforcement, and malicious prosecution.[4] (*See id.*) City Defendants argue that they are entitled to summary judgment on these claims because of the presumption of prosecutorial independence. (*Id.*)

Ms. Chen points out, however, that the presumption of prosecutorial independence has only been applied as a bar to claims that involve a finding of probable cause. (*See* 1st Resp. at 22 (citing *Caldwell v. City & Cty. of S.F.*, 889 F.3d 1105, 1116 (9th Cir. 2018)).) Therefore, according to Ms. Chen, the presumption could only serve as a defense to the unlawful arrest and malicious prosecution claims. (1st Resp. at 22.) City Defendants do

_____

[4] Although the court addressed Ms. Chen's § 1983 malicious prosecution claim in the previous section, *see supra* § III.C, the court addresses it again here because the prosecutorial independence analysis applies equally to the unlawful arrest and malicious prosecution claims.

not contest this argument.  (*See generally* 1st Reply.)  This issue was recently presented, but not decided, in the Ninth Circuit.  *See Caldwell*, 889 F.3d at 1115-16 (noting the dispute over whether "prosecutorial independence only severs the causal chain where the underlying civil rights violation is based on a lack of probable cause," but choosing to "not resolve the parties' debate").  This court likewise does not decide the issue because it is not necessary to resolution of the motion.  Here, the court only considers whether the presumption of prosecutorial independence is a bar to Ms. Chen's unlawful arrest and malicious prosecution claims.

"Typically, in constitutional tort cases, the '[f]iling of a criminal complaint immunizes investigating officers . . . because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." *Caldwell* 889 F.3d at 1115 (quoting *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981)).  However, a plaintiff may rebut this presumption by showing "that the independence of the prosecutor's judgment has been compromised." *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008).  A plaintiff may accomplish this by establishing "that officers either presented false evidence to or withheld crucial information from the prosecutor." *Caldwell*, 889 F.3d at 1116.  Regarding the presentation of false evidence, the plaintiff must show that the officers gave the prosecutor "information known by them to be false." *Id.* (citation omitted).

City Defendants argue that Detective D'Amico did not present false evidence or withhold crucial information from the KCPAO that would rebut the presumption of prosecutorial independence.  (*See* 1st MSJ at 9-11.)  City Defendants allege that, when

the presumption has been overcome, police reports have been the only source of information provided to prosecutors. (*Id.* at 10.) Here, however, Detective D'Amico provided the KCPAO with all of J.L.'s available healthcare records in addition to her police report and probable cause certificate. (*Id.* at 10-11; *see also* Carlstrom Decl. ¶ 4.) The KCPAO also reviewed materials from other police officers and CPS. (Carlstrom Decl. ¶ 4.) In addition, the KCPAO was aware that J.L.'s medical records were incomplete when it first received materials from Detective D'Amico. (1st MSJ at 11; Carlstrom Decl. ¶ 6.) Detective D'Amico later supplemented those records. (Carlstrom Decl. ¶ 5.) And the lead prosecutor, Ms. Carlstrom, made her own summary of J.L.'s medical history, rather than relying solely on Detective D'Amico's characterizations. (*See* Shickich Decl. ¶ 3, Ex. 2 ("Carlstrom Summary") (sealed).)

Ms. Carlstrom also discussed the case with two colleagues, including her supervisor, before bringing the charge. (*See* Shickich Decl. ¶ 2, Ex. 1 ("Carlstrom Tr.") at 38:13-21.) In that discussion, Ms. Carlstrom brought up "the extra complexities of [J.L.] being a child who already had special needs and potential medical issues," and that "there was a lot of history with this child, at least the records that [the KCPAO] had." (*Id.* at 49:11-23.) Ultimately, Ms. Carlstrom—a Senior Deputy Prosecuting Attorney who has "been involved in the investigation and prosecution of over 2500 child abuse and neglect cases"—decided to charge Ms. Chen based on her "independent professional judgment" and her "thorough review" of the evidence, with full knowledge that she did not yet have complete medical records. (Carlstrom Decl. ¶¶ 2, 6-7.)

//

1    Ms. Chen argues, however, that "[t]he *sole evidence* presented by" the KCPAO

2    when it charged Ms. Chen was Detective D'Amico's probable cause certificate, which

3    shows the KCPAO's reliance on Detective D'Amico. (1st Resp. at 20-21.) Ms. Chen

4    also alleges that the prosecutor's charge was inconsistent with the medical records—as

5    evidenced by the KCPAO later dropping the charge—which shows that the prosecutor

6    did not thoroughly review the materials. (*Id.*) Further, Ms. Chen argues that the

7    KCPAO's lack of witness interviews or consultation with medical professionals shows

8    that it did not exercise independent judgment. (*Id.*) Finally, Ms. Chen argues that

9    Detective D'Amico had exculpatory evidence in her possession that she did not provide

10   to the KCPAO, including an interview with Dr. Green and an email from Defendant

11   Kimberly Danner from DSHS that attached a letter from Dr. Gbedawo detailing J.L.'s

12   liver and kidney functions. (*Id.*)

13      The court concludes that the presumption of prosecutorial independence applies.

14   First, Ms. Chen has not presented evidence that, even when viewed in the light most

15   favorable to her, shows that City Defendants provided the KCPAO with "information

16   known by them to be false," *Caldwell*, 889 F.3d at 1116; (*see generally* 1st Resp.); nor

17   has the court independently found any. Although the KCPAO dropped the charge against

18   Ms. Chen, that action was due to evidence "unavailable at the time of filing." (Exception

19   Justification at 14.) To the extent the evidence was misrepresented to the KCPAO prior

20   to charging Ms. Chen, that was not City Defendants' fault; rather, it was due to the

21   SCAN team's misunderstanding of the events. (*See id.* ("Dr. Metz, a SCAN doctor at

22   SCH, mistakenly wrote in a report that [Ms. Chen] refused admittance to the ER . . . and

that [Ms. Chen] refused to follow Dr. Russell Migita's advice on 10/20/13 by leaving the ER against medical advice.").)  Detective D'Amico's report in fact corrects the SCAN team's misunderstanding.  (D'Amico Report at RED00011 ("10/20/13 [Ms. Chen] . . . returned with [J.L.] and he was admitted at Seattle Children's Hospital.  [J.L.'s] lab results had stabilized and therefore he was discharged.").)

Second, City Defendants did not withhold "crucial information" from the KCPAO.  In short, the two pieces of information that Ms. Chen claims City Defendants withheld were not "crucial."  *See Caldwell*, 889 F.3d at 1117 (the court determining on summary judgment whether information withheld was crucial).  The first piece of information is Dr. Gbedawo's letter, which mainly concerned J.L.'s kidney, thyroid, and liver function.  (*See* Gbedawo Decl. ¶ 9, Ex. A ("10/24/19 Gbedawo Letter") at 2.)  In the letter, Dr. Gbedawo also mentioned that she felt "strongly it is in [J.L.'s] best interest to be in the care of his mother."  (*Id.*)  The second piece of information is a phone call between Detective D'Amico and Dr. Green, which occurred in mid-November 2013.  (*See* Green Decl. ¶¶ 13-15.)  Dr. Green states that the phone call was "perfunctory" and that Detective D'Amico "made no discernable effort to ensure she understood the medical advice that I provided to [Ms. Chen] and [Mr. Lian]."  (*Id.* ¶¶ 7, 13-15.)  According to Dr. Green, he "made it very clear" during the call that he "did not see anything that [he] would regard as abusive or that would support a finding of child neglect or withholding basic necessities of life" regarding Ms. Chen or Mr. Lian's care of J.L.  (*Id.* ¶ 13.)

