UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SUSAN CHEN, et al.,<br><br>                Plaintiffs,<br><br>    v.<br><br>NATALIE D'AMICO, et al.,<br><br>                Defendants. | CASE NO. C16-1877JLR<br><br>AMENDED ORDER GRANTING IN PART AND DENYING IN PART STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

Before the court is Defendants Washington State Department of Social and Health Services ("DSHS"), Bill Moss, Kimberly R. Danner, and Jill Kegel's (collectively, "State Defendants") motion for summary judgment. (MSJ (Dkt. # 189).) Plaintiffs Susan Chen and J.L., a minor child, filed a response. (Chen Resp. (Dkt. # 204).) Plaintiff Naixiang Lian joins Ms. Chen and J.L.'s response.[1] (Lian Resp. (Dkt. # 201).) State

//

---

[1] The court refers to Ms. Chen, Mr. Lian, and J.L. collectively as "Plaintiffs."

Defendants filed a reply. (Reply (Dkt. # 219).) The court has considered the motion, the parties' submissions concerning the motion, the relevant portions of the record, and the applicable law.[2] Being fully advised, the court GRANTS in part and DENIES in part State Defendants' motion as set forth below.

## II. BACKGROUND

This case involves a dispute about the removal of a minor child, J.L., from his parents' custody. J.L.'s parents, Ms. Chen and Mr. Lian, initially brought claims against defendants affiliated with the City of Redmond (the "City Defendants") and a number of DSHS officials ("State Defendants"). (*See* FAC (Dkt. # 96) ¶¶ 132-286.) The court granted summary judgment in favor of the City Defendants on May 24, 2019. (*See* 5/24/19 Order (Dkt. # 170) at 60.) The remaining State Defendants—Kimberly Danner, Bill Moss, Jill Kegel, and DSHS— now move for summary judgment on Plaintiffs' remaining claims.[3]

//

//

//

//

//

---

[2] No party requests oral argument (*see* MSJ at 1; Chen Resp. at 1; Lian Resp. at 1), and the court finds oral argument unnecessary to its disposition of the motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] The court has set forth its detailed factual background in several prior orders. (*See, e.g.*, 5/24/19 Order at 2-16.) The court focuses here on the facts relevant to the State Defendants' present motion for summary judgment.

A.   **J.L.'s Hospital Visit and the Child Protective Services ("CPS") Referral**

On October 7, 2013,[4] Ms. Chen took J.L. to see Dr. Kate Halamay at Pediatric

Associates Inc., P.S. ("Pediatric Associates").  (RED00351-53.[5])  Dr. Halamay had seen

J.L. previously.  (*See, e.g.*, RED00339.)  According to the notes from the October 7

appointment, J.L. had been experiencing abdominal pain for around six weeks.

(RED00351.)  Dr. Halamay recommended that Ms. Chen take J.L. to the

Gastroenterology ("GI") department at Seattle Children's Hospital ("SCH"), but Ms.

Chen declined, stating that "she has seen them for the past 14 months and they 'have not

done anything for [J.L.]'"  (RED00352.)  Dr. Halamay's notes show that J.L. visited the

SCH GI department only once in the prior year.  (*Id.*)  Ms. Chen then asked Dr. Halamay

to order a number of labs, but Dr. Halamay refused because she was "unfamiliar with

several of them and would not know how to interpret them."  (RED00353.)

On October 19, 2013, Ms. Chen and Mr. Lian took J.L. to Dr. Julie Ellner at

Mercer Island Pediatrics, in part hoping that Dr. Ellner would order the labs they were

seeking.  (*See* RED00107; 1st Chen Decl. (Dkt. # 131) ¶ 27-28.)  Dr. Ellner's notes state

that Ms. Chen was worried that J.L. has a "severe problem with kidney or liver," that he

was losing weight, and was eating poorly.  (RED00107.)  Ms. Chen told Dr. Ellner that

_____

[4] J.L.'s medical history prior to October 2013 is set forth in this court's prior order on the City Defendants' summary judgment motion.  (*See* 5/24/19 Order at 2-4.)

[5] Documents cited solely as "REDXXXXX" are sealed documents that were part of Detective D'Amico's investigative file for the investigation of Ms. Chen.  (*See* 1st Lo Decl. (Dkt. # 132) (attaching unsealed exhibits); Dkt. # 133 (sealed exhibits).)  These documents are attached to the first declaration of T. Augustine Lo as exhibits B-L.  Otherwise, the court refers to exhibits to the first declaration of T. Augustine Lo as "1st Lo Decl., ¶ XX, Ex. XX," regardless of whether the exhibits appear at docket number 132 or 133.

J.L. had laboratory tests at a hospital in New York, as well as an ultrasound, which showed that there was something wrong with J.L.'s liver. (*Id.*) However, Ms. Chen did not bring the lab results to Dr. Ellner; nor was she able to remember the doctor or the hospital where the tests were performed. (*Id.*) Dr. Ellner referred J.L. to the emergency room. (*Id.*)

Later that day, instead of going to the emergency room, Ms. Chen took J.L. to Pediatric Associates. (*See* RED00356-58; D'Amico Decl. (Dkt. # 107) ¶ 3h, Ex. H ("CPS Docs") at RED00050-51.) Similar to Dr. Ellner, Dr. Roberta Winch at Pediatric Associates told Ms. Chen to take J.L. to emergency care. (RED00358 ("IT IS VERY IMPORTANT [J.L.] BE SEEN FOR FURTHER EVAL IN THE ED [emergency department] AT SCH. I RECCOMEND [sic] THEY GO NOW. PARENTS AGREED TO BE SEEN AT SCH ED AND SAID THEY WILL GO THERE NOW.").) Ms. Chen says that she did not understand Dr. Winch's instruction. (*See* 1st Chen Decl. ¶ 27.) Instead, Ms. Chen took J.L. to SCH's urgent care to have lab work done. (*Id.*; RED00853-55.)

Ms. Chen returned to SCH urgent care on October 20, 2013, to pick up J.L.'s lab work. (1st Chen Decl. ¶ 28.) Once there, doctors told Ms. Chen that J.L.'s lab work was abnormal, showing elevated levels of creatinine and blood urea nitrogen ("BUN"). (*Id.*) Ms. Chen then took J.L. to SCH emergency care. (*Id.*; CPS Docs at RED00050-51.) That day, Dr. Russell Migita in SCH's emergency department examined J.L. and performed additional tests, which showed J.L. improved since October 19, 2013, but that his lab results were still "not normal." (RED00370-75.) A nurse's report states that J.L.

"seemed irritable, tired, limp." (RED00805.) It also states that Ms. Chen "refused transport or interpreter services. NOTE!! this child was a no show to the ED yest[erday] for same issues, swollen abd[omen]." (*Id.*)

Dr. Migita expressed that J.L. "would benefit from having a coordinated workup that includes endocrinology, gastroenterology, and nephrology." (RED00374.) However, Dr. Migita discharged J.L. from the hospital on October 20, 2013, because he did not have "hypertensive emergency at this time and d[id] not meet the eminent risk criteria for medical hold." (*See* RED00374-75.) Dr. Migita released J.L. on the understanding that Ms. Chen and Mr. Lian would follow-up with J.L.'s primary care provider. (RED00374-75 (noting "Plan" to see Dr. Halamay "[w]ithin 1 to 3 days").)

On October 23, 2013, Ms. Chen brought J.L. to see Dr. Gbedawo, a naturopathic physician, who saw J.L. nine times between April 2013 and October 2013. (1st Chen Decl. ¶ 31; Gbedawo Decl. (Dkt. # 158) ¶¶ 2, 7, 8.) Dr. Gbedawo understood that J.L. had been to emergency and urgent care a few days earlier and that he had been discharged "as non-emergent." (Gbedawo Decl. ¶ 8.) At the appointment, Dr. Gbedawo "did not recommend that [Ms. Chen] take J.L. to the emergency department." (*Id.*) Rather, he recommended that Ms. Chen take J.L. "to a nephrologist and a nutritionist for additional consultations and ordered additional labs and imaging." (*Id.*)

Later that day, Ms. Chen took J.L. to Dr. Halamay, as she had been instructed by Dr. Migita. (1st Chen Decl. ¶ 32.) According to Dr. Halamay's notes, Ms. Chen "declined [a] phone interpreter although offered several times" and "refus[ed] to make eye contact, t[ook] a long time to answer questions or refuse[d] to answer at all."

(RED00397.)  Dr. Hal Quinn at Mercer Island Pediatrics, who had seen J.L. previously,

called Dr. Halamay before the appointment.  (RED00397; RED00105-06.)  Dr. Quinn:

> expressed great concern about this [patient] as well as family, feels that he
> his [sic] very sick, concern about failure to thrive, has lost several pounds
> since April, concerned that family has been going from dr to dr but that pt is
> not actually receiving appropriate medical attention.

(RED00397.)  Dr. Halamay noted that J.L. appeared "[v]ery tired" and continued to

"have distended abdomen," though Ms. Chen said his condition was improving.

(RED00397.)  Dr. Halamay also noted that Ms. Chen was confused about doctors'

instructions from October 19 and 20 to take J.L. to certain specialists, and that the Chen

family "did not go to [ED] as recommended."  (*Id.*)  Dr. Halamay recommended that Ms.

Chen admit J.L. to the hospital "at once" so that he could be seen by renal, endocrine, and

GI specialists.  (*Id.*)  Ms. Chen "refused to take [J.L.] for admission, even after [Dr.

Halamay] stated that [she] felt admission was medically necessary given his abdominal

distension, weight loss, and worsening lab values compared to those drawn a few weeks

ago."  (*Id.*)  Dr. Halamay further noted that she spoke with Dr. Metz, a doctor on the SCH

Suspected Child Abuse Network ("SCAN") team, "who again recommended admission

for this patient for coordination of care as well as to provide social support for the family

and also to determine if SCAN team involvement is necessary."  (*Id.*)

Dr. Halamay further recommended to Ms. Chen that they arrange an admission for

J.L. to coordinate several services, but Dr. Halamay's notes indicate that Ms. Chen

"refused to take him for admission, even after [Dr. Halamay] stated that [he] felt

admission was medically necessary given [J.L.'s] abdominal distension, weight loss, and

worsening lab values compared to those drawn a few weeks ago." (*Id.*) Ms. Chen

remarked "'I have no confidence in [SCH]. . . . I will find my own specialists. This is a

waste of time and a waste of money. I have no time to sit in the hospital.'" (*Id.*) Given

Ms. Chen's refusal, Dr. Halamay "again spoke [with] Dr. Metz who agreed that given

[J.L.]'s medical issues, if [Ms. Chen] does not agree to admission that it would be

appropriate to contact CPS." (*Id.*) Dr. Halamay then told Ms. Chen again that he felt that

J.L.'s admission was medically necessary, and that if Ms. Chen did not admit J.L., that

Dr. Halamay would "have to contact CPS in order to ensure that [J.L.] receives proper

medical attention." (*Id.*) Ms. Chen again refused to agree to admission, and according to

Dr. Halamay, "became angry, stood up, picked [J.L.] up and left the office." (*Id.*) Dr.