Although Detective D'Amico failed to give the KCPAO these pieces of information, Detective D'Amico gave prosecutors two other letters from healthcare

1  providers—one from Dr. Green and one from Dr. Brooke Greiner, "an experienced

2  pediatric occupational therapist who worked extensively with [Ms.] Chen and her son

3  J.L." (*see* Greiner Decl. (Dkt. # 134) ¶ 2)—that stated that Ms. Chen was doing her best

4  to address J.L.'s needs (*see* 1st Resp. at 13-14 (recognizing that "Dr. Green and Dr.

5  Greiner happened to include copies of their letters in their respective files turned over to

6  [Detective] D'Amico," which in turn were given to the KCPAO)). Similarly, Detective

7  D'Amico provided the KCPAO with a letter from Dr. Gbedawo's clinic, Vital Kids

8  Medicine, which stated that "[n]othing in our charting reflects any knowledge of neglect,

9  as we were unaware of any." (RED00767.)

10       Failing to include Dr. Gbedawo's additional letter, which bolstered information

11  Detective D'Amico had already provided to the KCPAO from Dr. Gbedawo's clinic as

12  well as other medical providers, does not constitute withholding "crucial information"

13  from the prosecutor. The withheld letter authored by Dr. Gbedawo is largely redundant

14  of the information already provided by her clinic. Similarly, the "perfunctory" phone call

15  with Dr. Green is not "crucial information" that could rebut the presumption. (*See* Green

16  Decl. ¶ 13-15.) This phone call was in addition to the medical records from Dr. Green

17  that Detective D'Amico provided to the KCPAO. (*Id*. ¶ 7; *see also* RED00563.)

18  Moreover, Dr. Green's opinion expressed over the phone is undermined by the fact that

19  his "last visit" with Plaintiffs was a phone consultation on April 1, 2013—over six

20  months before the relevant events. (*See* RED00565.) Thus, the court cannot say that

21  withholding the phone call with Dr. Green constituted a "crucial" omission.

22  *//*

The allegations here stand in contrast to cases where courts have found that omitted evidence rebutted the presumption of prosecutorial independence. For example, in *Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991), "the prosecutor had only the arresting officers' police reports available to him" when he filed charges. *Id.* at 1137. Likewise, in *Borunda v. Richmond*, 885 F.2d 1384 (9th Cir. 1988), "[t]he criminal prosecutor had no information available to him other than that contained in the police report submitted by appellants." *Id.* at 1390. Here, in addition to Detective D'Amico's report and probable cause certificate, Ms. Carlstrom had all of J.L.'s available healthcare records—totaling well over 1,000 pages—and files from other police officers and CPS. (*See* Carlstrom Decl. ¶ 4.) Ms. Carlstrom attests that she thoroughly reviewed all of this information, and that Detective D'Amico later supplemented those records. (Carlstrom Decl. ¶¶ 4-5.)

It is true that the presumption can be rebutted even when a prosecutor was provided evidence outside of the police reports. *See, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 483-84 (9th Cir. 2007); *Caldwell*, 889 F.3d at 1112-13. But in those cases, the prosecutors either did not review the outside evidence, *see Blankenhorn*, 485 F.3d at 483 (noting that the prosecutor "did not look at the video, relying instead on . . . police reports"), or the officer fabricated the outside evidence, *Caldwell*, 889 F.3d at 1112-13 (concluding there were triable issues whether (1) the officer manufactured a show-up that was designed to manipulate a witness's memory, and (2) the officer fabricated a statement from the defendant by falsifying notes).

//

Here, in contrast, it is undisputed that the City Defendants provided thousands of pages of evidence outside of the police report and that the KCPAO reviewed this evidence. Moreover, not only did City Defendants not falsify any evidence, they corrected evidence that others incorrectly recorded. Further, the evidence that City Defendants are accused of withholding is not crucial: the evidence constitutes a few pages of material that is either redundant or of limited value due to the perfunctory nature of the phone call and the fact that Dr. Green's last visit with Plaintiffs was over six months before the relevant events.

Again, the touchstone inquiry here is whether "the independence of the prosecutor's judgment has been compromised." *Beck*, 527 F.3d at 862. Viewing the evidence in the light most favorable to Ms. Chen, the court finds that the KCPAO's judgment was not compromised. The presumption of prosecutorial independence therefore applies.

Thus, the court GRANTS City Defendants' motion for summary judgment against Ms. Chen on counts I and IV of the complaint.

3. Qualified Immunity

City Defendants also move for summary judgment because Detective D'Amico is entitled to qualified immunity on all of Ms. Chen's 42 U.S.C. § 1983 claims. (1st MSJ at 11-24.)[5] Police officers "generally are shielded from liability for civil damages insofar as

---

[5] City Defendants do not argue that they are entitled to qualified immunity on Ms. Chen's § 1983 malicious prosecution claim. (*See generally* 1st MSJ.) The court therefore will not address this issue.

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether a police officer is entitled to qualified immunity, the court must decide: (1) whether the facts that the plaintiff alleges assert a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time the defendant engaged in the misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To determine whether a right was clearly established, "the standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified immunity." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) (quotation marks and citation omitted). Where a "genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Bonivert v. Clarkson*, 883 F.3d 865, 871-72 (9th Cir. 2017). Courts may consider the two prongs of the qualified immunity analysis in any order. *See Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011).

Further, "[a]n officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation." *Blankenhorn*, 485 F.3d at 481 n.12 (quoting *Chuman v. Wright,* 76 F.3d 292, 294-95 (9th Cir. 1996)). "[I]ntegral participation does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004). "But it does require

//

some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn*, 485 F.3d at 481 n.12 (citing *Boyd*, 374 F.3d at 780).

City Defendants' qualified immunity argument varies as to each of Ms. Chen's causes of action.  (*See* 1st MSJ at 11-24.)  The court will address the claims in turn.

### a. Judicial Deception

Ms. Chen asserts that Detective D'Amico fabricated and omitted material information from her probable cause certificate and police report.  (*See* FAC ¶¶ 132-45.) Without these fabrications and omissions, Ms. Chen alleges, there was not probable cause to arrest her.  (*Id.*)  Therefore, Ms. Chen claims that Detective D'Amico caused her unlawful arrest in violation of the Fourth Amendment.  (*Id.*)  Although styled as an "unlawful arrest" claim in the complaint (*see id.*), Ms. Chen recharacterizes it as a "claim for judicial deception" in her summary judgment response.  (*See* 1st Resp. at 22; *see also* 3/27/18 Order at 22 ("Based on those allegations, Plaintiffs appear to assert a judicial deception claim").)