Halamay then contacted CPS, and then contact SCH's emergency department that J.L.

"may be coming in and that he needs to be admitted." (*Id.*)

Ms. Chen recalls that she "felt as though Dr. Halamay and SCH were dismissive

and had not provided proper care for [J.L.]" (1st Chen Decl. ¶ 32.) Further, Ms. Chen

told Dr. Halamay at the October 23 appointment that she "would not go back to see [Dr.

Halamay] anymore" and that she "would make a complaint against her." (*Id.*)

Late on the night of October 23, 2013, a CPS social worker, Kirk Snyder, arrived

at Plaintiffs' home and took J.L. to SCH's emergency department. (*See* RED00814; Plfs'

MSJ (Dkt. # 141) at 7; *but see* 1st Chen Decl. ¶ 33 (stating that "[a]t [CPS]'s

recommendation, we took J.L. to SCH.").) J.L. was seen on October 24, 2013, by Dr.

Virginia Sanders and Dr. Shannon Staples. (*See* RED00791.) According to Dr.

Sanders's summary, J.L. showed a "failure to thrive . . . [and] gross malnutrition and

muscle wasting.  Concern for medical cause of wasting vs. neglect." (RED00792.)  J.L.

was then admitted to SCH's "general medicine service" to treat his malnutrition and

receive a SCAN consultation.  (*Id.*)  Dr. Sanders also wrote that "[g]iven mother's

resistance to medical evaluation in this ill child, he is currently in state custody." (*Id.*)

Dr. Sanders instructed lab tests and scheduled a follow-up with Dr. Kate Halamay.

(RED00793.)

While at SCH on October 24, 2013, providers gave J.L. Pedialyte even though Ms.

Chen told them that "whenever [J.L.] eats sugar his belly gets big." (RED00927,

RED00930.)  Ms. Chen also told the SCH providers that J.L. "cannot eat many foods,

including carbohydrates or sugar," but Ms. Chen was unable to "identify any food that he

does eat." (RED00927-28.)  In addition, Ms. Chen interfered with providers' attempts to

give J.L. Pedialyte.  (D'Amico Decl. ¶ 3c, Ex. C ("D'Amico Report") at RED00015.)

The doctors noted that Ms. Chen was "asked to leave" the hospital room "because of her

erratic and obstructionist behavior." (RED00930.)  However, after J.L. consumed several

ounces of Pedialyte, J.L. "reaccumulated significant abdominal distention," which

required the doctors to use a catheter to relieve the distention.  (*Id.*)

J.L. weighed 12.2 kilograms (26.9 pounds) when he was admitted to SCH on

October 24, 2013, which is the third percentile.  (RED00814.)  Carol Barber, a social

work consult, reported on that date that the attending physician gave J.L. Pedialyte and

J.L. drank it "hungrily." (*See* 2d Lo Decl. (Dkt. # 215, 216 (sealed)) ¶ 43, Ex. 42.)  She

also reported that "[o]n multiple occasions, when medical staff weren't looking, the

//

mother took the Pedialyte away from the patient while patient was drinking it.  Mother continued to do this despite instruction from medical staff to allow patient to drink."  (*Id.*)

Dr. Metz of the CPS SCAN team prepared a report dated October 27, 2019, while J.L. was still being treated at SCH.  (RED00813-18.)  The report noted that J.L was in the third percentile for weight and third percentile for body-mass index, and that J.L. was "severely malnourished."  (RED00816-17.)  Dr. Metz wrote that "this could potentially be due to his severe state of poor nutrition, although other etiologies must be ruled out." (RED00817.)  After a review of some of J.L.'s medical history, Dr. Metz wrote:

> It is concerning that patient's mother has not followed through with the recommendations by multiple providers, both in the emergency department at [SCH] as well as the outpatient setting.  Mother's behavior seems to be erratic and although she has sought care with multiple providers it does not appear that she is following through with their recommendations.  Regardless of [J.L.]'s mother's intentions, it does seem that there is an element of neglect given his current nutritional status. . . . I think it will be important to continue to obtain records from all of his providers that he has seen to try to further elucidate what medications he has been on.  It will be important while [J.L.] is in the hospital to see how he tolerates feeding and how his weight changes given adequate nutrition.

(*Id.*)

B.    **Protective Custody and 72-Hour Dependency Hearing**

The Seattle Police Department placed J.L. in protective custody on October 24, 2019, "due to immediate concerns of medical neglect," and transferred custody to "field worker Davis, who was present at the hospital."  (2d Lo Decl. ¶ 3, Ex. 2 ("Danner Case File") at 2-4[6]; *see also* RED00002 ("J.L. was taken into protective custody by [the Seattle

---

[6] Unless otherwise stated, the court cites to the page numbers provided by the court's electronic filing system.

Police Department] and turned over to [CPS]."); RED00814 ("[J.L.] was placed in

protective custody by the police department.").)

Kimberly Danner, a CPS investigator, was assigned to J.L.'s case on the same day.

(Danner Case File at 4.)  Ms. Danner's notes state that Ms. Chen "caused so much

disturbance that staff had to call police and have her removed from the hospital."  (*Id.* at

3.)  Another entry in the case file states that "[t]here are significant concerns about

mom's mental health due to her recent behavior at [SCH] as well as at Pediatric

Associates."  (*Id.* at 4.)

Ms. Danner signed and filed a dependency petition October 25, 2013, in King

County Superior Court – Juvenile Court.  (*See* 2d Lo Decl. ¶ 4, Ex. 3 ("Dependency

Petition") at 2, 7.)  In addition to largely repeating the medical history for J.L. described

in Ms. Danner's notes, the Dependency Petition also states, in relevant part:

- Due to J.L.'s "extremely distended abdomen," physicians at both Mercer Island
  Pediatric and Pediatric Associates on October 19, 2013 "recommended the mother
  take the child to the hospital immediately.  The mother refused and left against
  Medical Advice.  The mother and child returned to [SCH] later that day.  The
  child's labs had stabilized and the child was discharged."  (*Id.* at 4.)

- At Pediatric Associates on October 23, 2013, the physician reported that JL's
  condition had worsened.  "The referrer stated the child needs to be admitted to
  [SCH] immediately, and she directed parents to do so.  Mother did not take the
  child [J.L.] after this visit, and only did so later in the evening when the parents
  were directed to take the child to the hospital."  (*Id.*)

- "All health care providers who have been contacted by the Department and Law Enforcement to date have reported concerns that the mother is 'doctor shopping', seeking medical care that the child does not need, and also not following through on medical care that is recommended by medical care providers.'" (*Id.*)

- "Not only did the child suffer life-threatening physical conditions related to malnourishment, but [SCH] physician [sic] reported to the social worker that the child's delay in speech and social skills may be caused by malnourishment and social deprivation." (*Id.*)

- "The parents continue to be very evasive with questions asked by health care providers and the Department about previous health care." (*Id.*)

- Information is being gathered by "the [SCH] SCAN team to attempt to determine if the medical neglect was a case of mother's obstructing medical care, or if the maltreatment is related to a more insidious mental health crisis being experienced by the mother. According to [SCH] staff, based on preliminary information gathered, the mother was at the very least obstructing needed medical care for the child." (*Id.* at 5.)

- "At this time, the Department has grave concerns about both parents and their ability to safely parent these two children." (*Id.*)

A 72-hour dependency hearing was held from October 28 to October 30, 2013, to determine if J.L. should be placed in out-of-home care pending a final dependency determination. (*See* FAC ¶ 59.) An interpreter was present at the hearing (*See, e.g.*, 2d Chen Decl. ¶ 4, Ex. 2 (10/28/13 Hearing Tr.) at 2-14.) At the hearing, Ms. Danner

testified that J.L.'s health care providers "continue to have concerns about gross malnourishment." (10/28/13 Hearing Tr. at 4.) Dr. Migita testified that J.L. presented with gross malnutrition. (*See* 2d Chen Decl. ¶ 4, Ex. 3 (10/29/13 Hearing Tr.) at 2.) Dr. Migita further testified that upon admission to SCH on October 24, 2019, "lab values indicated that he was potentially entering into acute renal failure presumably from lack of fluid intake." (*See id.*) Dr. Migita stated that while in SCH's care, J.L. "seems quite content while eating" and did not show signs of spitting out food. (*See id.* at 4.) Dr. Migita also testified that J.L.'s behavior could be explained by "reactive attachment disorder, anxiety related diagnoses, or PTSD, as well as autism," but "we've witnessed enough social engagement to become less concerned about autism and more concerned about a reactive attachment issue or an anxiety issue." (*See id.* at 8.)

Dr. Green and Dr. Gbedawo provided testimony in support of Ms. Chen. (*See* Barbara Decl. (Dkt. # 191 (sealed)) ¶ 2, Ex. A at 14-15.) Commissioner Mark Hillman stated on the record that he "didn't even know [J.L.] was autistic until [he] heard from Dr. Green." (10/28/13 Hearing Tr. at 14.) Commissioner Hillman heard testimony "through the mother's exhibit, that [J.L.] has not gained any weight for approximately one year." (2d Chen Decl. ¶ 4, Ex. 1 (10/30/13 Hearing Tr.) at 7.)

Commissioner Hillman further stated that "[t]he autism report that I read, it seemed to support a diagnosis of autism" for J.L. (2d Chen Decl. ¶ 4, Ex. 1 (10/30/13 Hearing Tr.) at 5.) It was "unfortunate that Dr. Migita apparently didn't get provided with a copy of that report or have access to that report," and the court was "very hopeful that Dr. Migita will get a copy of that within 24 hours." (*Id.*) The court addressed the

potential effect of autism on J.L.'s weight: "It may be because, as an autistic child, he has problems digesting and absorbing food, but I have evidence that since his admission into Children's Orthopedic Hospital, he has been eating almost every food they give him with no apparent distress and he has gained 1.8 pounds." (*Id.* at 8.) The court did not fault Ms. Chen for taking J.L. to Dr. Green or a naturopath, but based on J.L.'s failure to gain weight for a year, followed by gaining 1.8 pounds in one week at SCH, in addition to his being diagnosed with malnourishment, meant that DSHS had met its burden to show reasonable cause that keeping J.L. with his parents could create substantial harm.[7] (*Id.* at 8-9.) The court ordered out-of-home placement and visitations. (*See* Barbara Decl. ¶ 2, Ex. A at 20.)