For a judicial deception claim to survive summary judgment on the ground of qualified immunity, Ms. Chen "must 1) make a 'substantial showing' of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the [arrest] would not have occurred." *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (citing *Hervey v. Estes*, 65 F.3d 784, 788-89 (9th Cir. 1995)).  Courts "must test and interpret affidavits which underlie an arrest in a 'commonsense and realistic fashion.'" *United States v. Esparza*, 546 F.2d 841, 843 (9th Cir. 1976) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).  Moreover, "not all inaccuracies in an

investigative report give rise to a constitutional claim." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (citing *Black v. Montgomery Cty.*, 835 F.3d 358, 372 (3d Cir. 2016)). False statements and omissions are material if the probable cause affidavit, "once corrected and supplemented," would not support probable cause. *Chism*, 661 F.3d at 389.

Ms. Chen alleges that Detective D'Amico's probable cause certificate contains nine material misstatements and omissions that evidence Detective D'Amico's deliberate and reckless conduct.[6] The court will address each of these statements individually and then analyze whether, when considered individually or together, they allow Ms. Chen's judicial deception claim to survive summary judgment.

*(1) "All other causes of J.L.'s condition aside from malnutrition had been ruled out."* (1st Resp. at 24 (citing PCC at RED00027).) Ms. Chen argues that numerous medical records state the opposite: that causes besides malnutrition must be ruled out before determining the cause of J.L.'s condition. (*See* 1st Resp. at 24 (citing RED00415, RED00976).) However, the disputed statement from Detective D'Amico's probable cause certificate is supported by the SCAN team's finding that "[J.L.] has been doing very well and gaining weight since coming to [SCH]. All other causes and labs to explain weight loss have been negative." (Riensche Decl. ¶ 3, Ex. 17 (sealed).) Further,

---

[6] Ms. Chen lists these alleged misstatements and omissions in bullet points, which she construes as giving her license to make her relevant arguments in single-space type for almost two pages of her response. (*See* 1st Resp. at 24-25.) This violates the local rules. *See* Local Rules W.D. Wash. LCR 10(e)(1) ("The text of any typed or printed brief must be 12 point or larger and must, with the exception of quotations, be double spaced."). Ms. Chen's transgression is especially egregious considering that the court granted her leave to file an overlength response brief. (*See* 4/1/19 Order (Dkt. # 148).) The court will not tolerate such flouting of its rules moving forward.

some of the records that Ms. Chen relies on explicitly reference J.L.'s malnutrition and Ms. Chen's caregiving as the likely cause of J.L.'s condition. (*See* RED00415 (notes from SCH stating that J.L. "has a constellation of symptoms . . . of unclear etiology, although some of these may be related to chronic malnutrition or inappropriate supplements," and that J.L.'s "poor weight gain [is] likely due to malnutrition and possible child neglect"); RED00975-76 (SCAN team notes stating that "other etiologies must be ruled out" to explain J.L.'s "significantly distended abdomen," though "[i]t is thought that this could potentially be due to his severe state of poor nutrition," and that "it does seem that there is an element of neglect given his current nutritional status").)

(2) *"Further investigation revealed [Ms.] Chen restricted J.L. from eating many things such as carbohydrates although she was never told J.L. could not have carbohydrates by any doctor."* (1st Resp. at 24 (citing PCC at RED00027).) Ms. Chen argues that this statement is false or "extremely misleading" because Ms. Chen did not prevent J.L. from eating carbohydrates and because J.L.'s doctors had recommended a low-carbohydrate diet. (1st Resp. at 24.) But it is undisputed that Ms. Chen reduced J.L.'s carbohydrate intake. (*See id.*) It is also undisputed that Dr. Green recommended in April 2013 to "increase [to J.L.'s] carbohydrate intake." (RED00565.) Moreover, Ms. Chen told SCH providers that J.L. "cannot eat many foods, including carbohydrates or sugar," but she was unable to "identify any food that he does eat." (RED00927-28.)

(3) *"[Ms.] Chen had also brought J.L. to 14 different healthcare providers in a two year period and she refused to share information amongst these providers. This made it nearly impossible to have continuous care and left J.L. not being monitored for*

*both weight and developmental gains by any one provider."* (1st Resp. at 24 (citing PCC at RED00027).)  Ms. Chen argues that J.L. only "had a small number of primary providers" and that she "did not prevent communication among these providers." (1st Resp. at 24.)  Further, Ms. Chen argues that J.L. was being regularly monitored by his primary provider—presumably Dr. Gbedawo. (*Id.*; *see also* Gbedawo Decl. ¶ 7 (noting nine appointments with J.L. between April 2013 and October 2013).)  But the 10-pages of medical records Dr. Gbedawo provided to Detective D'Amico did not make it clear that Dr. Gbedawo was coordinating J.L.'s care or monitoring his weight gain and development. (*See* RED00770-79.)  Nor does Dr. Gbedawo's undisclosed monitoring negate that J.L. saw at least 14 different healthcare providers.  Moreover, the medical records are full of examples of Ms. Chen's "obstructionist" behavior (RED00930); her requests that medical reports "not be sent to referring provider or Kindering Center, only to her" (RED00225); that Ms. Chen "specified to NOT send report to" one of J.L.'s providers (D'Amico Decl. ¶ 6, Ex. J (sealed) at RED00232); that Ms. Chen was "very reluctant" to disclose J.L.'s list of medications and supplements to a medical provider (D'Amico Decl. ¶ 6, Ex. P (sealed) at RED00907); that Ms. Chen "was not providing [a] full history" (Riesche Decl. ¶ 3, Ex. 18 (sealed) at CHEN0005739); and that Ms. Chen was "evasive," "had her own agenda," refused to allow the tests that doctors recommended, and would "not reveal the extensive past evaluations that were done by specialists at SCH" (RED00762).  Further, in a discussion between two of J.L.'s providers, one of them was "concerned that family has been going from dr to dr but that pt is not actually receiving appropriate medical attention." (RED00397; RED00105-06.)

The record contains additional examples that support this statement from the probable cause certificate. (*See* 1st MSJ at 15-17 (citing medical records).)

(4) *"[Ms.] Chen acted in a manner which created an imminent risk of great bodily harm to J.L., causing him to be admitted to [SCH] for approximately three weeks."* (1st Resp. at 24 (citing PCC at RED00027).) As the court already discussed, J.L.'s gross malnutrition, Ms. Chen's "erratic and obstructionist behavior," J.L.'s ultimate ability to tolerate "a full diet with no signs or symptoms of food allergy or intolerance," and medical providers implicating Ms. Chen as a potential cause for J.L.'s condition support a finding that Ms. Chen acted in a manner which created an imminent risk of great bodily harm to J.L. *See supra* § III.C.1. The court recognizes that J.L. was kept at SCH for 15 days (October 24 through November 7), rather than the "approximately three weeks" that Detective D'Amico wrote in her certificate, though the court also recognizes that J.L. had numerous medical appointments starting on October 19, 2013. (*See* RED01138.)