Commissioner Hillman noted uncertainty regarding "whether the mother or father has actually fed [J.L.] all of the food that Dr. Green and Dr. Gbedawo wanted them to be feeding him." (10/30/13 Hearing Tr. at 12.) However, Commissioner Hillman also stated "[t]he one thing that shelter care will show us, frankly, is whether [J.L.] will continue to show improvement on his weight as well as improvement on the symptoms of his autism . . . the shelter care period is going to show us whether we're going to have a long-term improvement on his nutrition. Because if Dr. Gbedawo is right, he may show

---

[7] DSHS also sought out-of-home placement for L.L., J.L.'s brother. (*See* Dependency Petition.) At the close of the hearing, Commissioner Hillman concluded that DSHS had not met its burden to show reasonable cause that allowing L.L. to remain in his parents' custody would create a substantial threat, and denied the Dependency Petition with respect to L.L. on that basis. (10/30/13 Hearing Tr. at 6.) However, the court placed conditions on the parents, including that "there will be no medical appointments for [L.L.], unless that appointment is disclosed to the department at least 48 hours in advance, including the time of the appointment and the provider, unless it is a bona fide emergency," in which case the parents must notify DSHS "where he went, why he went and who he saw within 24 hours after that appointment." (*Id.* at 6-7.)

improvement for a little bit and then he's going to turn around because the GI problems are going to come back in. And if the GI problems come back in outside the parents' care, well, guess what?" (*Id.* at 11-12.)

C.  **Post-Hearing Investigation and Foster Care**

Ms. Danner did not pass Dr. Green's autism report to Dr. Migita, but Rosalyn Dilorio with the Attorney General's Office ("AGO") emailed Dr. Migita on October 21, 2013, telling him that the court "wanted you to get the Autism report from Lakeside Autism Center. I think Kim is going to get that to you." (2d Lo Decl. ¶ 8, Ex. 7 at 2.) On November 3, 2013, J.L. weighed in at 14.6 kilograms (32.19 pounds), up from the 12.2 kilograms (26.9 pounds) he weighed on October 24, 2013. (RED01126.)

Ms. Danner completed an investigative assessment and emailed it to, among others, David Peterson and Jill Kegel, on November 15, 2013. (2d Lo Decl. ¶ 6, Ex. 5 ("Investigative Assessment") at 1.) The Investigative Assessment states that the "[i]nitial referral was [a] 24-hour response referral, made by health care providers, alleging that the parents had been advised by the provider to take the child to the ER immediately, and had not." (*Id.* at 7.) It reports that J.L. "has been diagnosed with Autism by the Lakeside Clinic; however, the attending doctor at Children's reports that they suspect an attachment disorder, and also believe that a lot of what the child is experiencing with developmental delays is due to gross malnourishment and social deprivation." (*Id.* at 6.) It also states that the parents "have remained completely unwilling to talk to [the social worker] about anything that doesn't involve visitation, including their parenting practices." (*Id.*)

On November 12, 2013, Ms. Chen filed a motion for revision of the court's shelter care order. (Barbara Decl. ¶ 2, Ex. A at 36.) At the time, Ms. Chen did not have access to updated medical records Ms. Chen had requested from Ms. Danner. (2d Chen Decl. ¶ 73.) Ms. Chen hired a new attorney, Linda Lillivek, who appeared on November 14, 2013. (2d Chen Decl. ¶ 74; Barbara Decl. ¶ 2, Ex. A at 42.) Ms. Lillivek requested production of updated medical records from the state, but was unable to obtain them before the 30-day hearing. (*Id.*) Ms. Chen contends that if she had access to the updated records, she could have brought the fact that J.L. lost weight while in foster care to the court's attention. (*Id.*) DSHS filed its response on November 20, 2013. (*Id.* at 44.) In its response, DSHS noted that J.L. was doing much better in SCH's case, and that he "has gained approximately 1.8 pounds in seven days". (*Id.* at 50.) DSHS represented that shelter care was warranted because "[i]n the care of his parents, [J.L.] was starving, malnourished, wasting, and had potential kidney failure, a compromised liver, abnormal thyroid levels, abnormal white blood cell count, a failure to thrive, and he suffered harm to his brain and development all due to malnutrition." (*Id.* at 58.) The court denied the motion to revise the shelter care order. (*See id.* at 72; 2d Chen Decl. ¶ 73.)

In a November 25, 2013, email to Ms. Danner, David Peterson, the DSHS social worker initially assigned to J.L.'s case, acknowledged that J.L. "gained 4lbs while hospitalized at Children's but has lost 2lbs since going into foster care." (*See* 2d Lo Decl. ¶ 34, Ex. 33 at 4.) Mr. LaRaus responded: "First off we need to figure out how it is that the kid lost 2lbs while in foster care – that really makes it hard to blame mom's mistreatment for his low weight before he was admitted to the hospital." (*Id.* at 2.)

Ms. Danner's involvement lessened as the case was handed from Mr. Peterson to Ms. Kegel. Ms. Kegel first learned about J.L.'s case when she reviewed Ms. Danner's Investigative Assessment. (2d Lo Decl. ¶ 2, Ex. 1 ("Kegel Dep.") at 80:22-81:3.) At her deposition, Ms. Kegel could not remember whether she met with Mr. Peterson during the transfer of the case. (*Id.* at 72:24-73:2.) She also reviewed the Dependency Petition and the shelter care order but did not receive a copy of the shelter care hearing transcript. (*Id.* at 85:22-25, 87:8-12.) She maintained contact with Dr. Quinn, but does not remember talking to Dr. Migita, Dr. Green, or Dr. Gbedow. (*Id.* at 89:20-90:14.)

Ms. Chen asserts that Ms. Kegel was frequently demeaning and uncaring towards Ms. Chen. (*See id.* ¶¶ 94-97.) Ms. Chen contends that Ms. Kegel prevented her from attending a neurodevelopmental evaluation for J.L. at SCH, even though several of J.L.'s providers, including Drs. Ivy Chung and Brooke Greiner, advocated that Ms. Chen should be allowed to participate. (*See* 2d Chen Decl. ¶ 98.) Ms. Chen also alleges that DSHS violated a court order by failing to provide a copy of J.L.'s autism evaluation to SCH providers "within 24 hours," leading to inaccurate reports. (*See id.*; *but see* 10/31/13 Hearing Tr. at 5 (Commissioner Hillman stating that he is "very hopeful" that Dr. Migita would receive a copy of Dr. Green's autism report within 24 hours); 2d Lo Decl. ¶ 8, Ex. 7 (AGO writing in an October 31, 2013, email to Dr. Migita that the court "wanted you to get the Autism Report from Lakeside Autism Center. I think Kim is going to get that to you.").)

Ms. Chen also contends that Ms. Kegel "did not tell the truth" when she "did not report, for example, that J.L. had lost two pounds in his placement, that DSHS was aware

of and communicating about information suggesting I was not to blame, that J.L.'s skills had significantly regressed to the dismay of his providers, or that he had been kicked out of the daycare DSHS put him in, for behavior he did not have before." (*See* 2d Chen Decl. ¶ 102.)

On January 23, 2014, Ms. Kegel wrote to Detective D'Amico and informed her that J.L. was receiving "OT and ABA therapy to assist with the autism . . . his parents are not cooperating with any services and have tried to interfere again." (*See* 2d Lo Decl. ¶ 35, Ex. 34.) On February 3, 2014, Ms. Kegel wrote in a DSHS placement referral that J.L. "has been diagnosed with Autism . . . [he] is receiving Occupational therapy and ABA therapy to address his developmental and autistic needs." (*See* 2d Lo Decl. ¶ 50, Ex. 49.) On February 6, 2014, Dr. Greiner wrote to David LaRaus, copying a number of others including Ms. Kegel, stating that the "doctor's recommendations lack key services that children with autism receive . . . J.L. has autism and it is not a subtle presentation of autism. He needs and deserves the usual recommended services and supports for treatment of autism." (*See* 2d Lo Decl. ¶ 37, Ex. 36 at 3.) Ms. Kegel responded to clarify that the recommendations "are in addition to the services [J.L.] is already receiving. . . . No one is saying that [J.L.] doesn't have autism or that he needs less intensive services." (*See id.* at 2.) Ms. Kegel responded a second time to clarify that "there have been some questions from providers about whether [J.L.] is on the ASD based on his immediate presentation before them – or if he could have delays that stem from another cause. However [DSHS] is not taking the position at this time that he is not

//

ASD, we are just seeking input from all possible sources on appropriate services." (*See id.*)

Ms. Chen contends that J.L. suffered from not receiving proper care for his autism and GI issues while in foster care. (2d Chen Decl. ¶ 45.) She describes a number of behavioral issues J.L. developed while in foster care, including biting, screaming, and hitting. (2d Chen Decl. ¶ 42.) Ms. Chen states that a number of those issues continued after J.L. was returned. (*See id.*) Ms. Chen also contends that DSHS cancelled and postponed visitations on several occasions and put unfair restrictions on the visits when they did occur. (*See* 2d Chen Decl. ¶ 78-89, Ex. 13.) Ms. Chen alleges further that DSHS did "not follow up on the initial concerns of the dependency court." (2d Chen Decl. ¶ 106.) She further alleges that by November 2013, DSHS was aware of information that raised doubts about whether this was a child abuse case, but did not return J.L. regardless. (*Id.*)

D. **Termination of Dependency Petition**

Ms. Chen and Mr. Lian separated "because [their] relationship had been broken as a result of J.L.'s removal and related events." (2d Chen Decl. ¶ 40.) Although Ms. Kegel opposed the move, J.L. was placed in Mr. Lian's care on July 25, 2014. (*See* 2d Lo Decl. ¶¶ 18, 20, Exs. 17, 19.) The dependency trial was originally set for June 2014. (2d Lo Decl. ¶ 22, Ex. 21.) On May 24, 2014, the AGO filed a motion to continue the dependency trial because of discovery delays. (Chen Decl. ¶ 77.)

On August 27, 2014, Mr. LaRaus emailed Ms. Chen's attorney, Lorraine Roberts, and stated that DSHS was not willing to concede that the parents did nothing wrong, but

if the parents would agree to certain conditions, DSHS would dismiss the Dependency

Petition.  (2d Lo Decl. ¶ 16, Ex. 15 at 2.)  On September 10, 2014, after interviewing Dr.

Quinn and other witnesses, Ms. Roberts emailed Mr. LaRaus, conveyed that even the

State's witnesses were supporting Ms. Chen, and demanded Mr. LaRaus dismiss the

petition without conditions.  (2d Lo Decl. ¶ 18, Ex. 17 at 3.)  The State decided to dismiss

the Dependency Petition on September 12, 2014.  (2d Lo Decl. ¶ 18, Ex. 17 at 2.)  Mr.

LaRaus told Ms. Roberts that J.L. was returned to his father's care on July 25, 2014 and

that there were no complaints about his care so far, and that Dr. Quinn now admits that

his conclusion that Ms. Chen failed to take J.L. to the hospital on October 20, 2013 was

incorrect.  (2d Lo Decl. ¶ 18, Ex. 17 at 2.)  The "founded" determination was changed to

"unfounded" shortly thereafter.  (2d Lo Decl. ¶ 19, Ex. 18.)