(5) *"There is also probable cause to believe [Ms. Chen] withheld basic necessities of life to [sic] including nutrition as [J.L.] was diagnosed as grossly malnourished and dehydrated upon arrival at Seattle Children's Hospital."* (1st Resp. at 25 (citing PCC at RED00027).) Ms. Chen argues that this statement is false or misleading because J.L. had been extremely sick for several days before Ms. Chen took him to SCH, where J.L. was diagnosed as non-emergent. (1st Resp. at 25.) Ms. Chen also argues that this statement falsely attributes the responsibility for J.L.'s nutrition to Ms. Chen even though Mr. Lian was primarily involved in feeding J.L. (*Id.*) As discussed, SCH allowed Ms. Chen and Mr. Lian to take J.L. home on October 20, 2013, because J.L. did not have "hypertensive

emergency at this time and does not meet the eminent risk criteria for medical hold," but based on the understanding that they would immediately follow up with Dr. Halamay. (*See* RED00374-75.) SCH's notes from that visit also reveal that J.L. was diagnosed with "failure to thrive," that his lab results are "improved but not normal," and that "he would benefit from having a coordinated workup that includes endocrinology, gastroenterology, and nephrology to aid with diagnosis and management of his chronic issues." (*Id.*) Further, by October 24, 2013—after Ms. Chen took J.L. to the hospital only after CPS's encouragement—SCH doctors diagnosed J.L. with "failure to thrive . . . [and] gross malnutrition and muscle wasting. Concern for medical cause of wasting vs. neglect." (RED00792.) J.L. was then admitted to SCH's general medicine service to treat his malnutrition and receive a SCAN team consultation. (*Id.*) On November 5, 2013, the SCH medical staff advised the SCAN team that J.L. was "severely malnourished" (RED00816), and even had J.L. been on a special diet, "he would not have been left malnourished and dehydrated" (D'Amico Report at RED00014). It is true that the probable cause certificate statement did not account for Mr. Lian's role as primarily being involved with feeding J.L. However, Detective D'Amico's police report, which was simultaneously transmitted to the KCPAO, notes that "[Mr. Lian] does most of the cooking." (*Id.* at RED00012.)

(6) *Detective D'Amico failed to disclose J.L.'s autism and the extensively documented, complex co-morbidities resulting from that condition, including chronic GI issues.* (*See* 1st Resp. at 25.) Detective D'Amico's certificate does not mention that J.L. was diagnosed with autism. (*See generally* PCC.) Nor does Detective D'Amico mention

that GI issues are common with autism. (*See id.*) But Detective D'Amico transmitted J.L.'s available medical records to the KCPAO with her probable cause certificate. These files included records from Lakeside Center for Autism. (*See* Carlstrom Decl. ¶ 4.) Detective D'Amico's police report also mentions that J.L. was diagnosed with autism. (*See* D'Amico Report at RED00018.) Moreover, Detective D'Amico submitted a "Detective/Officer Comment Sheet" to the KCPAO along with her probable cause certificate, in which she stated: "A problem with this case is that it is nearly impossible to differentiate between the developmental delays the victim was born with versus the developmental delays he has suffered as a result of prolonged malnutrition." (D'Amico Decl. ¶ 6, Ex. D ("Comment Sheet") at RED00024.)

*(7) Detective D'Amico failed to disclose that none of the medical providers with the most experience with Ms. Chen and J.L. and the most knowledge of his medical conditions believed that Ms. Chen had anything to do with his condition.* (*See* 1st Resp. at 25.) The probable cause certificate did not mention Dr. Green, Dr. Gbedawo, or Dr. Greiner's belief that Ms. Chen did not cause J.L.'s condition. (*See id.*) However, as discussed above, Detective D'Amico provided the KCPAO with letters from Dr. Green and Dr. Greiner, as well as a letter from Dr. Gbedawo's clinic, that supported Ms. Chen. *See supra* § III.C.2.

*(8) Detective D'Amico failed to disclose that Pedialyte caused J.L. significant GI distress.* (*See* 1st Resp. at 25.) Ms. Chen argues that the probable cause certificate should have mentioned J.L.'s adverse reaction to Pedialyte. (*Id.*) City Defendants argue, however, that it would make little sense to mention J.L.'s reaction to Pedialyte when the

probable cause certificate made no mention that Ms. Chen took Pedialyte away from J.L. (1st Reply at 13.)

(9) *Detective D'Amico failed to disclose that because J.L. was sick, Ms. Chen had taken J.L. to multiple doctors and the emergency room just days before he was removed, and that the hospital discharged him as non-emergent.* (*See* 1st Resp. at 25.) Ms. Chen's allegation here is similar to her argument about statement (5). The court will not rehash the arguments.

Considering each of these statements individually as well as together, and viewing the evidence in the light most favorable to Ms. Chen, the court concludes that Ms. Chen has not made a "substantial showing" that Detective D'Amico exhibited deliberate falsehood or reckless disregard for the truth. *See Liston*, 120 F.3d at 973. For example, regarding the first statement in dispute, Detective D'Amico's statement that "[a]ll other causes of J.L.'s condition aside from malnutrition had been ruled out" is supported by numerous statements in the records, including the SCAN team's finding that "[J.L.] has been doing very well and gaining weight since coming to [SCH]. All other causes and labs to explain weight loss have been negative." (*See* Riensche Decl. ¶ 3, Ex. 17 (sealed); *see also* RED00415, RED00975-76.) Likewise, the court concludes that, had the probable cause certificate been corrected or supplemented in the areas where it did not perfectly capture the thousands of pages of medical evidence, there still was probable cause to charge Ms. Chen. *See Chism*, 661 F.3d at 389. Again, regarding the first disputed sentence—had Detective D'Amico supplemented the probable cause certificate with the full statements that Ms. Chen cites, there still would have been probable cause to

charge Ms. Chen.  (*See, e.g.*, RED00415 (notes from SCH medical provider stating that J.L. "has a constellation of symptoms . . . of unclear etiology, although some of these may be related to chronic malnutrition or inappropriate supplements," and that J.L.'s "poor weight gain likely due to malnutrition and possible child neglect.").)  The other inaccuracies in the probable cause certificate—*e.g.*, saying that J.L. was in the hospital for "approximately three weeks" instead of 15 days—likewise do not evidence deliberate or reckless falsehoods on Detective D'Amico's behalf and, additionally, were not material to the finding of probable cause.  *See Esparza*, 546 F.2d at 843 (explaining that courts "must test and interpret affidavits which underlie an arrest in a 'commonsense and realistic fashion.'").  The court therefore GRANTS City Defendants' motion for summary judgment against Ms. Chen on count I of the complaint based on qualified immunity.

### b.  Deliberate Fabrication

Ms. Chen claims that Detective D'Amico "deliberately fabricated evidence that was used to criminally charge and prosecute" her, including by making material false statements and omitting material exculpatory information in her police report, probable cause certificate, and communications with prosecutors.  (*See* FAC ¶¶ 146-54; 1st Resp. at 27.)  Ms. Chen also claims that Detective D'Amico used coercive and abusive interview techniques to yield false information.  (*See id.*)

"The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official."  *Spencer*, 857 F.3d at 793.  Deliberate fabrication can be established by direct or circumstantial evidence.  *Id.*  To prevail on a deliberate fabrication claim, "a

plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Id.* at 798 (citing *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010)).

Similar to the discussion in the prior section, the court concludes that, even when viewing the evidence in the light most favorable to Ms. Chen, Detective D'Amico did not deliberately fabricate evidence. *See supra* § III.C.3.a. In fact, in one instance that is at the heart of the KCPAO's decision to charge Ms. Chen, even though the SCAN team mistakenly wrote that Ms. Chen refused to admit J.L. to the emergency room on October 20, 2013 (*see* Exception Justification at 14), Detective D'Amico correctly noted that J.L. "had stabilized and therefore he was discharged" (*see* D'Amico Report at RED00011).