### III. ANALYSIS

State Defendants now move for summary judgment on Plaintiffs' remaining

claims.  (*See generally* MSJ.)  First, State Defendants argue they are entitled to summary

judgment on Plaintiffs' 42 U.S.C. § 1983 claims for damages (Counts V, VI, and VII) on

the grounds that Plaintiffs "suffered no constitutional rights violations, the individual

State Defendants enjoy qualified immunity, and the individual State Defendants enjoy

testimonial immunity."[8]  (*Id.* at 4.)  Second, State Defendants argue that they are entitled

to summary judgment on Plaintiffs' state law claims (Counts IX, X, and XI) because

---

[8] In a single sentence, State Defendants also contend that Plaintiffs' 42 U.S.C. § 1983 damages claims are time-barred.  (*See* MSJ at 4.)  State Defendants include no argument or authority in support of this contention.  (*See generally* MSJ.)  Accordingly, the court does not address it.

Plaintiffs "cannot establish the essential elements of their claims." (*Id.*) Third, State Defendants argue they are entitled to summary judgment on Plaintiffs' 42 U.S.C. § 1983 claim for injunctive relief (Count XII) because "Plaintiffs have failed to satisfy the requirements of *Ex Parte Young* and cannot establish entitlement to injunctive relief." (*Id.*) Plaintiffs' response states that "Plaintiffs are not disputing dismissal of Count XII (injunctive relief)." (Chen Resp. at 15.) Accordingly, the court GRANTS summary judgment in favor of State Defendants on Count XII.

Before addressing the substance of State Defendants' summary judgment motion, the court addresses State Defendants' challenge to several of Plaintiffs' witness declarations.

## A.     Motions to Strike Declaration Testimony

State Defendants move to strike the "expert opinions" contained in several of plaintiffs' witness declarations on the basis that Plaintiffs have not disclosed any expert witnesses in this case. (*See* Reply at 2 (citing Green Decl. (Dkt. # 129); Greiner Decl. (Dkt. # 134); Chung Decl. (Dkt. # 156); Gbedawo decl. (Dkt. # 158); Park-Adams Decl. (Dkt. # 202); Shapovalova Decl. (Dkt. # 205); Chan Decl. (Dkt. # 209); Sinclair Decl. (Dkt. # 212); Haase Decl. (Dkt. # 213)).) In response, Plaintiffs argue that these are fact witnesses who were "directly involved in the relevant events and are testifying from *personal* knowledge." (*See* Chen MFL (Dkt. # 221); Chen Surreply (Dkt. # 221-1).) [9]

---

[9] Plaintiffs filed motions for leave to file surreplies in part to contend that all of the witnesses whose declarations State Defendants move to strike are fact witnesses who were "directly involved in the relevant events and are testifying from *personal* knowledge." (*See* Chen MFL (Dkt. # 221); Chen Surreply (Dkt. # 221-1); Lian MFL (Dkt. # 223); Lian Surreply

Federal Rule of Civil Procedure 26(a)(2)(B) provides, in relevant part, that the disclosure of an expert witness "must be accompanied by a written report—prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37. "The determination of whether a failure to disclose is justified or harmless is entrusted to the broad discretion of the district court." *S.F. Bay Area Rapid Transit Dist. v. Spencer*, No. 04-04632-SI, 2007 WL 421336, at *4 (N.D. Cal. Feb. 5, 2007); *Auto. Indus. Pension Tr. Fund v. Tractor Equip. Sales, Inc.*, 73 F. Supp. 3d 1173, 1181-82 (N.D. Cal. 2014), *aff'd*, 672 F. App'x 685 (9th Cir. 2016).

Rule 26(a)(2)(A) requires a party to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A); *see also* Fed. R. Evid. 701(a) ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . rationally based on the witness's perception."). Although "other circuits have held that treating physicians are experts that must be properly disclosed under . . . Rule . . . 26, . . .

//

---

(Dkt. # 223-1).) No response to a motion to strike "shall be filed unless requested by the court." *See id.* LCR 7(g)(4). Plaintiffs' surreplies are styled as responses to the State Defendants' motions to strike contained in their reply brief. (*See* Chen Surreply; Lian Surreply.) Nevertheless, they contain argument that Plaintiffs could not have included in their responsive briefing, and the court finds them helpful to its disposition of the State Defendants' motions to strike. Accordingly, the court GRANTS Plaintiffs leave to file their surreplies.

[the Ninth Circuit] has not." *Hoffman v. Lee,* 474 F. App'x 503, 505 (9th Cir. 2012) (internal citation omitted).

So long as these witnesses testify solely as percipient witnesses, Plaintiffs are not required to disclose treating medical providers as expert witnesses. *See id.* ("We hold that [the doctor] testified only as a percipient witness and thus need not have been disclosed as an expert."). Further, a district court properly admits the testimony of a party's treating medical provider, even if the party has not disclosed the provider as an expert witness, so long as each of the treating medical provider's opinions "addresses his [or her] thoughts on particular actions that he [or she] took in his [or her] treatment of [the party]." *See id.*

Thus, consistent with *Hoffman*, the court will permit Plaintiffs' disclosed treating medical providers to testify as percipient witnesses about their diagnosis and treatment of J.L. and/or Ms. Chen and to any opinions formed during the course of treatment. *See Haro v. GGP-Tucson Mall LLC*, No. CV-17-00285-TUC-JAS, 2019 WL 369269, at *4 (D. Ariz. Jan. 30, 2019) (considering treating physicians as lay witnesses and allowing them to "testify regarding their diagnosis and treatment" of the plaintiff); *Walker v. Spina*, No. CIV 17-0991 JB/SCY, 2019 WL 145626, at *19 (D. N.M. Jan. 9, 2019) ("A treating physician does not need to be certified as an expert witness and may testify as a lay witness 'if he or she testifies about observations based on personal knowledge, including the treatment of the party.'") (quoting *Guerrero v. Meadows*, 646 F. App'x 597, 602 (10th Cir. 2016)).

//

However, a physician's testimony as a percipient witness does not extend to the issue of causation. The Ninth Circuit has held that "a physician's assessment of the cause of an injury is expert testimony." *United States v. Urena*, 659 F.3d 903, 908 (9th Cir. 2011) (citing *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir.2005) ("Her diagnosis of the injury itself . . . would be permissible lay testimony, but her statement about the cause of the injury was, as she admitted, a 'hypothesis.' And the ability to answer hypothetical questions is the essential difference between expert and lay witnesses." (internal quotation and alteration omitted)); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir.2004) (holding that, where the cause of an injury would not be obvious to a lay juror, expert testimony is required)).

In sum, the court GRANTS in part and DENIES in part State Defendants' motion to exclude opinion testimony from Plaintiffs' disclosed treating medical providers. Although these witnesses may not opine on matters outside of their personal knowledge of Plaintiffs,[10] including causation, these witnesses may testify as percipient witnesses concerning their personal experience with Plaintiffs.[11]

//

//

---

[10] Accordingly, the court disregards any portions of the treating providers' declarations that constitute causation testimony.

[11] State Defendants also move to strike declaration testimony on the grounds that it is inadmissible speculation, hearsay, or character evidence. (*See* Reply at 3.) As the contested testimony would not change the court's rulings on State Defendants' motion for summary judgment, the court denies State Defendants' motion to strike declaration testimony on the basis that it is speculation, hearsay, or character evidence, without prejudice to raising the same objections at trial.

**B.    Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003). Nor can a party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

## C.    Absolute Immunity

Individual State Defendants contend that they enjoy absolute immunity for their "discretionary, quasi-prosecutorial decisions to institute court dependency proceeds [sic] to take custody away from [the] parents." (*See* MSJ at 8 (quoting *Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003).) They further contend that Ms. Kegel enjoys absolute witness immunity for her declarations "filed in connection with the dependency proceedings." (*See id.* at 9.)

Plaintiffs respond that the "scope of absolute immunity for social workers is extremely narrow," and absolute immunity does not apply to discretionary or investigatory actions. (Chen Resp. at 20 (quoting *Miller*, 335 F.3d at 897-898).) Plaintiffs contend that the individual State Defendants' actions consisted primarily of investigating and acting as witnesses, activities that are not covered by absolute immunity. (*See id.* at 20-21.)

1   In reply, State Defendants contend that Ms. Danner has absolute immunity for her

2   "quasi-prosecutorial" decisions to file petitions for dependency. (*See* Reply at 8-9.)

3   They further contend that Ms. Kegel enjoys absolute immunity "when filing updates with

4   the court."  (*See id.* at 9.)

5        Absolute immunity protects "individuals performing functions necessary to the

6   judicial process" from suit.  *See Miller*, 335 F.3d at 895-96.  Absolute immunity "shields

7   only those who perform a function that enjoyed absolute immunity at common law."  *See*

8   *id.* at 897 (citing *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993)).

9   Absolute immunity's protections depend solely on "the specific function performed, and

10  not the role or title of the official."  *Id.* at 897.

11       The law of absolute immunity for social workers has evolved in recent years.  For

12  example, Ninth Circuit opinions previously held that "social workers are entitled to

13  absolute immunity for the initiation and pursuit of dependency proceedings, including

14  their testimony offered in such proceedings."  *See Mabe v. San Bernardino Cty., Dept. of*

15  *Pub. Soc. Servs.*, 237 F.3d 1101, 1109 (9th Cir. 2001) (citing *Meyers v. Contra Costa Cty*

16  *Dep't of Soc. Servs.*, 812 F.2d 1158-59 (9th Cir. 1987)).  Additionally, prior opinions

17  held that social workers "enjoy absolute, quasi-judicial immunity when making post-

18  adjudication custody decisions pursuant to a valid court order."  *Id.* (quoting *Babcock v.*

19  *Tyler*, 884 F.2d 497, 503 (9th Cir. 1987) (overruled in part by *Safouane v. Fleck*, 226 F.

20  App'x 753, 762 (9th Cir. 2007)).  However, several of those decisions were overruled "by

21  subsequent Supreme Court decisions to the extent [they] granted absolute prosecutorial

22  //

immunity to social workers for duties beyond which prosecutors were rendered immune at common law." *See Safouane*, 226 F. App'x at 762 (citing *Miller*, 335 F.3d at 897).

The Ninth Circuit, following Supreme Court precedent, has since defined the categories of activity covered by absolute immunity more narrowly. Under current precedent, "[a]bsolute immunity is available only if the social worker's 'activity or function' . . . was part and parcel of presenting the state's case as a generic advocate." *Cox v. Dept. of Soc. & Health Servs.*, 913 F.3d 831, 838 (9th Cir. 2019) (quoting *Hardwick v. Cty. of Orange*, 844 F.3d 1112, 1115 (9th Cir. 2017)). Actions taken "during or to initiate [dependency] proceedings" remain covered by absolute immunity. *See Safouane*, 226 F. App'x at 762; *see also Miller*, 335 F.3d at 898 (noting that "the critical decision to institute proceedings to make a child a ward of the state is functionally similar to the prosecutorial institution of a criminal proceeding.")). "[T]he initiation and pursuit of child-dependency proceedings [are] prosecutorial in nature and warrant absolute immunity on that basis." *Miller*, 335 F.3d at 896 (citing *Meyers*, 812 F.2d at 1157).