Ms. Chen also argues that Detective D'Amico's failure to use an interpreter when interviewing her and Mr. Lian evidences deliberate fabrication of evidence. (1st Resp. at 27-28.) Ms. Chen claims that, due in part to the lack of an interpreter, Detective D'Amico's "description of this interview in the police report is inaccurate and misleading." (*Id.*) Specifically, Ms. Chen alleges that the police report incorrectly states that J.L. does not eat "bread, crackers, or fruit," that certain supplements in the pantry were for Ms. Chen's skin, that "there appeared to be no extracurricular activities" even though Ms. Chen said she took J.L. "to the park, playground, library and other places for activities," and that Ms. Chen would "discipline" J.L. for eating foods he was not supposed to have." (Chen Decl. ¶¶ 39-41; *see also* D'Amico Report at RED00012-13.)

"[A]n interviewer who deliberately mischaracterizes witness statements in her investigative report . . . commits a constitutional violation," but "not all inaccuracies in an

investigative report give rise to a constitutional claim." *Spencer*, 857 F.3d at 798

(quoting *Costanich*, 627 F.3d at 1111). "Mere careless[ness] is insufficient, as are

mistakes of tone." *Id.* (quotation marks and citations omitted). Further, "[e]rrors

concerning trivial matters cannot establish causation, a necessary element of any § 1983

claim." *Id.* Further, "mere allegations that Defendants used interviewing techniques that

were in some sense improper, or that violated state regulations, without more, cannot

serve as the basis for a claim under § 1983." *Devereaux v. Abbey*, 263 F.3d 1070, 1075

(9th Cir. 2001) (en banc).

Here, Detective D'Amico explicitly stated before discussing her interview with

Ms. Chen and Mr. Lian that "[i]t was apparent [Ms. Chen] spoke English as a second

language and we had some trouble communicating." (D'Amico Report at RED00012;

*see also* Comment Sheet at RED00024 ("The family is from China and that is their first

language.").) Further, Detective D'Amico qualified all the statements for which Ms.

Chen takes issue. For example, Detective D'Amico's report states that J.L. did, in fact,

eat some gluten-free bread. (*See* D'Amico Report at RED00012 ("I saw a bag of

gluten-free bread and asked [Ms. Chen] if [J.L.] was able to have any of those. [Ms.

Chen] pointed the [sic] nutritional label and advised she couldn't give him much.").) The

statement regarding the supplements is similarly qualified (*see id.* ("[Ms. Chen] told me

some of the supplements were for her skin")), as well as "trivial" and therefore unable to

establish § 1983 causation, *see Spencer*, 857 F.3d at 798. Likewise, Detective D'Amico

said "[i]t appeared there were no extracurricular activities or anything outside of school

for [J.L.] and [L.L.]," which is not inconsistent with Ms. Chen's alleged statement that

she took J.L. outside the home for activities.  (*See* D'Amico Report at RED00012; Chen

Decl. ¶ 41.)  Lastly, Detective D'Amico's comments about potential physical abuse were

similarly qualified:

> [Ms. Chen] informed me if [J.L.] would try to get food that he was not supposed to have, he would be disciplined for it. [Ms. Chen] made somewhat of a swatting gesture with her hand as if she was demonstrating what she would do to [J.L.]  I asked her how [J.L.] would be disciplined, and she couldn't give me a clear answer.  I asked her if she physically punishes [J.L.] for trying to eat food she doesn't allow him to eat, and she began to talk about another topic.

(D'Amico Report at RED00012.)  Moreover, Detective D'Amico stated shortly thereafter

in her report that "[Ms. Chen] also went on to say how much she cares for [J.L.] and that

she takes him to the doctor all the time."  (*Id.*)  In short, the court does not find that

Detective D'Amico deliberately mischaracterized Ms. Chen (or Mr. Lian's) statements in

her investigative report.  To the contrary, she noted that English was their second

language and qualified her report to show her lack of certainty regarding Ms. Chen's and

Mr. Lian's statements.

This stands in contrast to instances where courts found that an officer was not

entitled to qualified immunity because there was a genuine issue on whether he or she

deliberately fabricated evidence.  For example, the Ninth Circuit determined that an

officer was not entitled to qualified immunity where she indicated in her police report

that she had interviewed 34 people, but "later admitted that she had made only brief

contact with eighteen of the individuals listed," including misrepresenting that she

interviewed doctors central to the case.  *See Costanich*, 627 F.3d at 1112.  Similarly, a

court declined to award an officer qualified immunity where the officer wholly created

statements by a witness and the witness denied providing any information on the topics. *See McSherry v. City of Long Beach*, 560 F.3d 1125, 1130 (9th Cir. 2009); *Spencer*, 857 F.3d at 798 ("[The officer's] investigative reports contained scores of quotations attributed to Kathryn and Matthew, both of whom unequivocally testified at trial that they had never made those statements.").  Here, in contrast, Detective D'Amico's alleged misstatements—to the extent there were any—followed her preamble that English was not Ms. Chen's first language and were qualified in ways to show her lack of certainty.  Moreover, Detective D'Amico did not wholly fabricate statements; rather, in viewing the evidence in a light most favorable to Ms. Chen, the inaccuracies in Detective D'Amico's report show mere "careless[ness]," "mistakes of tone," and/or involve trivial matters that cannot form the basis of a § 1983 claim.  *See Spencer*, 857 F.3d at 798.

The court therefore GRANTS City Defendants' motion for summary judgment against Ms. Chen on count II of the complaint based on qualified immunity.

### c.  Selective Enforcement

Ms. Chen brings a Fourteenth Amendment selective enforcement claim against Detective D'Amico alleging that, in short, Ms. Chen was targeted by Detective D'Amico "due to her gender and her assumed gender role as J.L.'s mother."  (1st Resp. at 28-29; FAC ¶¶ 155-68.)

To prevail on a selective enforcement claim, "a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose."  *Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012) (quotation marks and citation omitted).  "In order to prove discriminatory effect, 'the

claimant must show that similarly situated individuals . . . were not prosecuted.'" *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Individuals are similarly situated "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Ford*, No. 3:14-cr-00045-HZ, 2016 WL 4443167, at *4 (D. Or. Aug. 22, 2016) (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)). The standard for proving discriminatory effect "is a demanding one." *Id.* (quotation marks and citation omitted). Discriminatory intent requires that the prosecutor took a course of action at least in part because of "its adverse effects upon an identifiable group." *Id.* at *7 (quotation marks omitted).

Ms. Chen alleges that she and Mr. Lian are similarly situated. (*See* 1st Resp. at 29.) Yet, according to Ms. Chen, Detective D'Amico treated her differently despite knowing that CPS sought to remove J.L. and L.L. from both Ms. Chen's and Mr. Lian's custody, that Mr. Lian frequently accompanied Ms. Chen to J.L.'s medical appointments, and that, if anything, Mr. Lian was more responsible for J.L.'s nutrition. (*See id.* at 28-29.) Ms. Chen argues that the reasonable inference is that Detective D'Amico pursued Ms. Chen and not Mr. Lian because of unlawful gender bias and socially constructed beliefs about gender roles. (*Id.* at 29.)