However, "decisions and recommendations as to the particular home where a child is to go or as to the particular foster parents who are to provide care" are "decisions and recommendations that are not functionally similar to prosecutorial or judicial decisions" and are "not protected by absolute immunity." *Safouane*, 226 F. App'x at 767-68. Social workers "are not afforded absolute immunity for their investigatory conduct, discretionary decisions or recommendations." *Id.* (holding that social workers were not entitled to qualified immunity for deciding a visitation location because it was "was

within the social workers' discretion" and was not dictated by the court) (quoting *Tamas v. Dep't of Soc. & Health Servs., State of Wash.*, 630 F.3d 833, 842 (9th Cir. 2010)).

Additionally, even in the context of dependency proceedings, social workers are not entitled to absolute immunity for claims that they "fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute." *Costanich v. Dept. of Soc. & Health Servs.*, 627 F.3d 1101, 1109 (9th Cir. 2010) (quotation omitted). "[U]nless the social worker's activity has the requisite connection to the judicial process, only qualified immunity is available." *Id.* (citing *Meyers*, 812 F.2d at 1158); *see also Meyers*, 812 F.2d at 1157 (holding that a child services worker enjoyed absolute immunity for "bringing dependency proceedings" and for "the testimony he gave during the dependency proceedings," but not for allegedly ordering a child "to stay away from his home until after the hearing before the juvenile court"). In applying these above principles, "the district court [is] obligated to examine the functions" the social workers performed. *Miller*, 335 F.3d at 898. In doing so, "the defendants bear the burden of showing that their respective common-law functional counterparts were absolutely immune." *Id.*

The court first concludes that Ms. Danner is absolutely immune from claims based on her actions to initiate the dependency proceedings for both J.L. and L.L., including the decision to sign and file the Dependency Petition. (*See* Dependency Petition.) Second, Ms. Danner and Ms. Kegel are absolutely immune from claims based on actions they

//

took in their roles as in-court advocates for the State in the dependency case. *See Hardwick*, 844 F.3d at 1115 (holding that absolute immunity applies to actions that are "part and parcel of presenting the state's case as a generic advocate").

However, the State Defendants do not enjoy absolute immunity for (1) their investigations, (2) allegedly making false statements or fabricating evidence, or (3) making discretionary decisions related to J.L.'s care while he was in the State's custody. *See Tamas*, 630 F.3d at 842 (noting that absolute immunity is not afforded for a social worker's "investigatory conduct, discretionary decisions or recommendations."); *Patterson v. Ariz. Dep't of Econ. Sec*, 689 F. App'x 565, 566 (9th Cir. 2017) ("[S]ocial workers are not entitled to absolute immunity from claims they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury."). These actions are entitled only to a determination of qualified immunity. Accordingly, the court GRANTS in part and DENIES in part the State Defendants request for summary judgment on the basis of absolute immunity.

**D.     Qualified Immunity**

The State Defendants maintain they enjoy qualified immunity because they acted reasonably when faced with a "complex medical situation" in which several medical professionals opined that J.L. was failing to thrive, was malnourished, and was "wasting." (*See* MSJ at 9.) In determining whether a government employee is entitled to qualified immunity, the court must decide: (1) whether the facts that the plaintiff alleges assert a violation of a constitutional right; and (2) whether the right at issue was "clearly

established" at the time the defendant engaged in the misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To determine whether a right was clearly established, "the standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified immunity." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) (quotation marks and citation omitted). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.*

Further, a state official's liability under 42 U.S.C. § 1983 is predicated on his 'integral participation' in the alleged violation." *Blankenhorn v. Cty of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (quoting *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir. 1996)). "[I]ntegral participation does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004). "But it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn*, 485 F.3d at 481 n.12 (citing *Boyd*, 374 F.3d at 780). Where a "genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Bonivert v. Clarkson*, 883 F.3d 865, 871-72 (9th Cir. 2017). Courts may consider the two prongs of the qualified immunity analysis in any order. *See Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011).

//

With the above principles in mind, the court analyzes Plaintiffs' 42 U.S.C. § 1983 claims in turn to determine (1) whether they assert the deprivation of a constitutional right supported by evidence in the record, and (2) if so, whether the right was clearly established at the time State Defendants allegedly violated it.

### 1. Due Process

Plaintiffs' substantive due process and procedural due process claims have substantial factual overlap. Plaintiffs allege that State Defendants "wrongfully initiated, facilitated, maintained, and failed to timely terminate the dependency actions regarding J.L. and L.L." by "[p]ossessing but failing to disclose . . . information indicating that J.L.'s physical condition was due to medical problems outside Ms. Chen and Mr. Lian's control . . . information indicating that neither J.L. nor L.L. were at risk of imminent harm in their own home . . . [and] information indicating that J.L.'s condition was not solely attributable to Ms. Chen and Mr. Lian's care." (*See* FAC ¶ 188, 201.) Plaintiffs contend that by doing so, State Defendants violated Ms. Chen's and Mr. Lian's "protected liberty interests under the United States Constitution in the companionship and society of their children, including the right to live with and care for their children . . . ." (*See* FAC ¶ 192.) Plaintiffs further allege that State Defendants "deprived Plaintiffs of their legal right to due process of law by, *inter alia*, depriving them of an unbiased tribunal with a full and fair record of evidence pertaining to the dependency proceedings regarding J.L. and L.L." (*See id.* ¶ 204.)

"A claim of interference with the parent/child relationship may be brought as either a procedural due process claim or a substantive due process claim." Ninth Circuit

Model Civil Jury Instructions § 3.2 cmt. (citing *Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1039 n.9 (9th Cir. 1999)). Although the allegations of substantive and procedural due process overlap, they are analyzed "under a distinct standard." Ninth Circuit Manual of Model Civil Jury Instructions § 3.2 comment.

   a.  *Substantive Due Process*

State Defendants contend that they are entitled to qualified immunity on Plaintiffs' substantive due process claims because nothing they did amounts to "egregious conduct or the use of force," or actions that "shock[] the conscience." (*See* MSJ at 7 (quoting Ninth Circuit Manual of Model Civil Jury Instructions § 3.2 comment (quoting *Gantt v. City of L.A.*, 717 F.3d 702, 707 (9th Cir. 2013)))).) On procedural due process, State Defendants contend that they are entitled to qualified immunity because (1) the Seattle Police Department originally took J.L. into protective custody, (2) legitimate medical concerns about J.L. justified interference in the parent-child relationship, (3) the King County Superior Court ordered that J.L. be removed from his parents, and (4) "[a]t all stages of the shelter care proceedings, Ms. Chen and Mr. Lian had notice and an opportunity to be heard, had access to counsel, and had interpreters provided or proceedings delayed until interpreters were available." (*See* MSJ at 7.) State Defendants also point to this court's prior order that held that City Defendants had probable cause to charge Ms. Chen with criminal mistreatment, which they contend means "there was also probable cause to initiate a dependency to protect J.L. and L.L." (*Id.* (citing 5/24/19 Order at 25).)

In response, Plaintiffs rely heavily on *Lesley v. DSHS*, 921 P.2d 1066 (Wash. Ct. App. 1996), which they describe as "a seminal case involving facts closely analogous to those here." (*See* Chen Resp. at 15, 27 (citing *Lesley*, 921 P.2d at 267-70).) In that case, the Washington Court of Appeals held that a DSHS social worker was not entitled to qualified immunity when he failed to confirm a provider's incorrect diagnosis that a mark on a child was a bruise and not a birthmark before removing the child from her parents' custody. *Lesley*, 921 P.2d at 267. Plaintiffs contend that "[a]t least since *Lesley*, if not before, DSHS and its employees have known that the failure to seek a clarifying diagnosis, and the making of disparaging and prejudicial comments based on biased or partial information, which prolong the separation of parents and children, is conduct that violates the right of family unity." (*See* Chen Resp. at 23 (citing *Lesley*, 921 P.2d at 279).)

In reply, State Defendants contend that "Plaintiffs have done exactly what the Supreme Court has cautioned against doing when considering due process claims—defining the establish[ed] right at the highest level rather than applied to the facts of the case." (Reply at 9.) Instead, State Defendants "submit the relevant question . . . is whether all reasonable socials [sic] workers confronted with conflicting medical opinions, including medical opinions from recognized experts in child abuse and neglect would have known their conduct violated plaintiffs' constitutional rights when they elected to protect the child, even if that resulted in out-of-home placement." (*Id.*) State Defendants argue that "[q]ualified immunity exists for exactly cases like this one. . . . It is undisputed J.L. had serious medical conditions, that he had lost weight over the course of

a year, that his bodily functions were abnormal, and that numerous medical care providers expressed serious concerns about his well-being." (*See id.*) "It is further undisputed that J.L.'s weight climbed while he was in the hospital and, with a brief exception of fluctuation, trended upward throughout his time in foster care." (*See id.* at 9-10.)

"[T]o establish a substantive due process claim a plaintiff must . . . show a government deprivation of life, liberty, or property." *Costanich*, 627 F.3d at 1110 (quoting *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998)). To rise to the level of a constitutional due process violation actionable under 42 U.S.C. § 1983, "state officials must act with such deliberate indifference to the liberty interest that their actions 'shock the conscience.'" *Id.* at 844 (quoting *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (citation omitted)). "Conduct that 'shocks the conscience' is 'deliberate indifference to a known or so obvious as to imply knowledge of, danger.'" *Id.* (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006) (citation and internal quotation marks omitted)).

Portions of Plaintiffs' substantive due process claims are barred by the fact that Ms. Danner or Ms. Kegel were not involved in the alleged conduct, and by absolute immunity. *See supra* § III.C. As to the initial seizure of J.L., it was done by the Seattle Police Department, Ms. Danner was not yet on the case, and Ms. Kegel had not yet been hired by DSHS. (*See* Danner Case File at 2-4; RED00002 ("J.L. was taken into protective custody by [the Seattle Police Department] and turned over to [CPS]."); RED00814 ("[J.L.] was placed in protective custody by the police department.").)

Furthermore, as discussed above, Ms. Danner's decision to file a Dependency Petition and advocate for dependency before the court is covered by absolute immunity. *See supra* § III.C.

Accordingly, the conduct that remains for the court to evaluate through the lens of qualified immunity is limited to Ms. Danner's and Ms. Kegel's investigations and discretionary decisions regarding J.L.'s placement and care while in DSHS custody. With that in mind, the court concludes that even viewed in the light most favorable to Plaintiffs, Plaintiffs have not submitted evidence of State Defendants' conduct that rises to the level of a substantive due process violation.

Ms. Danner originally became involved with Plaintiffs' family when she was obligated to respond to three salient facts: (1) several medical providers who directly treated J.L., in the span of a few days, found J.L., a three-year-old boy, with a "distended abdomen" (RED00397) and "gross malnutrition and muscle wasting" (RED00792); (2) on October 23, 2013, Ms. Chen "refused to take [J.L.] for admission, even after [Dr. Halamay] stated that [she] felt admission was necessary given his abdominal distension, weight loss, and worsening lab values" (RED00397); and (3) even after J.L. went to the hospital, Ms. Chen had to be asked to leave the room "because of her erratic and obstructionist behavior" (RED00930). Ms. Danner responded to several medical professionals that all agreed that J.L. faced a life-threatening medical emergency and that Ms. Chen was an obstacle to J.L. receiving the potentially life-saving care he needed. Under the circumstances, the court concludes that no reasonable jury could conclude that Ms. Danner's actions "shock the conscience."