City Defendants argue that Ms. Chen was originally brought to their attention by SPD, SCH, and CPS, which reported that Ms. Chen—not Mr. Lian—attempted to interfere with J.L.'s care, showed hostility toward J.L. in therapy sessions, and showed signs of Munchausen by Proxy. (1st MSJ at 21-22; D'Amico Decl. ¶ 3, Ex. A at

RED0002, Ex. F at RED00038; CPS Docs at RED00051.)  City Defendants also point

out that the KCPAO based its charging decision against Ms. Chen on (1) a mistaken

belief that Ms. Chen failed to take J.L. to emergency care immediately when

recommended by physicians on October 19, 2013; (2) the fact that Ms. Chen took

Pedialyte away from J.L. against SCH's medical providers' orders; and (3) Ms. Chen's

pattern of taking J.L. to see multiple providers who were not coordinating J.L.'s care.

(*See* 1st MSJ at 22; Exception Justification at 13.)  At least the first and second factors

only implicate Ms. Chen.  Further, the KCPAO charged Ms. Chen for actions that

occurred between October 19 and 24, 2013.  (*See* Carlstrom Decl. ¶ 3, Ex. A.)  In that

time-period, five medical providers recommended taking J.L. to emergency care—those

records mention that Ms. Chen was at all five appointments, while Mr. Lian was at just

two.  (*See* 1st MSJ at 22 (citing records).)  Further, certain records from that time-period

implicate "mother's resistance to medical evaluation in this ill child," but do not mention

Mr. Lian.  (*See, e.g.*, RED00930.)

The court finds that there is no genuine dispute of material fact that there were

"distinguishable legitimate prosecutorial factors that might justify" making different

prosecutorial decisions with respect to Ms. Chen and Mr. Lian.  *See Ford*, 2016 WL

4443167, at *4.  The court therefore GRANTS City Defendants' motion for summary

judgment against Ms. Chen on count III of the complaint based on qualified immunity.

### d.  Substantive and Procedural Due Process

"Parents and children have a well-elaborated constitutional right to live together

without governmental interference.  That right is an essential liberty interest protected by

the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Hardwick v. Cty. of Orange*, 844 F.3d 1112, 1116 (9th Cir. 2017) (internal quotation marks and citation omitted). A plaintiff has a due process right protecting him or her "against deliberate government use of perjured testimony and fabricated evidence in [a] dependency court proceeding" that is designed to separate the plaintiff from his or her immediate family. *Id.*

Here, Ms. Chen alleges that Detective D'Amico "participat[ed] in the deprivation of Plaintiffs' due process rights pertaining to the removal of J.L. and L.L., and the family's right to be free of interference." (1st Resp. at 30; *see also* FAC ¶¶ 186-208.) Ms. Chen claims that Detective D'Amico did so by "conduct[ing] a flawed and biased investigation, and prepar[ing] a false and misleading report and [probable cause certificate], which falsely implicated [Ms.] Chen in wrongdoing and led to her prosecution for felony child abuse." (1st Resp. at 30.) These allegations relate to the KCPAO's criminal proceedings against Ms. Chen, not the dependency action that deprived Ms. Chen of the rights at issue in this claim. But, Ms. Chen points out that, once the criminal case against her was terminated, the AGO dismissed the dependency action. (*See id.*; Lo Decl. ¶ 9, Ex. S.) Thus, although Detective D'Amico did not directly participate in the dependency proceedings, Ms. Chen claims that Detective D'Amico's actions make her at least an "integral participant" in the deprivation of Ms. Chen's due process rights and therefore liable under § 1983. (1st Resp. at 31); *Blankenhorn*, 485 F.3d at 481 n.12.

City Defendants argue that Ms. Chen's due process claims are "frivolous" because Detective D'Amico never testified or presented evidence at any dependency proceeding.[7] (1st MSJ at 22-23; FAC ¶¶ 187(a), 200(a).)  In addition, City Defendants assert that Ms. Chen has not provided sufficient authority or evidence to support her claims that the criminal investigation and proceedings prolonged the dependency action, that the dependency action itself was an "unlawful intrusion," or that Detective D'Amico was an integral participant in any alleged unlawful intrusion.  (Reply at 15-16.)

Ms. Chen's due process claims fail.  It is undisputed that Detective D'Amico did not testify or present evidence at the dependency proceedings.  (*See* 1st MSJ at 22-23; 1st Resp. at 30-31.)  Ms. Chen instead argues that Detective D'Amico should be implicated in the dependency action because Detective D'Amico "was communicating with CPS at the time [of the dependency proceedings], and was knowledgeable of the dependency proceedings, and the theories of the facts held by CPS social workers."  (1st Resp. at 30 (citing Lo Decl. ¶¶ 10-11, Exs. T-U).)  But the evidence Ms. Chen cites in no way shows that Detective D'Amico "participated in" or "facilitated" the dependency proceedings.  (*See* 1st Resp. at 30.)  The evidence involves emails from a DSHS representative updating Detective D'Amico on the status of J.L. in foster care and Ms. Chen's and Mr. Lian's lack of cooperation with DSHS (*see* Lo Decl. ¶ 10, Ex. T), and emails between

//

---

[7] City Defendants make a one-sentence argument in a footnote that this claim is untimely because it is based on allegations of fact that were not made in the original complaint.  (*See* 1st MSJ at 23, n.4.)  City Defendants do not cite sufficient law or facts on which the court could decide this assertion.  The court therefore will not address this argument at this time.

Ms. Carlstrom and Detective D'Amico in which Ms. Carlstrom says she received numerous emails from DSHS (*see* Lo Decl. ¶ 11, Ex. U).

Moreover, neither the October 28-30, 2013, 72-hour dependency hearing, nor Ms. Chen's late-November 2013 motion for revision of the shelter care order (*see* FAC ¶ 62) could have relied on Detective D'Amico's police report or probable cause certificate because Detective D'Amico did not author these documents until December 9, 2013 (*see* D'Amico Report at RED00019; PCC). Regardless, the court has already determined that Detective D'Amico did not present a "false and misleading" information in these documents. *See surpa* § III.C.3.b; (1st Resp. at 31.) Thus, even if the dependency proceedings relied on Detective D'Amico's police report or probable cause certificate— which Ms. Chen has not presented any evidence to support—such reliance would not be a due process violation. *See Hardwick*, 844 F.3d at 1116 (explaining that a plaintiff has a due process right protecting him or her "against deliberate government use of perjured testimony and fabricated evidence in [a] dependency court proceeding").

Detective D'Amico was also not an "integral participant" in the alleged unlawful intrusion into Ms. Chen's right to be with J.L. (*See* 1st Resp. at 31.) The cases Ms. Chen cites for this proposition are off base. For example, in *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018), officers were considered integral participants in an unlawful entry where, even though they did not lead the unlawful entry into the home, they "developed a plan of entry" with the officer who first entered, "provided armed backup" as that officer broke into the back door, and entered the home directly after the lead officer. *Id.* at 879; *see also Blankenhorn*, 485 F.3d at 481 n.12 (explaining that an officer

who arrived at the scene after the arrest was completed "did not participate in any integral way in the arrest," but an officer who handcuffed the plaintiff was an integral participant in a later excessive use of force made possible by the handcuffing).  Here, Detective D'Amico was not in any way a participant—let alone an integral participant—in the dependency action.