Plaintiffs make a number of allegations to support their substantive due process claim against Ms. Danner. First, they allege that after the 72-hour hearing, Ms. Danner "did not conduct an investigation consistent with DSHS policies and procedures or that addressed the Court's concerns." (*See* Chen Resp. at 6.) Plaintiffs contend that Ms. Danner's Investigative Assessment "largely repeated the same allegations identified in the [Dependency Petition] and concluded that the allegations of Negligent Treatment or Maltreatment of J.L. were founded." (Chen Resp. at 6 (citing 2d Lo Decl. ¶¶ 4, 7, Exs. 3, 6).) Second, Plaintiffs contend that Ms. Danner failed to deliver the autism report to Dr. Migita, who did not have the report prior to his testimony at the 72-hour hearing, and did not arrange for Dr. Migita to speak with Dr. Green or the parents. (*See* Chen Resp. at 6-7.) Third, Plaintiffs contend that Ms. Danner stated that J.L. gained almost two pounds while in the hospital, and "continues to gain weight in foster care," when in fact J.L. lost two pounds in four days while in SCH's care, and "lost another 1.5 lbs. by November 20," 2013, while in foster care—despite Commissioner Hillman's interest in J.L.'s weight in out-of-home care, and Ms. Danner's admission that it would be important to note that J.L. lost weight in foster care. (*See* Chen Resp. at 7.)

Although Plaintiffs' allegations raise questions about Ms. Danner's investigation, the court finds that even viewing the facts in the light most favorable to Plaintiffs, no reasonable jury could conclude that Ms. Danner's conduct "shocks the conscience." Ms. Danner's Investigative Assessment was completed roughly two weeks after the 72-hour dependency hearing. (*See* Investigative Assessment at 1.) The assessment included J.L.'s autism diagnosis, but also stated that the provider at SCH suspected an attachment

disorder, and that J.L.'s health issues are "due to gross malnourishment and social deprivation." (*See id.* at 6.) Although Plaintiffs take issue with the SCH provider's diagnosis, they do not explain how including providers' competing views in Ms. Danner's Investigative Assessment constitutes "egregious" conduct by Ms. Danner that "shocks the conscience."

Second, although Ms. Danner did not directly present the Lakeside Autism Report to Dr. Migita, Dr. Migita was made aware of the report the day after the hearing concluded. Ms. Dilorio of the AGO emailed Dr. Migita on October 21, 2013, telling him that "the court 'wanted you to get the Autism report from Lakeside Autism Center. I think Kim is going to get that to you.'" (2d Lo Decl. ¶ 8, Ex. 7 at 2.)

Third, SCH records show that J.L.'s weight when admitted to SCH on October 24, 2013 was 12.2 kilograms, increased to 14.6 kilograms on November 3, 2013, then decreased to 13.7 kilograms by November 7, 2013. (2d Lo Decl. ¶ 45, Ex. 44.) However, there is no evidence that Ms. Danner's potentially inaccurate statement in the Investigative Assessment shows a "deliberate indifference to a known or so obvious as to imply knowledge of, danger." *Tamas*, 630 F.3d at 844 (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006) (citation and internal quotation marks omitted)). Plaintiffs provide no evidence that Ms. Danner was aware of J.L.'s weight but decided to report it inaccurately, or was deliberately ignorant of it. (*See generally* Chen Resp.); *Tamas*, 630 F.3d at 844. Furthermore, Plaintiffs' contention that Ms. Danner should have included the November 20, 2013, weight in her Investigative Assessment is

//

without merit, because Ms. Danner's Investigative Assessment was already complete at that time.  (*See* Investigative Assessment.)

Additionally, Ms. Chen's own exhibit at the shelter care hearing showed that J.L. had not gained any weight for an entire year prior to the shelter care hearing.  (*See* 10/30/13 Hearing Tr. at 7.)  Moreover, Plaintiffs do not dispute that they weighed J.L. during visitations, and thus his weight was not a secret that Ms. Danner or Ms. Kegel was failing to disclose.  (*See generally* Chen Resp.)

Plaintiffs also assert that Ms. Kegel violated their substantive due process rights by failing to conduct an adequate investigation and by failing to share objective evidence of J.L.'s condition with his parents.  (*See* Chen Resp. at 7).  Plaintiffs also contend that Ms. Kegel failed to heed the advice of doctors and therapists who had worked with J.L. (*See* Chen Resp. at 8).  Third, Plaintiffs contend that Ms. Kegel failed to provide Ms. Chen with medical records from SCH.  (*See* Chen Resp. at 3.).  Fourth, Plaintiffs argue that Ms. Kegel failed to ensure J.L. was doing well in foster care and ignored signs that he was not.  (*See* Chen Resp. at 12).

Like Plaintiffs' allegations against Ms. Danner, the court concludes that no reasonable jury could conclude that Ms. Kegel's alleged conduct violates Plaintiffs' substantive due process rights.  The evidence Plaintiffs have submitted shows, at most, that Ms. Kegel did not fully investigate J.L.'s health conditions with all of J.L.'s multitude of health providers—many of whom had competing views.  Additionally, even if the court credits Ms. Chen's testimony that J.L.'s condition declined while in State

//

custody, it does not follow that Ms. Kegel was "deliberately ignorant" of imminent danger to J.L.

The court further concludes that even if there was a genuine dispute of material fact about a substantive due process violation, Plaintiffs have not met their burden to persuade the court that a substantive due process right as Plaintiffs describe it is clearly established. Plaintiffs' reliance on *Lesley* is misplaced. (*See* Chen Resp. at 15, 27 (citing *Lesley*, 921 P.2d at 267-70).) In *Lesley*, the court held that a DSHS social worker was not entitled to qualified immunity when he failed to confirm a provider's incorrect diagnosis that a mark on a child was a bruise and not a birthmark before removing the child from her parents' custody. *See Lesley*, 921 P.2d at 267. In contrast to *Lesley*, J.L. was already removed from his parents' custody by the Redmond Police Department when DSHS became involved. (*See* Danner Case File at 2-4.)

More importantly, *Lesley* is no longer—and likely never was—good law with respect to qualified immunity. In a subsequent case in the same court, the court declined to follow *Lesley* because it believes "that it is contrary to United States Supreme Court precedent requiring that a clearly established constitutional right be established with particularity based on prior decisional law." *Petcu v. State*, 86 P.3d 1234, 1249 (citing *Saucier*, 533 U.S. at 200-01). In doing so, the Washington Court of Appeals stated that the *Lesley* court "assumed, without analysis, that a constitutional 'family unity right' was well established." *Id.* (citing *Lesley*, 921 P.2d at 1074-75). The court rejected *Lesley*'s generalized formulation of the right at stake because it "falls short of the inquiry necessary to ensure that a state official had notice that his or her conduct would violate a

constitutional right." *See id.* It then noted that the Washington Court of Appeals has previously held that "there is no well-established constitutional right to the companionship of children whom one abused or neglected, and thus made dependent, according to a final and appealable dependency judgment." *Id.* at 1250 (quoting *Miles*, 6 P.3d at 121). The court acknowledged that the finding that the parent had sexually abused the child was ultimately overturned. *See id.* However, the court held this fact did not negate qualified immunity, because "when [the social worker] investigated, there was reasonable cause to believe that [the parent] had sexually abused [the child]." *See id.* Similarly, here, Commissioner Hillman found reasonable cause to believe that Ms. Chen medically neglected J.L. (*See* 10/30/13 Hearing Tr. at 8.) And similarly, here, the fact that DSHS later changed the "founded" determination to "unfounded" does not eliminate qualified immunity for the State Defendants' prior actions. (*See* 2d Lo Decl. ¶ 19, Ex. 18.)

Aside from *Lesley*, Plaintiffs do not cite to a single case in which a court has held that a social worker was not entitled to qualified immunity for a substantive due process claim based on allegations like those before the court here. (*See generally* Chen Resp.) At the time Ms. Danner and Ms. Kegel took on this case, there was no clearly established substantive due process right to the return of one's child subsequent to a court's reasonable cause finding.

Plaintiffs also rely on *Wallis v. Spencer*, 202 F.3d 1126, 1132 (9th Cir. 2000). (*See* Chen Resp. at 22.) In *Wallis*, police officers responded to a tip from "a mental patient who had a long history of delusional disorders and was confined to a mental

institution[, who] told her therapist a fantastic tale of Satanic witchcraft within her family and an impending child sacrifice." *Wallis*, 202 F.3d at 1131. Officers, "evidently acting on the basis of a non-existent court order, seized the children, aged two and five, placed them in a county-run institution, and several days later, without obtaining judicial authorization and without notifying their parents, took them to a hospital for the performance of highly intrusive anal and vaginal physical examinations." *Id.* The court noted that the facts of that case "were extraordinary in every sense of the word." *See id.* at 1140.

The facts of *Wallace* are far afield from the facts in this case, and they cannot be lumped together neatly as two cases in which "investigators relied on weak and suspect evidence to justify removal of [a] child." (*See* Chen Resp. at 22.) Here, in contrast to *Wallace*, J.L. was removed from his parents' custody not by the State Defendants but by the Redmond Police Department, and based on reports from several different medical providers who had evaluated J.L. in person. *See* RED00002 ("J.L. was taken into protective custody by [the Seattle Police Department] and turned over to [CPS].");  RED00814 ("[J.L.] was placed in protective custody by the police department.").) Additionally, unlike in *Wallis*, here DSHS acted in response to a valid court order finding reasonable cause after a three-day hearing with testimony from all sides.

For the reasons stated above, the court concludes that the State Defendants are entitled to summary judgment on Plaintiffs' substantive due process claims on the basis of qualified immunity.

//

*b. Procedural Due Process*

Parents have a procedural due process claim where "a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue." *Keates v. Koile*, 883 F.3d 1228, 1237-38 (9th Cir. 2018). Additionally, "deliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake." *Costanich*, 627 F.3d at 1107-08. However, "mere allegations that [d]efendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under § 1983." *Costanich*, 627 F.3d at 1111 (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc)).

State Defendants are entitled to qualified immunity with respect to Plaintiffs' procedural due process claims because "information at the time of the seizure, after reasonable investigation, establishe[d] reasonable cause to believe that [J.L. was] in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion [were] reasonably necessary to avert the specific injury at issue." *See Keates*, 883 F.3d at 1237-38. Putting aside the fact that the Seattle Police Department, not the State Defendants, put J.L. into protective custody, State Defendants were faced with sufficient information to establish reasonable cause that J.L. was in imminent danger.