Detective D'Amico's participation in the criminal proceedings does not change that fact.  At best, Ms. Chen's claim is that Detective D'Amico's probable cause certificate and police report helped convince the KCPAO to initiate criminal proceedings, which helped convince the AGO to prolong the dependency action.  Again, this argument ignores that the dependency proceedings began before Detective D'Amico drafted or submitted the certificate or report.  (*See* FAC ¶ 52; D'Amico Report at RED00019.)

Finally, and fundamentally, Ms. Chen fails to allege that an "unlawful intrusion" occurred as the result of the dependency hearing.  (*See generally* FAC; 1st Resp.)  Certainly, a dependency hearing that removes a child from his or her parents' custody is not in and of itself a constitutional violation.  *See Santosky v. Kramer*, 455 U.S. 745, 758 (1982) (discussing that parental rights termination proceedings are valid so long as parents receive due process).  And, as discussed, there is no genuine dispute of fact that Detective D'Amico did not violate Ms. Chen's due process rights at the dependency hearing, such as by causing or presenting "perjured testimony" or "fabricated evidence." *See Hardwick*, 844 F.3d at 1116.

The court therefore GRANTS City Defendants' motion for summary judgment against Ms. Chen on counts V and VI of the complaint based on qualified immunity.

**D.  City Defendants' Motion Against Mr. Lian, J.L., and L.L.**

City Defendants move for summary judgment against Mr. Lian, J.L., and L.L. (collectively referred to as "Mr. Lian" for purposes of this section) on all seven claims asserted against City Defendants, as well as City Defendants' malicious prosecution counterclaim.  (*See generally* 2d MSJ.)  City Defendants first argue that Mr. Lian only has standing to assert the substantive and procedural due process claims, and therefore the other claims should be dismissed.  (*Id.*)  Mr. Lian explains, however, that he only brings the due process claims, and therefore City Defendants' request for summary judgment against him on the other causes of action is moot.  (*See* 2d Resp. at 28.)  The court agrees and DENIES as moot City Defendants' request for summary judgment on counts I, II, III, IV, and VIII against Mr. Lian.

The court addresses the remaining portions of City Defendants' motion in turn.

1.  Substantive and Procedural Due Process

Mr. Lian's substantive and procedural due process claims are identical to those articulated by Ms. Chen.  (*See* FAC ¶¶ 186-208.)  For the reasons articulated above with respect to City Defendants' motion against Ms. Chen, the court GRANTS City Defendants' motion for summary judgment against Mr. Lian on counts V and VI of the complaint based on qualified immunity.  *See surpa* § III.C.3.d.  It is undisputed that Detective D'Amico did not testify or present evidence at the dependency proceedings.[8]

_____

[8] Mr. Lian claims that Detective D'Amico's probable cause certificate should be considered "testimony."  (*See* 2d Resp. at 22.)  But, as stated, this ignores that the certificate was created on December 9, 2013 (*see* PCC), well after the late-October 2013 dependency hearing, and therefore could not have been used as "testimony" at the dependency hearing.

*Id.* Detective D'Amico was also not an "integral participant" in the alleged unlawful intrusion into Ms. Chen's right to be with J.L. *Id.* Lastly, Mr. Lian fails to support the allegation that Detective D'Amico caused an "unlawful intrusion" to occur as the result of the dependency hearing. *Id.*

Mr. Lian makes an additional argument that Ms. Chen avoided: Detective D'Amico violated his due process rights by failing to disclose all evidence in her possession that might have been favorable. (*See* 2d Resp. at 26-27; *cf.* 1st Resp. at 30-31 (explaining that "[Ms.] Chen is not challenging the disclosure of exculpatory information to her").) Mr. Lian equivocates on what ground he asserts this argument, though it appears he is claiming a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (2d Resp. at 26-27.) "In order to prevail on a *Brady* claim, a defendant must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted." *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006). There was no *Brady* violation in this case.

The evidence that Mr. Lian claims was withheld consists of: (1) medical records from Dr. Gbedawo that Dr. Gbedawo never provided to Detective D'Amico in the first place and (2) the phone call with Dr. Green.[9] (*Id.* at 27 & n.140; *see also* 2d Reply at 10 n.4 (explaining that the Evergreen Center records that Mr. Lian identifies in footnote 140

---

[9] City Defendants note in their response to Plaintiffs' summary judgment motion that Mr. Lian's interrogatories also allege that Detective D'Amico withheld exculpatory information concerning SCH and Dr. Halamay. (*See* 3d Resp. at 19; Riensche Decl. ¶ 3, Ex. 7 at 55-58.) The court addresses the SCH and Dr. Halamay information below. *See infra* § III.E.

as being withheld were in fact provided, but there was an "oversight" that failed to initially account for these records).) Obviously Detective D'Amico did not suppress evidence that she never had. And, as discussed, no "prejudice resulted" from Detective D'Amico's failure to disclose the call with Dr. Green. *See supra* § III.C.2. The lack of prejudice is underscored by the fact that both Dr. Green and Gbedawo testified and submitted letters at the 72-hour dependency hearing. (*See* FAC ¶ 59; Riensche Decl. ¶ 2, Ex. 8 at CHEN0005996-6000.)

Even if all three *Brady* factors were met, there still is no *Brady* violation because Mr. Lian was "aware of the essential facts enabling him to take advantage of any exculpatory evidence." *Raley*, 470 F.3d at 804 (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)). In *Raley*, for example, the defendant did not have a viable *Brady* claim on the prosecution's alleged withholding of medical records because the defendant knew about his own medical visits and prescriptions, which was "sufficient to alert defense counsel to the probability" that the disputed medical records existed. *Raley*, 470 F.3d at 804. Here, Mr. Lian was aware that J.L. had visited Dr. Gbedawo and Dr. Green, which made him "aware of the essential facts enabling him to take advantage of any exculpatory evidence." *Id.*

The court therefore GRANTS City Defendants' motion for summary judgment against Mr. Lian on counts V and VI of the complaint based on qualified immunity. Deciding the claims on qualified immunity, the court does not address the other due process arguments presented by the parties.

//

2. Malicious Prosecution Against Mr. Lian, J.L., and L.L.

City Defendants also move for summary judgment against Mr. Lian based on City Defendants' malicious prosecution counterclaim. (2d MSJ at 19-21; Countercl. at 23-28.)

A party may bring a malicious prosecution counterclaim on the ground that the original tort action "was instituted with knowledge that the same was false, and unfounded, malicious and without probable cause in the filing of such action, or that the same was filed as a part of a conspiracy to misuse judicial process by filing an action known to be false and unfounded." RCW 4.24.350(1). A law enforcement officer bringing a malicious prosecution claim pursuant to RCW 4.24.350 still must prove the remaining common law elements of malicious prosecution except for arrest, seizure, damages, or termination or abandonment of the proceedings in the officer's favor. *See Nguyen v. Cty. of Clark*, No. C10-5267BHS, 2011 WL 181393, at *2-3 (W.D. Wash. Jan. 19, 2011). Therefore, the relevant malicious prosecution elements include:

> (1) that the prosecution claimed to have been malicious was instituted or continued by the defendant; (2) that there was want of probable cause for the institution or continuation of the prosecution; (3) that the proceedings were instituted or continued through malice; . . . and ([4]) that the plaintiff suffered injury or damage as a result of the prosecution.

*Id.*; *see also Hanson*, 852 P.2d at 298. A plaintiff can show malice in a malicious prosecution case by establishing that "the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff." *Nguyen*, 2011 WL 181393, at *4.