Further, Plaintiffs received robust process throughout the dependency case. Plaintiffs had notice of and were present with an attorney at the 72-hour dependency hearing, along with an interpreter. (*See, e.g.*, 10/28/13 Hearing Tr. at 2-14.) The court heard testimony from witnesses both in favor of and against out-of-home placement for J.L., including the medical provider whose autism diagnosis had not yet been provided to Dr. Migita. (*See generally* 10/28/13 Hearing Tr.; 10/29/13 Hearing Tr.; 10/30/13 Hearing Tr.) The court evaluated testimony, including an exhibit from Ms. Chen herself, that J.L. had not gained any weight for approximately one year. (*See* 10/30/13 Hearing Tr. at 7.) The court specifically considered and weighed the potential effect of autism on J.L.'s weight against the potential effect of medical neglect. (*See id.* at 8 ("It may be because, as an autistic child, he has problems digesting and absorbing food, but I have evidence that since his admission into Children's Orthopedic Hospital, he has been eating almost every food they give him with no apparent distress and he has gained 1.8 pounds.").) The court did not fault Ms. Chen for taking J.L. to Dr. Green or a naturopath, but based on J.L.'s failure to gain weight for a year, followed by gaining 1.8 pounds in one week at SCH and his malnourishment diagnosis, the court concluded that DSHS showed reasonable cause that keeping J.L. with his parents could create substantial harm. (*See id.* at 8-9.)

Plaintiffs were also represented by counsel in filing a motion for revision of shelter care order and up to the point where the State decided to drop the case. (*See* Barbara Decl. ¶ 2, Ex. A at 36; 2d Lo Decl. ¶ 18, Ex. 17.) Plaintiffs complain of delays,

//

but the court is aware of no authority under which a short continuance constitutes a due process violation.

Plaintiffs' remaining allegations that touch on procedural due process involve allegations that State Defendants made false statements or omitted key information in their presentations to the court. (*See generally* Chen Resp.) As discussed above, Ms. Danner and Ms. Kegel are entitled to absolute immunity for their advocacy for the State before the court in the dependency case, unless they deliberately fabricated evidence. *See supra* § III.C. Plaintiffs contend that Ms. Danner made "many false or misleading allegations" in the Dependency Petition. (*See* Chen Resp. at 3.) However, none rise to the level of deliberate fabrication. The primary false statement on which Plaintiffs base their argument is the statement that Ms. Chen refused to take J.L. to emergency care on October 20, 2013. (*See* Dependency Petition ("The mother refused . . . against [m]edical [a]dvice.").) The statement was ultimately revealed to be incorrect. (*See* 2d Lo Decl. ¶ 18, Ex. 17 at 2.) However, no reasonable juror could find that this statement was a "deliberate fabrication" by the State Defendants. First, the statement originated from a medical provider, Dr. Halamay. (*See* RED00397 (stating that the Chen family "did not go to [the emergency department] as recommended.").) Second, Dr. Halamay testified at the shelter care hearing. (*See* Barbara Decl. ¶ 2, Ex. A at 16.) Third, the gravity of the statement's inaccuracy is offset at least in part by the fact that Ms. Chen in fact did refuse to take J.L. to emergency care just three days later, on October 23, 2013, until a social worker arrived at her house. (*See* RED00397; RED00814; 1st Chen Decl. ¶ 33.)

//

For the reasons stated above, the court concludes that the State Defendants are entitled to summary judgment on Plaintiffs' procedural due process claims on the basis of qualified immunity.

### c. Unlawful Seizure

A substantial portion of Plaintiffs' Fourth Amendment claim is based on State Defendants' actions when they "initiated, facilitated, and maintained the dependency actions regarding J.L. and L.L." (*See* FAC ¶¶ 210, 213.) However, as discussed above, "the initiation and pursuit of child-dependency proceedings [are] prosecutorial in nature and warrant absolute immunity on that basis." *Miller*, 335 F.3d at 896 (citing *Meyers*, 812 F.2d at 1157)). Accordingly, Ms. Danner and Ms. Kegel are absolutely immune from Plaintiffs' Fourth Amendment claims based on these actions, and the court need not address them through the lens of qualified immunity.

Plaintiffs also contend that State Defendants violated their Fourth Amendment rights by taking L.L. and J.L. "from the custody and care of their parents without probable cause and based on false and incomplete evidence." (FAC ¶ 215.) Plaintiffs assert that "[w]hen children are seized by the state, their claims are assessed under the Fourth Amendment." (Chen Resp. at 22.)

"The Fourth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." *Doe v. Lebbos*, 348 F.3d 820, 827 (9th Cir. 2003), *overruled on other grounds by Beltran v. Santa Clara Cty.*, 514 F.3d 906 (9th Cir. 2008) (quoting *Mabe*, 237 F.3d at 1107). "Officials may remove a child from the custody of [his or her] parent without prior judicial authorization only if

the information they possess at the time of the seizure is such as provides reasonable

cause to believe that the child is in imminent danger of serious bodily injury and that the

scope of the intrusion is reasonably necessary to avert that specific injury." *Doe*, 348

F.3d at 827 (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000)).

Although Plaintiffs refer generally to the Fourth Amendment right described

above, they do not explain how Ms. Danner or Ms. Kegel's actions constitute a Fourth

Amendment violation. *See Blankenhorn*, 485 F.3d at 481 n.12 ("[A] state official's

liability under section 1983 is predicated on his integral participation in the alleged

violation.") (internal quotation omitted). Police officers, not DSHS, originally placed

J.L. into protective custody. (*See* Danner Case File at 2-4; RED00002 ("J.L. was taken

into protective custody by [the Seattle Police Department] and turned over to [CPS].");

RED00814 ("[J.L.] was placed in protective custody by the police department.").)

The 72-hour dependency hearing occurred on October 28-30, 2013, while J.L.

was still being treated at SCH for malnourishment and dehydration. At the hearing,

Commissioner Hillman concluded that DSHS showed reasonable cause to remove J.L.

from his parents' custody. (*See* 10/30/13 Hearing Tr. at 8.) Plaintiffs do not explain how

Ms. Danner was an integral participant in any "seizure" of J.L. under these

circumstances. (*See generally* Resp.) Moreover, Ms. Kegel had not even been assigned

to the case at the time of the dependency hearing. (*See* Kegel Dep. at 80:22-81:3.)

To the extent Plaintiffs' theory—unexplained in their briefing—is that Ms. Danner

and Ms. Kegel "seized" J.L. after he was already lawfully in state custody by court order,

by failing to disclose information that tends to show that Ms. Chen was mistreating J.L.

1 less than the evidence originally showed, the court will not entertain it. Plaintiffs do not

2 provide any authority under which this alleged conduct constitutes an unlawful seizure

3 under the Fourth Amendment, and the court is aware of none. Accordingly, the State

4 Defendants are entitled to summary judgment on qualified immunity grounds with

5 respect to Plaintiffs' Fourth Amendment claim.

6      Having concluded that Ms. Danner and Ms. Kegel are entitled to absolute

7 immunity for their advocacy in the dependency proceedings, and qualified immunity on

8 all three of Plaintiffs' 42 U.S.C. § 1983 claims, the court GRANTS summary judgment in

9 favor of State Defendants on all of Plaintiffs' Section 1983 claims.[12]

10 **E.     Plaintiffs' State Law Claims**

11     1.     <u>Negligent Investigation</u>

12      There is no common law cause of action for negligent investigation under

13 Washington law. *Ducote v. State, Dep't of Soc. & Health Servs.*, 186 P.3d 1081, 1082

14 (Wash. Ct. App. 2008), *aff'd*, 222 P.3d 785 (Wash. 2009) (citing *Dever v. Fowler*, 816

15 P.2d 1237, 1242 (Wash. Ct. App. 1991)). However, the Washington Supreme Court has

16 determined that RCW 26.44.050 creates a private right of action based on "DSHS's

17 statutory duty to investigate child abuse." *See id.* (citing *Bennett v. Hardy*, 784 P.2d

18

---

19     [12] Plaintiffs do not make any argument with respect to Bill Moss and do not describe any
conduct of his that shows him to be an integral participant in this case. (*See generally* Chen
20 Decl.) Additionally, Plaintiffs present no argument that any abstract role Mr. Moss played
violated a well-established and specifically defined constitutional right or that Mr. Moss had any
21 role in the allegations that relate to Plaintiffs' state law claims. Accordingly, the court concludes
that Mr. Moss is entitled to qualified immunity on Plaintiffs' Section 1983 claims, and further
22 concludes that Plaintiffs have not met their burden to show a genuine dispute of fact that Mr.
Moss is liable for any of Plaintiffs' state law claims.

1258, 1261-62 (Wash. 1990); *Tyner v. Dep't of Soc. & Health Servs.*, 1 P.3d 1148, 1155

(Wash. Ct. App. 2000)).  That statute provides:

> [U]pon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

RCW 26.44.050.  The Washington Supreme Court further held that "the duty to use

reasonable care in investigating allegations of child abuse is owed to a child's parents,

even those suspected of abusing their own children." *Tyner*, 1 P.3d at 1155.

"A negligent investigation claim is available only when law enforcement or DSHS

conducts an incomplete or biased investigation that 'resulted in a harmful placement

decision.'" *McCarthy v. Cty. of Clark*, 376 P.3d 1127, 1134 (Wash. Ct. App. 2016)

(quoting *M.W. v. Dep't of Soc. & Health Servs.*, 70 P.3d 954, 955 (Wash. 2003).  "A

harmful placement decision includes 'removing a child from a nonabusive home, placing

a child in an abusive home, or letting a child remain in an abusive home.'" *Id.* (quoting

*M.W.*, 70 P.3d at 960).  To prevail on a negligent investigation claim, "the claimant must

prove that the allegedly faulty investigation was a proximate cause of the harmful

placement." *See Petcu*, 86 P.3d at 1244.

"A negligent investigation may be the cause in fact of a harmful placement even

when a court order imposes that placement." *McCarthy*, 376 P.3d at 1135 (citing *Tyner*,

1 P.3d at 1156).  "Liability in this situation depends upon what information law

enforcement or DSHS provides to the court." *Id.* (citing *Tyner*, 1 P.3d at 1157-58).  "A

court order will act as a superseding cause that cuts off liability 'only if all material

information has been presented to the court.'" *Id.* (quoting *Tyner*, 1 P.3d at 1158

(holding that whether a social worker failed to inform the court that he had determined

the allegations against a parent were unfounded was material was a question of fact for

the jury)).  Additionally, the materiality of an investigator's failure to interview "key

collateral sources" is a question of fact for the jury.  *See id.* at 1158-59.

In addition to concealment of a material fact, "negligent failure to discover

information may subject the State to liability even after adversarial proceedings have

begun." *Id.* at 1156.  In *Tyner*, the court reversed a grant of summary judgment for a

social worker where the social worker determined that the allegations against the plaintiff

were unfounded, concluding that the fact that the social worker reached this conclusion

was "a fact that might have been relied on by the court in making its decision." *See id.* at

1158.  The court also found that whether the caseworkers' alleged failure to "interview

collateral sources, and in turn fail[ure] to deliver the information to the court that these

sources would have provided" were material facts was a question for the jury. *See id.* at

1158-59.