City Defendants argue that Mr. Lian's due process claims are frivolous because Mr. Lian knew when he filed the claims that: (1) Detective D'Amico did not testify or

present evidence in the dependency action; (2) the AGO was aware of Plaintiffs' contentions regarding Dr. Green's and Dr. Gbedawo's dietary advice, as well as the records from other medical providers; (3) CPS—not RPD—was investigating the dependency matter for the AGO; and (4) he had no evidence of any medical record being submitted to Detective D'Amico that recommended reducing J.L.'s carbohydrate intake. (2d MSJ at 19-20.)

Mr. Lian claims that "[t]hese facts are in dispute." (2d Resp. at 29.) Mr. Lian explains that, by "testifying and providing evidence at the dependency hearing," Mr. Lian meant that Detective D'Amico "wrongfully facilitated the dependency actions." (*Id.* at 22.) Mr. Lian further states that he based his claims on the fact that Detective D'Amico communicated with the KCPAO and CPS, and that CPS relied in part on the KCPAO for its dependency proceedings as evidenced by the AGO terminating the proceedings after the KCPAO dropped the criminal case. (*See id.*; *see also* Lo Decl. ¶¶ 10-11, Exs. T-U.) Further, at least Dr. Green's medical records that were submitted to Detective D'Amico recommended restricting J.L.'s carbohydrate intake. (*See* RED00575.)

At this stage, viewing the evidence in the light most favorable to Mr. Lian, the court finds that there is a genuine dispute of material fact whether Mr. Lian instituted his due process claims "with knowledge that the same was false, and unfounded, malicious and without probable cause." RCW 4.24.350(1). The court likewise concludes that there is a genuine dispute of material fact whether Mr. Lian's claims were "filed as a part of a conspiracy to misuse judicial process by filing an action known to be false and

//

unfounded." *Id.* The court therefore DENIES City Defendants' motion for summary

judgment against Mr. Lian on City Defendants' malicious prosecution counterclaim.

**E.    Plaintiffs' Motion Against City Defendants**

Plaintiffs move for summary judgment on City Defendants' malicious prosecution

counterclaim. (*See generally* 3d MSJ; *see also* Joinder.) Similar to City Defendants'

motion against Ms. Chen, Plaintiffs move for summary judgment on the ground that

probable cause existed for Plaintiffs to bring all their claims against City Defendants. (3d

MSJ at 12-17; *see also* 1st MSJ at 7-9.)

A defendant asserting a malicious prosecution counterclaim under RCW 4.24.350

must base the counterclaim "on an 'action,' not merely on a factual allegation." *Watson

v. City of Vancouver*, No. C13-5936RBL, 2015 WL 1137530, at *14 (W.D. Wash. Mar.

12, 2015) (quoting *Brin v. Stutzman,* 951 P.2d 291, 297-98 (1998)). When a malicious

prosecution counterclaim is based on more than one charge, "the court must 'separately

analyze the charges claimed to have been maliciously prosecuted.'" *Garvais v. United

States*, No. CV-03-0290-JLQ, 2010 WL 610282, at *14 (E.D. Wash. Feb. 17, 2010)

(quoting *Johnson v. Knorr,* 477 F.3d 75, 85 (3d Cir. 2007)), *aff'd*, 421 F. App'x 769 (9th

Cir. 2011). In other words, a finding of probable cause on one of a plaintiff's charges—

which is as a complete defense to malicious prosecution—does not foreclose a malicious

prosecution action on a different charge. *See Garvais*, 2010 WL 610282, at *14-15.[10] In

---

[10] The court in *Garvais* explained that no Washington State court "squarely addresses
whether the . . . charge-by-charge analysis on probable cause is employed in Washington." 2010
WL 610282, at *15. But, following the holdings from "multiple federal Circuit Courts," *Garvais*

asserting a claim, "a civil plaintiff need not have the degree of certainty as to the existence of the facts on which the proceedings is based that is required of a prosecutor in a criminal proceeding." *Brin*, 951 P.2d at 299. Rather, "the civil plaintiff must have a reasonable belief that the relevant facts can be established through the trial process." *Id.*

Plaintiffs allege that they had a "reasonable belief in both the existence of facts on which their claims are based and in the legal validity of their claims." (3d MSJ at 14.) The court has discussed at length the evidence and arguments in this case and will not restate them here. For the reasons discussed above, the court finds that Ms. Chen had probable cause to allege her judicial deception, deliberate fabrication, selective enforcement, and malicious prosecution claims. Although City Defendants prevailed on summary judgment on these claims, the court concludes that Ms. Chen had a reasonable belief in the facts on which these claims were based. Thus, the court GRANTS Plaintiffs' motion for summary judgment on City Defendants' malicious prosecution counterclaim as it relates to Ms. Chen's judicial deception, deliberate fabrication, selective enforcement, and malicious prosecution claims, counts I, II, III, IV, and VIII.

However, the court concludes that genuine issues of material fact exist regarding whether Plaintiffs had probable cause to bring their substantive and procedural due process claims. *See Act Up!/Portland*, 988 F.2d at 873 ("[T]he court should not determine probable cause at the summary judgment stage if a genuine issue of material fact exists."). Plaintiffs' complaint alleges that Detective D'Amico "wrongfully

---

determined that the Washington Supreme Court "would follow this charge-by-charge approach to the probable cause element." *Id.* at *14-15.

facilitated the dependency actions" by "[t]estifying at and/or providing false and misleading evidence in favor of the dependency hearings" and by "[p]ossessing but failing to disclose" exculpatory material. (*See* FAC ¶¶ 187, 200.) But it is undisputed that Detective D'Amico did not testify or present evidence at the dependency hearings. *See surpa* §§ III.C.3.d, III.D.1, III.D.2. Even construing Plaintiffs claims to mean that Detective D'Amico wrongfully "participated in" or "facilitated" the dependency proceedings (*see* 1st Resp. at 30-31; 2d Resp. at 22), there remains a genuine dispute of material fact whether probable cause existed for this claim. Likewise, a genuine dispute exists regarding whether Plaintiffs had a reasonable belief that Detective D'Amico withheld material evidence from the dependency action. The alleged withheld evidence is from Dr. Green, Dr. Gbedawo, Dr. Halamay, and SCH. (*See* 3d Resp. at 19.) However, all of these parties testified and/or submitted letters at the 72-hour dependency hearing. (*See id.*; Riensche Decl. ¶ 2, Ex. 8 at CHEN0005996-6000.) Further, as discussed above, Plaintiffs knew about the purported exculpatory material such that it could not support an action based on unlawful withholding. *See supra* § III.D.1.

Therefore, the court DENIES Plaintiffs' motion for summary judgment on City Defendants' malicious prosecution counterclaim as it relates to Plaintiffs' substantive and procedural due process claims, counts V and VI.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS City Defendants' summary judgment motion against Ms. Chen (Dkt. # 106), GRANTS in part, DENIES in part, and DENIES as moot in part City Defendants' summary judgment motion against Mr. Lian,

J.L., and L.L. (Dkt. # 108), and GRANTS in part and DENIES in part Plaintiffs' motion

for summary judgment against City Defendants (Dkt. # 141).

Dated this 24th day of May, 2019.

JAMES L. ROBART
United States District Judge