State Defendants do not contest that DSHS changed its finding of Ms. Chen's

medical neglect from "founded" to "unfounded," in what a State witness described as a

rare occurrence.  (*See generally* Mot.; Reply; 2d Lo Decl. ¶ 29, Ex. 28 ("Allison-Noone

Dep.") at 78:6-81:22.)  Accordingly, the court concludes that there are questions of

material fact as to whether a "harmful placement decision" was made when J.L. was

removed from "a non-abusive home." *See McCarthy*, 376 P.3d at 1134 (quoting *M.W.*,

70 P.3d at 955).

State Defendants contend that Commissioner Hillman's shelter care order operates as a superseding cause of out-of-home placement for J.L.  (*See* MSJ at 12-13.)  Plaintiffs respond that State Defendants failed to present material information to the court.  (*See* Chen Resp. at 16.)  Additionally, Plaintiffs contend that DSHS is liable for negligent investigation after the shelter care order because each time DSHS moved J.L. to a new foster home counts as an additional "harmful placement."  (Chen Resp. at 17.)

Here, viewing the facts in the light most favorable to Plaintiffs, they have identified facts that a jury could deem material prior to Commissioner Hillman's October 30, 2013, shelter care order.  First, a jury could determine that Ms. Danner's failure to discuss J.L.'s care with his remaining treating providers prior to the shelter care hearing constitutes a material failure to interview collateral sources.  Although Dr. Green and Dr. Gbedawo were present at the hearing and testified in favor of Ms. Chen, the court cannot conclude as a matter of law that interviewing J.L.'s other medical providers did not preclude material information from reaching Commissioner Hillman.  And while Commissioner Hillman heard testimony from Dr. Green regarding J.L.'s autism, interviews with J.L.'s other providers may have confirmed the autism more clearly before the hearing, and may have changed Dr. Migita's testimony that suggested medical neglect, not autism, was the cause of J.L.'s medical issues.

Second, the Dependency Petition stated that Ms. Chen refused to take J.L. to the emergency department on October 20, 2013, a determination that ultimately was determined to be incorrect.  (*See* Dependency Petition.)  Whether this incorrect determination was due to Ms. Danner's negligence or to another cause, and whether it

1   was a material fact that would have changed Commissioner Hillman's determination, are

2   fact questions for the jury.

3         However, the court agrees with State Defendants that J.L.'s placements in

4   subsequent foster homes following his initial placement cannot constitute additional

5   harmful placement decisions. Although Plaintiffs contend that J.L. regressed in foster

6   care, they make no allegations constituting abuse by the foster parents. (*See generally*

7   Chen Resp.); *M.W.*, 70 P.3d at 955 ("A harmful placement decision includes removing a

8   child from a nonabusive home, placing a child in an abusive home, or letting a child

9   remain in an abusive home."). Accordingly, the only harmful placement decision at issue

10  in this case is the removal of J.L. from his nonabusive home as a result of the

11  Dependency Petition and the shelter care order. Therefore, the only portion of Plaintiffs'

12  negligent investigation claim that can survive summary judgment relates to Ms. Danner's

13  investigation prior to Commissioner Hillman's October 30, 2013 shelter care order.

14  Additionally, because Ms. Kegel was not involved with J.L.'s case until after the shelter

15  care order was issued, the court GRANTS State Defendants summary judgment on

16  Plaintiffs' negligent investigation claim against Ms. Kegel. The court further agrees that

17  Ms. Danner cannot be held liable for negligent investigation if the information she is

18  accused of omitting was before Commissioner Hillman through another witness. *See*

19  *Petcu*, 86 P.3d at 1246.

20        Finally, the court disagrees with State Defendants that an expert witness is

21  required to determine the standard of care Ms. Danner should have followed during her

22  investigation of J.L.'s case. (*See* MSJ at 14.) State Defendants cite to no case that

requires an expert witness for a negligence case against a social worker, and the court concludes that the jury is capable of deciding whether Ms. Danner conducted "an incomplete or biased investigation" without expert testimony. (*See generally* MSJ); *Tyner*, 1 P.3d at 1155 (holding that social workers have a "duty [to a child's parents] to use reasonable care in investigating allegations of child abuse").

In sum, the court concludes that there a genuine dispute of material fact as to whether Ms. Danner and DSHS made a "harmful placement decision" by removing J.L. from a nonabusive home. The court further concludes that the shelter care order is a superseding cause unless material facts were withheld from the court. As a result, at trial, Plaintiffs must prove that Ms. Danner's failure to interview additional collateral sources or to provide accurate information regarding the October 20, 2013, emergency department visit were material to Commissioner Hillman's decision. The court GRANTS in part and DENIES in part the State Defendants' summary judgment motion with respect to Plaintiffs' negligent investigation claims.

    2.   <u>IIED</u>

The burden of proof on an IIED claim is stringent. *See Lyons v. U.S. Bank Nat. Ass'n*, 336 P.3d 1142, 1151 (Wash. 2014). To prevail on an IIED claim, "a plaintiff must prove (1) outrageous and extreme conduct by the defendant, (2) the defendant's intentional or reckless disregard of the probability of causing emotional distress, and (3) actual result to the plaintiff of severe emotional distress." *Steinbock v. Ferry Cty. Pub. Util. Dist. No. 1*, 269 P.3d 275, 282 (Wash. Ct. App. 2011).

*//*

1    "The first element requires proof that the conduct was 'so outrageous in character,

2    and so extreme in degree, as to go beyond all possible bounds of decency, and to be

3    regarded as atrocious, and utterly intolerable in a civilized community.'" *Lyons*, 336

4    P.3d at 1151 (quoting *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002); *Dicomes*

5    *v. State*, 782 P.2d 1002, 1012 (Wash. 1989)).  "The question of whether certain conduct

6    is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to

7    determine if reasonable minds could differ on whether the conduct was sufficiently

8    extreme to result in liability." *Id.* (quoting *Dicomes*, 782 P.2d at 1013.)  "It is for the

9    court to determine whether on the evidence severe emotional distress can be found; it is

10    for the jury to determine whether, on the evidence, it has in fact existed." *Id.* (quoting

11    Restatement (Second) of Torts § 46 (Am. Law Inst. 1965)).

12    Plaintiffs' IIED claim fails on the first element.  Without opining on how Ms.

13    Danner and Ms. Kegel could have done their jobs better, no reasonable jury could find

14    that their actions were so outrageous in character, and so extreme in degree, as to go

15    beyond "all possible bounds of decency." *See, e.g.*, *Waller v. State*, 824 P.2d 1225, 1235

16    (Wash. Ct. App. 1992) ("While it is true that substantial evidence has shown that the

17    caseworkers were in error when they believed Frances' allegations, the caseworkers were

18    supported in part by the expert opinions of therapists.  Thus, their conduct cannot be said

19    to have been outrageous.").  Accordingly, the court GRANTS summary judgment in

20    favor of State Defendants on Plaintiffs' IIED claim.

21    //

22    //

### 3. <u>Negligent Infliction of Emotional Distress</u>

Negligent infliction of emotional distress is a narrowly construed tort that is limited to "those individuals who are most likely to be severely impacted by 'the shock caused by the perception of an especially horrendous event.'" *Bylsma v. Burger King Corp.*, 293 P.3d 1168, 1175 (Wash. 2013) (quoting *Colbert v. Moomba Sports, Inc.*, 176 P.3d 497, 502 (Wash. 2008)). The "horrendous event" must encompass "conditions analogous to seeing a 'crushed body' . . . or hearing 'cries of pain [or] dying words.'" *Id.* (quoting *Colbert*, 176 P.3d at 504). A cause of action based on bystander negligent infliction of emotional distress occurs only "where a plaintiff witnesses the victim's injuries at the scene of an accident shortly after it occurs and before there is [a] material change in the attendant circumstances." *Colbert*, 176 P.3d at 503 (quoting *Hegel v. McMahon*, 960 P.2d 424, 429 (Wash. 1998)).

Additionally, a plaintiff must prove: "(1) the emotional distress is within the scope of foreseeable harm of the negligent conduct, (2) the plaintiff reasonably reacted given the circumstances, and (3) objective symptomatology confirms the distress." *Repin v. State*, 392 P.3d 1174, 1184 (Wash. Ct. App. 2017) (citing *Bylsma*, 293 P.3d at 1170-71)).

"[T]o satisfy the objective symptomology requirement . . . a plaintiff's emotional distress must be susceptible to medical diagnosis and proved through medical evidence." *Hegel v. McMahon*, 960 P.2d 424, 431 (Wash. 1998). The plaintiff must provide "objective evidence regarding the severity of the distress, and the causal link between the observation at the scene and the subsequent emotional reaction." *Id.*

Here, Plaintiffs fail to create a genuine dispute of material fact on two elements. First, Plaintiffs do not identify an "especially horrendous event" akin to "seeing a crushed body . . . or hearing cries of pain or dying words." (*See generally* Resp.) Second, Plaintiffs cannot prove causation with the evidence submitted to the court. Plaintiffs provide evidence of objective symptomology from treating providers. (*See, e.g.*, Chan Decl. ¶ 18 ("Ms. Chen continues to suffer from clinical depression and anxiety.").) However, Plaintiffs disclosed no expert witnesses in this case, and therefore are unable to provide competent causation evidence. *See supra* § III.A; *see also Urena*, 659 F.3d at 908 ("[A] physician's assessment of the cause of an injury is expert testimony."); *Henderson*, 409 F.3d at 1300 ("Her diagnosis of the injury itself . . . would be permissible lay testimony, but her statement about the cause of the injury was, as she admitted, a 'hypothesis.' And the ability to answer hypothetical questions is the essential difference between expert and lay witnesses." (internal quotation and alteration omitted)); *Wills*, 379 F.3d at 46 (holding that, where the cause of an injury would not be obvious to a lay juror, expert testimony is required)).

Accordingly, the court GRANTS summary judgment in favor of the State Defendants on Plaintiffs' claim for negligent infliction of emotional distress.

### IV. CONCLUSION

For the reasons set forth above, the court GRANTS in part and DENIES in part the State Defendants' motion for summary judgment (Dkt. # 189); GRANTS summary judgment in full in favor of Defendants Bill Moss and Jill Kegel; GRANTS summary judgment in favor of Defendants Kimberly Danner and Washington State Department of

Social and Health Services with the exception of Count IX: Negligent Investigation;

GRANTS in part and DENIES in part State Defendants' motion to strike portions of

Plaintiffs' declarations; GRANTS Ms. Chen's and Mr. Lian's motions to file surreplies

(Dkt. ## 221, 223); and ORDERS Ms. Chen and Mr. Lian to file the surreplies found at

docket numbers 221-1 and 223-3 on the docket within seven (7) days of the date of this

order.

      Dated this 20th day of December, 2019.


JAMES L. ROBART
United States District Judge