UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SUSAN CHEN, et al., | CASE NO. C16-1877JLR |
| Plaintiffs, | ORDER GRANTING MOTION FOR PARTIAL RECONSIDERATION |
| v. | |
| NATALIE D'AMICO, et al., | |
| Defendants. | |

## I. INTRODUCTION

Before the court is Defendants Washington State Department of Social and Health Services ("DSHS") and Kimberly Danner's (collectively, "State Defendants") motion for partial reconsideration of the court's December 20, 2019, order granting in part and denying in part State Defendants' motion for summary judgment. (*See* MFR (Dkt. # 253); MSJ Order (Dkt. # 242).)[1]  Plaintiffs Susan Chen, Naixiang Lian, and minor

---

[1] In addition to DSHS and Ms. Danner, State Defendants' motion for summary judgment also included Defendants Bill Moss and Jill Kegel. (*See* MSJ Order at 1.)  The court granted

children J.L. and L.L. filed responses.  (*See* Chen MFR Resp. (Dkt. # 263); Lian MFR Resp. (Dkt. # 266).)  State Defendants filed a reply.  (MFR Reply (Dkt. # 267).)

The court has considered the motion for reconsideration, the parties' submissions in support of and in opposition to the motion, the relevant portions of the record, and the applicable law.  Being fully advised, the court GRANTS State Defendants' motion for reconsideration.

## II.    BACKGROUND

### A.    Procedural History

On December 20, 2019, the court granted State Defendants summary judgment on Plaintiffs' 42 U.S.C. § 1983 claims and on Plaintiffs' state law claims for intentional and negligent infliction of emotional distress.  (*See* MSJ Order (Dkt. # 242) at 19-47, 52-55.) The court further granted partial summary judgment in favor of State Defendants on Plaintiffs' negligent investigation claim and limited the claim to DSHS's investigation prior to the October 30, 2013, shelter care order.  (*See id.* at 47-52.)

The court held a pretrial conference on January 2, 2020.  (*See* 1/2/20 Min. Entry (Dkt. # 252).)  At the conference, State Defendants' counsel informed the court that they intended to file a motion for reconsideration of the court's ruling on Plaintiffs' negligent investigation claim on the ground that RCW 4.24.595 requires the court to apply a gross negligence standard to the remainder of Plaintiffs' negligent investigation claim.  Later

//

---

summary judgment in favor of Mr. Moss and Ms. Kegel, and that ruling is not at issue here.  (*See id.* at 55.)

1   that day, State Defendants filed a document entitled "Anticipated Scope of Trial" that set

2   forth their argument.  (*See generally* MFR.)

3         On January 3, 2020, the court construed State Defendants' filing as a motion for

4   partial reconsideration and noted that "[t]he plain language of RCW 4.24.595(1) supports

5   State Defendants' argument."  (*See* OSC (Dkt. # 254) at 4.)  The court further stated that

6   "[i]n addition, the court sua sponte considers whether it should grant summary judgment

7   in favor of State Defendants on Plaintiffs' remaining claim for negligent investigation."

8   (*See id.* at 2 (citing Fed. R. Civ. P. 56(f)).)  Finally, the court ordered Plaintiffs to file a

9   response to State Defendants' motion by January 8, 2020, at 12:00 p.m. Seattle time, and

10  allowed State Defendants to file a reply by January 9, 2020.  (*See id.* at 4.)

11        Ms. Chen timely filed her response and attached evidence largely duplicative of

12  the evidence she filed in response to State Defendants' motion for summary judgment.

13  (*See* Chen MFR Resp.; Janura Decl. (Dkt. # 264) ¶¶ 2-12, Exs. 1-11.)  Mr. Lian filed his

14  response the same day at 1:54 p.m., roughly two hours after the deadline.  (*See* Lian MFR

15  Resp.)  State Defendants filed their reply on January 9, 2020.  (*See* MFR Reply.)  State

16  Defendants also filed a declaration from Ms. Danner.  (*See* Danner Decl. (Dkt. # 269).)

17        On January 10, 2020, the court entered an order granting summary judgment in

18  favor of State Defendants on Plaintiffs' remaining negligent investigation claim and

19  vacated the trial date.  (*See* 1/10/20 Order (Dkt. # 270).)  The court stated that an order

20  setting forth the court's analysis would follow.  (*See id.* at 2.)

21  //

22  //

On the same day, Ms. Chen filed a surreply.[2]  (*See* Chen Surreply (Dkt. # 271) at 1.)  Despite the court having not yet issued this order setting forth the court's reasoning, Ms. Chen's surreply asserts that the court's order granting summary judgment "was in part based on [State Defendants' reply] and the Danner Declaration," and that the Danner Declaration "contains multiple false statements contradicted by the documents in this case."  (*See id.* at 1.)  On that basis, Plaintiffs ask the court to reconsider its order granting summary judgment on Plaintiffs remaining negligent investigation claim.[3]  (*See id.* at 1.)

**B.    Relevant Facts**

The court has set forth the facts of this case in great detail in several prior orders.  (*See* 5/24/19 Order (Dkt. # 170); MSJ Order.)  The court incorporates the facts set forth in those orders and repeats here only the facts relevant to State Defendants' motion for partial reconsideration.

1.    <u>Events Prior to Protective Custody</u>

Ms. Chen took J.L. to several medical providers on October 19 and October 20, 2013, to address issues including abdominal pain and swelling, kidney and liver problems, weight loss, and poor eating.  (*See* MSJ Order at 3-5 (discussing visits to

---

[2] Mr. Lian also filed a surreply that simply states "Plaintiff Lian hereby submits this Joinder to Plaintiffs' Surreply filed by counsel for Plaintiff Susan Chen."  (*See* Lian Surreply (Dkt. # 273).)

[3] Plaintiffs did not request leave to file a surreply pursuant to LCR 7(g).  (*See generally* Dkt.); *see also* Local Civil Rules W.D. Wash. LCR 7(g).  However, because the surreply responds to evidence not in the record at the time Plaintiffs filed their response to State Defendants' motion for reconsideration, the court considers it.

Mercer Island Pediatrics, Pediatric Associates, Seattle Children's Hospital's ("SCH")

urgent care clinic, SCH's emergency department, and Dr. Hatha Gbedawo (a naturopathic

physician).) Dr. Darren Migita of SCH released J.L. after an October 20, 2013, visit, on

the understanding that Ms. Chen would follow up with J.L.'s primary care provider, Dr.

Kate Halamay of Pediatric Associates, within one to three days. (*See* RED00374-75.[4])

Ms. Chen took J.L. to Dr. Halamay on October 23, 2013. (1st Chen Decl. (Dkt.

# 131) ¶ 32.) According to Dr. Halamay's notes, Ms. Chen "declined [a] phone

interpreter although offered several times" and "refus[ed] to make eye contact, t[ook] a

long time to answer questions or refuse[d] to answer at all." (RED00397.) Dr. Hal

Quinn at Mercer Island Pediatrics, who had seen J.L. previously, called Dr. Halamay

before the appointment. (*Id.*; RED00105-06.) Dr. Quinn:

> expressed great concern about this [patient] as well as family, feels that he
> his [sic] very sick, concern about failure to thrive, has lost several pounds
> since April, concerned that family has been going from dr to dr but that pt is
> not actually receiving appropriate medical attention.

(RED00397.) Dr. Halamay noted that J.L. appeared "[v]ery tired" and continued to

"have distended abdomen," though Ms. Chen said his condition was improving. (*See id.*)

Dr. Halamay also noted that Ms. Chen was confused about doctors' instructions from

October 19 and 20, 2013, to take J.L. to certain specialists, and that the Chen family "did

*//*

---

[4] Documents cited solely as "REDXXXXX" are sealed documents that were part of
Detective D'Amico's investigative file for the investigation of Ms. Chen. (*See* 1st Lo Decl.
(Dkt. # 132) (attaching unsealed exhibits); Dkt. # 133 (attaching sealed exhibits).) These
documents are attached to the first declaration of T. Augustine Lo as exhibits B-L. Otherwise,
the court refers to exhibits to the first declaration of T. Augustine Lo as "1st Lo Decl., ¶ XX, Ex.
XX," regardless of whether the exhibits appear at docket number 132 or 133.

not go to [the emergency department] as recommended." (*Id.*) Dr. Halamay recommended that Ms. Chen admit J.L. to the hospital "at once" so that he could be seen by renal, endocrine, and gastroenterology specialists. (*Id.*) Ms. Chen "refused to take [J.L.] for admission, even after [Dr. Halamay] stated that [she] felt admission was medically necessary given his abdominal distension, weight loss, and worsening lab values compared to those drawn a few weeks ago." (*Id.*) Dr. Halamay further noted that she spoke with Dr. Metz, a doctor on the SCH Suspected Child Abuse Network ("SCAN") team, "who again recommended admission for this patient for coordination of care as well as to provide social support for the family and also to determine if SCAN team involvement is necessary." (*Id.*)

Dr. Halamay further recommended to Ms. Chen that they arrange an admission for J.L. to coordinate several services, but Dr. Halamay's notes indicate that Ms. Chen "refused to take him for admission, even after [Dr. Halamay] stated that [he] felt admission was medically necessary given [J.L.'s] abdominal distension, weight loss, and remarked "'I have no confidence in [SCH]. . worsening lab values compared to those drawn a few weeks ago." (*Id.*) Ms. Chen. . I will find my own specialists. This is a waste of time and a waste of money. I have no time to sit in the hospital.'" (*Id.*) Given Ms. Chen's refusal, Dr. Halamay "again spoke [with] Dr. Metz who agreed that given [J.L.]'s medical issues, if [Ms. Chen] does not agree to admission that it would be appropriate to contact CPS." (*Id.*) Dr. Halamay then told Ms. Chen again that she felt that J.L.'s admission was medically necessary, and that if Ms. Chen did not admit J.L., that Dr. Halamay would "have to contact CPS in order to ensure that [J.L.] receives

proper medical attention." (*Id.*) Ms. Chen again refused to agree to admission, and according to Dr. Halamay, "became angry, stood up, picked [J.L.] up and left the office." (*Id.*) Dr. Halamay then contacted CPS, and then informed SCH's emergency department that J.L. "may be coming in and that he needs to be admitted." (*Id.*)

Ms. Chen recalls that she "felt as though Dr. Halamay and SCH were dismissive and had not provided proper care for [J.L.]" (1st Chen Decl. ¶ 32.) Further, Ms. Chen told Dr. Halamay at the October 23, 2013, appointment that she "would not go back to see [Dr. Halamay] anymore" and that she "would make a complaint against her." (*Id.*) Late on the night of October 23, 2013, a CPS social worker, Kirk Snyder, arrived at Plaintiffs' home and took J.L. to SCH's emergency department. (*See* RED00814; Pl. MSJ (Dkt. # 141) at 7; *but see* 1st Chen Decl. ¶ 33 (stating that "[a]t [CPS]'s recommendation, we took J.L. to SCH").)

J.L. was seen on October 24, 2013, by Dr. Virginia Sanders and Dr. Shannon Staples at SCH. (*See* RED00791.) According to Dr. Sanders's summary, J.L. showed a "failure to thrive . . . [and] gross malnutrition and muscle wasting." (RED00792.) She noted her "concern for medical cause of wasting vs. neglect." (*Id.*) J.L. weighed 12.2 kilograms (26.9 pounds) when he was admitted to SCH on October 24, 2013, which was in the third percentile. (RED00814.) J.L. was admitted to SCH's "general medicine service" to treat his malnutrition and receive a SCAN consultation. (*See* RED00791.) Dr. Sanders also wrote that "[g]iven mother's resistance to medical evaluation in this ill child, he is currently in state custody." (*Id.*) Dr. Sanders instructed lab tests and scheduled a follow-up with Dr. Halamay. (RED00793.)

The doctors noted that Ms. Chen was "asked to leave" the hospital room "because of her erratic and obstructionist behavior." (RED00930; *see also* 2d Lo Decl. (Dkt. # 215, 216 (sealed)) ¶ 3, Ex. 2 ("Danner Case File") at 3 (attaching a social worker's note stating that Ms. Chen "caused so much disturbance that staff had to call police and have her removed from the hospital"), 4 ("There are significant concerns about mom's mental health due to her recent behavior at [SCH] as well as at Pediatric Associates.").)

Dr. Metz of the CPS SCAN team prepared a report dated October 27, 2019, while J.L. was still being treated at SCH. (RED00813-18.) The report noted that J.L was in the third percentile for weight and third percentile for body-mass index, and that J.L. was "severely malnourished." (RED00816-17.) Dr. Metz wrote that "this could potentially be due to his severe state of poor nutrition, although other etiologies must be ruled out." (RED00817.) After a review of some of J.L.'s medical history, Dr. Metz wrote:

> It is concerning that patient's mother has not followed through with the recommendations by multiple providers, both in the emergency department at [SCH] as well as the outpatient setting. Mother's behavior seems to be erratic and although she has sought care with multiple providers it does not appear that she is following through with their recommendations. Regardless of [J.L.]'s mother's intentions, it does seem that there is an element of neglect given his current nutritional status. . . . I think it will be important to continue to obtain records from all of his providers that he has seen to try to further elucidate what medications he has been on. It will be important while [J.L.] is in the hospital to see how he tolerates feeding and how his weight changes given adequate nutrition.

(*Id.*)

2. Protective Custody and the Shelter Care Hearing

The Seattle Police Department placed J.L. in protective custody on October 24, 2019, "due to immediate concerns of medical neglect," and transferred custody to "field

worker [Brian] Davis, who was present at the hospital." (Danner Case File at 2-4; *see also* RED00002 ("J.L. was taken into protective custody by [the Seattle Police Department] and turned over to [CPS]."); RED00814 ("[J.L.] was placed in protective custody by the police department.").)

DSHS had limited time to investigate because state law requires a shelter care hearing within 72 hours when a child is taken into custody. *See* RCW 13.34.065. Entries in the DSHS FamLink system show a flurry of activity on October 24 and 25, 2013. (*See* Danner Case File at 21-24.) Kirk Snyder spoke with SCH personnel on October 24, 2013. (*See id.* at 21.) On the same day, Tom Soule described his communications with SCH staff and Officer Chung, and the expected results of a welfare check. (*Id.* at 22.) Mr. Davis documented his unsuccessful attempt to reach Mr. Lian over the phone on October 24, 2013, and also spoke with a SCAN doctor over the phone. (*Id.* at 23.) On the same day, Ms. Danner was assigned to J.L.'s case. (*See id.* at 24.) In the same entry documenting Ms. Danner's assignment, Natalya Gaydarzhi states that "as of this morning, [Ms. Chen] was sent home from SCH due to her continued disruption and interference of hospital staff providing care to [J.L.]." (*See id.*)

The next day, October 25, 2013, Ms. Danner spoke with Jackie Brandt, a social worker who was working with the SCAN team, and Dr. Metz. (*See* 2d Chen Decl. (Dkt. # 217) ¶ 4, Ex. 2 (10/28/13 Hearing Tr.) at 4-6.) Ms. Danner also spoke with Dr. Quinn, J.L.'s primary care provider, and Dr. Migita. (*See id.* at 8-9.) Ms. Danner filed a dependency petition on October 25, 2013, the day after she was assigned to the case. (*See* 2d Lo Decl. ¶ 4, Ex. 3 ("Dependency Petition") at 2, 7.) In addition to largely

repeating the medical history for J.L. described in Ms. Danner's notes, the Dependency

Petition also states, in relevant part:

- Due to J.L.'s "extremely distended abdomen," physicians at both Mercer Island Pediatric and Pediatric Associates on October 19, 2013 "recommended the mother take the child to the hospital immediately. The mother refused and left against Medical Advice. The mother and child returned to [SCH] later that day. The child's labs had stabilized and the child was discharged." (*Id.* at 4.)

- At Pediatric Associates on October 23, 2013, the physician reported that JL's condition had worsened. "The referrer stated the child needs to be admitted to [SCH] immediately, and she directed parents to do so. Mother did not take the child [J.L.] after this visit, and only did so later in the evening when the parents were directed to take the child to the hospital." (*Id.*)

- "All health care providers who have been contacted by [DSHS] and Law Enforcement to date have reported concerns that the mother is 'doctor shopping', seeking medical care that the child does not need, and also not following through on medical care that is recommended by medical care providers." (*Id.*)

- "Not only did the child suffer life-threatening physical conditions related to malnourishment, but [SCH] physician [sic] reported to the social worker that the child's delay in speech and social skills may be caused by malnourishment and social deprivation." (*Id.*)

- "The parents continue to be very evasive with questions asked by health care providers and the Department about previous health care." (*Id.*)

- Information is being gathered by "the [SCH] SCAN team to attempt to determine if the medical neglect was a case of mother's obstructing medical care, or if the maltreatment is related to a more insidious mental health crisis being experienced by the mother. According to [SCH] staff, based on preliminary information gathered, the mother was at the very least obstructing needed medical care for the child." (*Id.* at 5.)

- "At this time, [DSHS] has grave concerns about both parents and their ability to safely parent these two children." (*Id.*)

A 72-hour shelter care hearing was held before Commissioner Mark Hillman from October 28 to October 30, 2013, to determine if J.L. should be placed in out-of-home care pending a final dependency determination. (*See* FAC ¶ 59.) The parties agree that generally shelter care hearings are short proceedings that often last around one hour. (*See* Chen MFR Resp. at 5 n.2; MFR Reply at 2 (citing Danner Decl. ¶ 2).) In this case, the shelter care hearing lasted three days. (*See* 10/28/13 Hearing Tr.; 2d Chen Decl. ¶ 4, Ex. 3 (10/29/13 Hearing Tr.); 2d Chen Decl. ¶ 4, Ex. 1 (10/30/13 Hearing Tr.).) Commissioner Hillman heard testimony from DSHS witnesses Dr. Migita, Dr. Halamay, and Ms. Danner, and from Plaintiffs' witnesses Dr. John A. Green, Dr. Gbedawo, Dr. Hugeback, and Mr. Lian. (*See* Barbara Decl. (Dkt. ## 190 (redacted), 191 (sealed) ¶ 2, Ex. A ("Dependency Records") at 13-18.) The parties presented the following exhibits:

- "Lab results from [SCH]"

- "Letter from Vital Kids Medicine dated 10/24/13"

- "Food record for [J.L.] from [SCH]"

- "Declaration of Brooke Greiner, Occupational Therapist dated 10/26/13"

- "Report for [J.L.] from Lakeside Center for Autism"

- "Weight tracking log for [J.L.]"

- "Letter from Dr. John A. Green III dated 10/30/13"

- "Report from Eastside ENT (Dr. Gumprecht)"

(*See* Dependency Records at 33-34.)[5]

At the hearing, Ms. Danner testified that J.L.'s health care providers "continue to have concerns about gross malnourishment." (10/28/13 Hearing Tr. at 4.) Ms. Danner described the quick timeframe with which she was faced. (*See id.* at 12.) She testified that she spoke to Ms. Brandt, who worked with the SCAN team, Dr. Metz, and Dr. Migita. (*See id.* at 5, 9.) Plaintiffs argue that Ms. Danner failed to personally interview several providers prior to the shelter care hearing (*see* Chen Surreply at 2-4) and Ms. Danner concedes that some of her information was second-hand through Ms. Brandt (*see* 10/28/13 Hearing Tr. at 8). However, there is no dispute that DSHS communicated with several of J.L.'s medical providers because several of them testified at the shelter care hearing. (*See* Dependency Records at 13-18.) Moreover, Commissioner Hillman heard testimony from Dr. Migita that was consistent with Ms. Danner's testimony. (*See* 10/29/13 Hearing Tr. at 2 (Q: "Would you describe [J.L.]'s presentation upon admission as gross malnutrition?" Dr. Migita: "Yes, I would."); *id.* ("[P]rior to [J.L.]'s admission on the 24th our lab values indicated that he was potentially entering into acute renal

//

---

[5] Plaintiffs offered each of the above exhibits except for J.L.'s SCH food record. (*See id.*)

failure presumably from lack of fluid intake.  This has resolved and we believe his kidneys are currently safe.").)  Dr. Migita testified that while in SCH's care, J.L. "seem[ed] quite content while eating" and did not show signs of spitting out food.  (*See id.* at 4.)  Dr. Migita also testified that J.L.'s behavior could be explained by "reactive attachment disorder, anxiety related diagnoses, or PTSD, as well as autism," but "we've witnessed enough social engagement to become less concerned about autism and more concerned about a reactive attachment issue or an anxiety issue."  (*See id.* at 8.)  Dr. Halamay, who made the initial CPS referral, also testified.  (*See* Dependency Records at 17).)

Ms. Chen and Mr. Lian were at the hearing, were represented by counsel, submitted exhibits, cross-examined DSHS's witnesses, and called their own witnesses.  (*See* Dependency Records at 13-18.)  An interpreter was present.  (*See, e.g.*, 10/28/13 Hearing Tr. at 2-14.)  Dr. Green and Dr. Gbedawo provided testimony in support of Ms. Chen.  (*See* Dependency Records at 14-15.)

Commissioner Mark Hillman credited Dr. Green's autism diagnosis.  (*See* 10/28/13 Hearing Tr. at 14; 10/30/13 Hearing Tr. at 5.)  Commissioner Hillman also considered the potential effect of autism on J.L.'s weight:  "It may be because, as an autistic child, he has problems digesting and absorbing food, but I have evidence that since his admission into Children's Orthopedic Hospital, he has been eating almost every food they give him with no apparent distress and he has gained 1.8 pounds."  (*See* 10/30/13 Hearing Tr. at 8.)  Nevertheless, Commissioner Hillman understood "through the mother's exhibit, that [J.L.] has not gained any weight for approximately one year."

(*See id.* at 7.)  Additionally, Commissioner Hillman stated on the record that "[t]he

testimony I heard from the medical doctors was that when he was admitted, he was

diagnosed as being grossly malnourished or having malnourishment."  (*See id.* at 8.)

Therefore, despite the autism diagnosis, Commissioner Hillman determined that DSHS

had met its burden to show reasonable cause that keeping J.L. with his parents could

create substantial harm.  (*Id.* at 8-9.)  Ultimately, Commissioner Hillman ordered

out-of-home placement and visitations.[6]  (*See* Dependency Records at 20.)

### III.   ANALYSIS

The issues presented by State Defendants' motion for reconsideration are (1)

whether RCW 4.24.595(1) requires the court to apply a gross negligence standard to

Plaintiffs' remaining claim for negligent investigation, and (2) if so, whether State

Defendants are entitled to summary judgment on that basis.  The court concludes that it

must apply the gross negligence standard and that State Defendants are entitled to

//

---

[6] DSHS also sought out-of-home placement for L.L., J.L.'s brother.  (*See* Dependency Petition ¶ 13.)  The court ordered L.L. to be placed into temporary state custody on October 25, 2013, pending the outcome of the October 28, 2013, shelter care hearing.  (*See id.* ("[DSHS] requests a pick-up order to be issued placing [L.L.] in state custody, due to ongoing concerns about [Ms. Chen's] mental health, the child's age and vulnerability, and the severe maltreatment that has been suffered by [J.L.,] the other child in the home."); Barbara Decl. ¶ 2, Ex. A at 07010729-30 (Pickup Order).)  At the close of the hearing, Commissioner Hillman concluded that DSHS had not met its burden to show reasonable cause that allowing L.L. to remain in his parents' custody would create a substantial threat and denied the Dependency Petition with respect to L.L. on that basis. (10/30/13 Hearing Tr. at 6.)  However, the court placed conditions on the parents, including that "there will be no medical appointments for [L.L.], unless that appointment is disclosed to [DSHS] at least 48 hours in advance, including the time of the appointment and the provider, unless it is a bona fide emergency," in which case the parents must notify DSHS "where he went, why he went and who he saw within 24 hours after that appointment."  (*Id.* at 6-7.)

summary judgment on Plaintiffs' negligent investigation claim. Accordingly, the court GRANTS State Defendants' motion for reconsideration and GRANTS summary judgment in favor of State Defendants on Plaintiffs' remaining claim for negligent investigation.

## A.     Legal Standards

Motions for reconsideration are granted only upon a "showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to [the court's] attention earlier with reasonable diligence." *See* Local Civil Rules W.D. Wash. LCR 7(h); *see also Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (holding that reconsideration of a district court's summary judgment order "is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."). Additionally, a court may sua sponte grant summary judgment under Federal Rule of Civil Procedure 56(f) "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). Here, the court has provided both sides with notice and received extensive briefing on the issue. (*See* MSJ Order; MFR; Chen MFR Resp.; Lian MFR Resp.; MFR Reply.)

## B.     Negligent Investigation

There is no common law cause of action for negligent investigation under Washington law. *Ducote v. State, Dep't of Soc. & Health Servs.*, 186 P.3d 1081, 1082 (Wash. Ct. App. 2008), *aff'd*, 222 P.3d 785 (Wash. 2009) (citing *Dever v. Fowler*, 816 P.2d 1237, 1242 (Wash. Ct. App. 1991)). However, the Washington Supreme Court has

held that RCW 26.44.050 implies a private right of action based on "DSHS's statutory duty to investigate child abuse." *See id.* (citing *Bennett v. Hardy*, 784 P.2d 1258, 1261-62 (Wash. 1990); *Tyner v. Dep't of Soc. & Health Servs.*, 1 P.3d 1148, 1155 (Wash. 2000)). That statute provides:

> [U]pon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

RCW 26.44.050.

"A negligent investigation claim is available only when law enforcement or DSHS conducts an incomplete or biased investigation that 'resulted in a harmful placement decision.'" *McCarthy v. Cty. of Clark*, 376 P.3d 1127, 1134 (Wash. Ct. App. 2016) (quoting *M.W. v. Dep't of Soc. & Health Servs.*, 70 P.3d 954, 955 (Wash. 2003)). "A harmful placement decision includes 'removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.'" *Id.* (quoting *M.W.*, 70 P.3d at 960). To prevail on a negligent investigation claim, "the claimant must prove that the allegedly faulty investigation was a proximate cause of the harmful placement." *See Petcu v. State*, 86 P.3d 1234, 1244 (Wash. Ct. App. 2004).

"A negligent investigation may be the cause in fact of a harmful placement even when a court order imposes that placement." *McCarthy*, 376 P.3d at 1135 (citing *Tyner*, 1 P.3d at 1156). "Liability in this situation depends upon what information law enforcement or DSHS provides to the court." *Id.* (citing *Tyner*, 1 P.3d at 1157-58). "A court order will act as a superseding cause that cuts off liability 'only if all material

information has been presented to the court.'" *Id.* (quoting *Tyner*, 1 P.3d at 1158

(holding that whether a social worker failed to inform the court that he had determined

the allegations against a parent were unfounded was a material question of fact for the

jury)). Additionally, the materiality of an investigator's failure to interview "key

collateral sources" is a question of fact for the jury. *See id.* at 1158-59. However, when

determining whether material information was withheld from the court, courts must

account for all information presented to the court, not just information presented by

DSHS. *See Petcu*, 86 P.3d at 1246.

In addition to concealment of a material fact, "negligent failure to discover

information may subject the State to liability even after adversarial proceedings have

begun." *Id.* at 1156. In *Tyner*, the Washington Supreme Court reversed a grant of

summary judgment for a social worker where the social worker determined that the

allegations against the plaintiff were unfounded, concluding that the fact that the social

worker reached this conclusion was "a fact that might have been relied on by the court in

making its decision." *See id.* at 1158. The Court also found that whether the

caseworkers' alleged failure to "interview collateral sources, and in turn fail[ure] to

deliver the information to the court that these sources would have provided" were

material facts was a question for the jury. *See id.* at 1158-59.

In its December 20, 2019, order granting partial summary judgment on Plaintiffs'

negligent investigation claim, the court concluded, based on *Tyner* and its progeny, that

Plaintiffs identified only one potentially "harmful placement decision"—the decision to

remove J.L. from Ms. Chen's home. (*See* MSJ Order at 51.) Because negligent

investigation is only actionable when it proximately causes a harmful placement decision, the court concluded that State Defendants were entitled to summary judgment for any alleged negligent investigation that occurred after Commissioner Hillman issued his order temporarily removing J.L. from his parents' custody.[7]  (*See id.*)

Again following the *Tyner* line of cases, the court concluded that the shelter care order is a superseding cause of any negligent investigation claim that cuts off liability unless State Defendants' negligence prevented material facts from reaching Commissioner Hillman.  (*See* MSJ Order at 48-49 (quoting *Tyner*, 1 P.3d at 1158 (holding that a court order will act as a superseding cause if "all material information has been presented to the court")); *id.* at 50-52.)  However, viewing the facts in the light most favorable to Plaintiffs, the court concluded that Plaintiffs identified facts that a jury could deem material prior to Commissioner Hillman's October 30, 2013, shelter care order, including (1) whether Ms. Danner failed to interview key collateral sources prior to the shelter care hearing, and (2) whether the incorrect statement that Ms. Chen failed to take

---

[7] Plaintiffs misinterpret the court's December 20, 2019, order and ask the court to reconsider its decision limiting negligent investigation claims generally to pre-shelter care hearing investigations.  (*See* Chen MFR Resp. at 10-11.)  The court did not hold that a plaintiff can never bring a negligent investigation claim based on events that occurred after a shelter care hearing.  (*See* MSJ Order at 51.)  However, to prevail on a negligent investigation claim, "the claimant must prove that the allegedly faulty investigation was a proximate cause of the harmful placement."  (*See id.* at 48 (quoting *Petcu*, 86 P.3d at 1244).)  As the court explained in its summary judgment order, here, there is no evidence of any potentially harmful placement decision after the shelter care order.  (*See id.* at 51 ("Although Plaintiffs contend that J.L. regressed in foster care, they make no allegations constituting abuse by the foster parents."); *id.* ("A harmful placement decision includes removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.") (quoting *M.W.*, 70 P.3d at 955).)  Accordingly, the court limited Plaintiffs' claim to the time period in which the alleged negligent investigation could have proximately caused a harmful placement decision.  (*Id.*)  That decision remains and is not at issue here.

J.L. to the emergency room on October 19, 2013, was due to Ms. Danner's negligence or to another cause, and whether it was a material fact that would have changed Commissioner Hillman's determination. (*See* MSJ Order at 50-51.) However, the court held that DSHS cannot be liable for negligent investigation for omitting material information if that same information was before the court through another witness. (*See* MSJ Order at 51 (citing *Petcu*, 86 P.3d at 1246 ("Petcu suggests that for purposes of determining whether the court has been presented with all material information, we should consider only that information presented by DSHS, not by him. We disagree because to do so would presuppose a much broader cause of action for negligent investigation than has been recognized by our courts.")).) In this case, that means DSHS cannot be liable for failing to interview medical providers who nevertheless testified at the shelter care hearing or for failing to provide records that Plaintiffs or others submitted to Commissioner Hillman.

State Defendants now contend that the remaining portion of State Defendants' negligent investigation claim—limited to DSHS's investigation prior to the October 30, 2013, shelter care order—was an "emergent placement" investigation that the court must analyze under a gross negligence standard pursuant to RCW 4.24.595. (*See* MFR at 3.)[8] The court first analyzes whether RCW 4.24.595 applies to the remainder of Plaintiffs'

//

---

[8] State Defendants did not address RCW 4.24.595 in their underlying motion for summary judgment, and Plaintiffs did not address RCW 4.24.595 in their responses to State Defendants' motion for summary judgment. (*See generally* MSJ (Dkt. # 189); Chen MSJ Resp (Dkt. # 204); Lian MSJ Resp. (Dkt. # 201).)

negligent investigation claim, and then analyzes whether State Defendants are entitled to summary judgment based on the gross negligence standard.

**C.     Immunity Under RCW 4.24.595**

The legislature enacted RCW 4.24.595 in an apparent response to *Tyner*'s formulation of the implied cause of action for negligent investigation.  *See Tyner*, 1 P.3d at 1155.  The law became effective on June 7, 2012.  *See* Engrossed Substitute S.B. 6555, 62nd Leg., Reg. Sess. (Wash. 1998).  The statute states, in full:

> (1) Governmental entities, and their officers, agents, employees, and volunteers, are not liable in tort for any of their acts or omissions in emergent placement investigations of child abuse or neglect under chapter 26.44 RCW including, but not limited to, any determination to leave a child with a parent, custodian, or guardian, or to return a child to a parent, custodian, or guardian, unless the act or omission constitutes gross negligence.  Emergent placement investigations are those conducted prior to a shelter care hearing under RCW 13.34.065.

> (2) The department of children, youth, and families and its employees shall comply with the orders of the court, including shelter care and other dependency orders, and are not liable for acts performed to comply with such court orders.  In providing reports and recommendations to the court, employees of the department of children, youth, and families are entitled to the same witness immunity as would be provided to any other witness.

RCW 4.24.595.[9]

On its face, RCW 4.24.595 applies to Plaintiffs' remaining negligent investigation claim.  Specifically, RCW 4.24.595 applies to "emergent placement investigations," which are defined in the statute as "those conducted prior to a shelter care hearing."  *See*

//

---

[9] DSHS was reorganized into the Department of Children, Youth and Families as of July 1, 2018.  *See* RCW 43.216.906.  For the sake of consistency with the parties' briefing and the court's prior orders, the court uses the term "DSHS" throughout this order.

RCW 4.24.595(1).  The only investigation at issue that resulted in an allegedly harmful placement decision—and thus, the only investigation still at issue in this case—was State Defendants' investigation of suspected neglect conducted prior to a shelter care hearing. (*See* MSJ Order at 51.)  Thus, it is an "emergent placement investigation" for which State Defendants are immune from tort liability unless they were grossly negligent.

Plaintiffs contend that RCW 4.24.595(1) does not apply because the investigation of medical neglect of J.L. was not "emergent," which Plaintiffs define as "situations in which a state employee is required to make a snap decision or where the child is or is considered to be potentially in immediate danger."  (*See* Chen Resp. at 2.)  In making this argument, Plaintiffs disregard the plain language of the statute, which states:  "Emergent placement investigations are those conducted prior to a shelter care hearing under RCW 13.34.065."  RCW 4.24.595(1).  Whether an investigation qualifies as an "emergent placement investigation" is a statutorily defined term, and under the statutory definition, it makes no difference whether the investigation was in fact a situation "in which a state employee is required to make a snap decision."[10]  As one court has reasoned:

> RCW 4.24.595 does not grant [DSHS] immunity only for investigations that [DSHS] internally classifies as emergent.  RCW 4.24.595(1) defines "emergent placement investigations" as "those conducted prior to a shelter care hearing under RCW 13.34.065."  Therefore, the statute, not [DSHS]'s internal classification, controls whether [DSHS] is entitled to immunity.

//

---

[10] Even if "emergent placement investigations" under RCW 4.24.595 were defined as those investigations classified by DSHS as emergent, that standard would be met in this case. Here, DSHS in fact did classify the investigation of J.L. and L.L. prior to the shelter care hearing as "emergent."  (*See* Danner Case File at 24 (Ms. Gaydarzhi stating "[e]mergent intake assigned to [social worker] Danner for investigation")).

1    *Peterson v. State by & through Dep't of Soc. & Health Servs.*, No. 48828-1-II, 2019 WL

2    3430537, at \*6 (Wash. Ct. App. July 30, 2019).[11]

3         Plaintiffs also contend that even if RCW 4.24.595 applies, the "prior to" language

4    in the statute means that "the period in which state employees benefit from a lower

5    standard of care ends when the shelter care hearing begins." (*See* Chen MFR Resp. at 3.)

6    Plaintiffs contend that "[t]here is no reasonable reading of the statute that would extend

7    the period of gross negligence beyond that point." (*See id.* at 4.) Therefore, Plaintiffs

8    contend, RCW 4.24.595(1) does not apply to any investigation that occurred

9    *during* the October 28-30, 2013, shelter care hearing.

10         The court disagrees. First, although Plaintiffs contend "[t]here is substantial

11    evidence of negligent investigation" during the October 28-30, 2013, shelter care hearing,

12    Plaintiffs cite nothing in the record to support that contention. (*See id.* at 5.) Indeed,

13    Plaintiffs concede—in the very same paragraph—that at the time the shelter care hearing

14    began, "Defendants . . . had already completed their 'investigation.'" (*See id.*) Plaintiffs'

15    concession that the investigation took place prior to the hearing moots Plaintiffs'

16    argument that the court should not apply a gross negligence standard *during* the hearing.

17    //

18    //

19

20        [11] Although *Peterson* is an unpublished opinion, the court finds its reasoning persuasive and adopts it here. *See Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value."); Washington State Court General Rules GR 14.1(a) ("unpublished opinions of the [Washington] Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate.").

Second, to the extent that Plaintiffs argue that State Defendants' conduct during the hearing itself constitutes negligent investigation, State Defendants are entitled to immunity under RCW 4.24.595(2). *See* RCW 4.24.595(2) ("In providing reports and recommendations to the court, employees of the department of children, youth, and families are entitled to the same witness immunity as would be provided to any other witness.").

Third, Plaintiffs' reading of RCW 4.24.595 would result in an absurdity. Under Plaintiffs' reading, the legislature would have had to intend to provide immunity for investigations during the 72 hours prior to a shelter care hearing, for representations to the court at the shelter care hearing, and for complying with court orders as a result of the shelter care hearing, but not for any investigation *during* the hearing—which the parties agree lasts an hour in the usual case. (*See* Chen MFR Resp. at 4.) This is an absurd result that the legislature could not have intended[12] because it would strip DSHS of statutory immunity for tort claims based on actions DSHS failed to take prior to shelter care hearings—the purpose of the statute—if DSHS failed to take those same actions *during* the shelter care hearings. For example, a plaintiff alleging that DSHS negligently investigated a referral when it failed to contact a collateral source could bypass the statutory immunity conferred by RCW 4.24.595 simply by pointing to the fact that DSHS also failed to contact that same source during the one-hour hearing, whereas a plaintiff

//

---

[12] In construing statutory language, courts avoid absurd results which could not have been intended by the legislature. *See, e.g.*, *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 59 P.3d 655, 663 (Wash. 2002).

that points to DSHS failing to contact that source prior to the hearing would not bypass statutory immunity.[13]

Finally, a Washington court of appeals case has already dealt with this issue and concluded that DSHS "is entitled to statutory immunity given the closeness in time of its investigation preceding the shelter care hearing and its continuing investigation after the shelter care hearing." *Peterson*, 2019 WL 3430537, at *5 ("[T]he most reasonable interpretation of the statute to give effect to the legislature's intent would grant the department immunity for investigations that result in an emergent removal and shelter care hearing regardless of the exact timing of any of the particular events.").[14] Therefore, RCW 4.24.595's gross negligence standard applies here as well.[15]

-----

[13] In a footnote, Plaintiffs also contend that RCW 4.24.595 is unconstitutional because it could limit claims under the Fourth and Fourteenth Amendments to the United States Constitution. (*See* Chen MFR Resp. at 4.) Plaintiffs' remaining claim is a state law tort claim arising out of a state statute and is therefore subject to the legislature's restrictions. *See, e.g.*, *Peterson*, 2019 WL 3430537, at *6 ("Because negligent investigation is a cause of action specifically derived from RCW 26.44.050, the legislature is within its power to essentially overturn the court's creation of the negligent investigation cause of action by granting the Department immunity for investigations unless it acts with gross negligence."). Plaintiffs provide no argument or authority establishing that the Washington State Legislature's restriction on state law tort claims in any way restricts claims under the Fourth and Fourteenth Amendments.

[14] As noted above, although *Peterson* is an unpublished opinion, the court finds its reasoning persuasive and adopts it here. *See supra* n.11.

[15] Plaintiffs contend, in the alternative, that the court "should certify to the Washington Supreme Court the issues about whether negligent investigation claims can be asserted for additional placement decisions after the initial shelter care order and about whether RCW 4.24.595 has the meaning ascribed to it by DSHS." (*See* Chen MFR Resp. at 11 (citing RCW 2.60.020).) Certification is warranted where "it is necessary to ascertain [Washington law] in order to dispose" of a proceeding and Washington law "has not been clearly determined." *See* RCW 2.60.060. Certification is unwarranted here. Certification is unwarranted on Plaintiffs' proposed negligent investigation question because as explained above, Plaintiffs misread the court's prior order to hold that negligent investigation claims cannot be asserted "for additional

ORDER - 24

**D. Gross Negligence Standard**

The Washington State Supreme Court defines gross negligence as "the failure to exercise slight care." *Harper v. State*, 429 P.3d 1071, 1076 (Wash. 2018) (quoting *Nist v. Tudor*, 407 P.2d 798, 803-04 (1965)). "Slight care" means "not the total absence of care but care substantially or appreciably less than the quantum of care adhering in ordinary negligence." *See Nist*, 407 P.2d at 804. "In determining the degree of negligence, the law must necessarily look to the hazards of the situation confronting the actor." *Id.*

"To survive summary judgment in a gross negligence case, a plaintiff must provide substantial evidence of serious negligence." *Harper*, 429 P.3d at 1076. *Harper* sets forth the analysis the court must consider in this context:

> In determining whether the plaintiff has provided substantial evidence, the court must look at all the evidence before it, evidence that includes both what the defendant failed to do *and* what the defendant did. If a review of all the evidence suggests that reasonable minds could differ on whether the defendant may have failed to exercise slight care, then the court must deny the motion for summary judgment. But if a review of all the evidence reveals that the defendant exercised slight care, and reasonable minds could not differ on this point, then the court must grant the motion.

*Harper*, 429 P.3d at 1078-79 (citing *Whitehall v. King Cty.*, 167 P.3d 1184 (Wash. Ct. App. 2007)); *see also Kelley v. Dep't of Corr.*, 17 P.3d 1189, 1192 (Wash. Ct. App.

//

//

---

placement decisions after the initial shelter care order." (*See* Chen MFR Resp. at 11; *supra* § IV.B.) Certification is also unwarranted on Plaintiffs' question regarding RCW 4.24.595, because the court concludes that RCW 4.24.595 "conclusively determine[s]" the issue—RCW 4.24.595 unmistakably provides immunity absent gross negligence for Plaintiffs' negligent investigation claim, which the court limited on separate grounds to the time period prior to the October 30, 2013, shelter care order.

2000) (stating that there is no issue of gross negligence for the jury without "substantial evidence of serious negligence") (quoting *Nist*, 407 P.2d at 804)).

The facts of *Harper* and *Peterson* further clarify the gross negligence standard the court must apply. In *Harper*, the plaintiff alleged that the Washington Department of Corrections ("DOC") was liable for the death of Tricia Patricelli. *See Harper*, 429 P.3d at 1071. Scottye Miller, Ms. Patricelli's longtime boyfriend, murdered her while he was on probation. *See id.* It was undisputed that DOC had a duty to supervise Mr. Miller while he was on probation. *See id.* It was further undisputed that Ms. Patricelli's family, friends, and DOC "knew that [Mr.] Miller had physically abused [Ms.] Patricelli in the past and would likely do so again if they resumed their relationship." *Id.* Ms. Patricelli and Mr. Miller resumed their relationship while Mr. Miller was on probation, and Ms. Patricelli, Mr. Miller, and Mr. Miller's mother represented to DOC that Mr. Miller was living with his mother, even though he was actually living with Ms. Patricelli. *See id.* The plaintiff alleged that "although DOC knew about [Mr.] Miller's history of violating no-contact orders barring him from contacting [Ms.] Patricelli, DOC still (1) failed to call both of [Ms.] Patricelli's phone numbers, (2) failed to ask [Mr.] Miller's mother to verbally confirm that he had been residing with her, and (3) failed to assume that [Mr.] Miller was lying when he reported that he was living with his mother." *Id.* at 1079.

The court of appeals reversed the trial court's entry of summary judgment in favor of DOC and held that "DOC's failure to take additional steps to verify [Ms.] Patricelli's statements or [Mr.] Miller's housing arrangements could qualify as gross negligence."

//

*See id* at 1071.  The court of appeals "also stated that that whether a defendant acted with simple or gross negligence is basically a question for the jury, not the court."  *See id.*

The Washington Supreme Court reversed.  *See id.*  In doing so, the Washington Supreme Court determined that the court of appeals improperly "focused entirely on what DOC failed to do in supervising the no-contact order," instead of also considering "what DOC did to prevent Mr. Miller from contacting Ms. Patricelli," which included requiring Mr. Miller to submit a weekly shelter log verified by another person's signature, and calling Mr. Miller's mother to verify the living arrangements.  *See id.* at 1079.  Although Mr. Miller and his mother lied to DOC about Mr. Miller's whereabouts, and although the Supreme Court identified areas in which DOC "could have done more," the Supreme Court reversed the court of appeals because the plaintiff "failed to provide substantial evidence demonstrating that DOC exercised substantially or appreciably less than that degree of care that a reasonably prudent department would have exercised in the same or similar circumstances."  *Id.* at 1079-80 ("Looking at the whole picture—what DOC failed to do *and* what DOC did with regard to the relevant alleged failure—we agree with the trial court that reasonable minds could not differ about the fact that DOC exercised slight care and was therefore not grossly negligent.").

In *Peterson*, the court analyzed RCW 4.24.595's application in the specific context of a negligent investigation claim against DSHS.  *See Peterson*, 2019 WL 3430537, at *5.  Applying the plain language of RCW 4.24.595, the court noted that "the legislature has limited the scope of this cause of action by granting the Department immunity for emergent placement decisions and compliance with shelter care and dependency court

orders." *Id.* The plaintiff, the father of minor child T.P., alleged that DSHS conducted a negligent investigation prior to a shelter care hearing at which the superior court entered an order keeping T.P. in foster care pending further order on the basis of false allegations against the plaintiff, and alleged that T.P. was subsequently abused while in foster care. *Id.* at *2-*3. The plaintiff alleged that DSHS failed to determine that the allegations against him that led to T.P.'s out-of-home placement were false. *Id.* at *6. The plaintiff contended that DSHS should have "uncovered an obviously concocted story." *See id.* Relying on *Harper*, the *Peterson* court affirmed the trial court's entry of summary judgment for DSHS, and held that "[v]iewing the facts in the light most favorable to [the plaintiff], the CPS investigator's failure to conclude that [those who made the referrals against the plaintiff] had fabricated the allegations of sexual abuse at the time [T.P.] was taken into protective custody and prior to the shelter care hearing does not constitute gross negligence." *Id.* at *7. The court determined that "the CPS investigator had no way to definitively determine the accuracy of the allegations at the time law enforcement took T.P. into protective custody." *See id.*

**E.      Application of RCW 4.24.595 to Plaintiffs' Negligent Investigation Claim**

Having set forth the applicable law and case authority, the court reexamines Plaintiffs' negligent investigation claim under the gross negligence standard required by RCW 4.24.595. In doing so, the court must identify the specific conduct alleged to be grossly negligent; consider what the defendant did as well as what they failed to do; and consider the hazards of the situation confronting State Defendants. *Harper*, 429 P.3d at 1078 ("In determining whether the plaintiff has provided substantial evidence, the court

must look at all the evidence before it, evidence that includes both what the defendant failed to do *and* what the defendant did."); *Nist*, 407 P.2d at 804 ( "In determining the degree of negligence, the law must necessarily look to the hazards of the situation confronting the actor."). "[I]f a review of all the evidence reveals that the defendant exercised slight care, and reasonable minds could not differ on this point, then the court must grant the motion" for summary judgment. *See Harper*, 429 P.3d at 1078-79.

Here, DSHS and Ms. Danner were faced with an emergent investigation of medical neglect and were statutorily required to prepare for a shelter care hearing within 72 hours of taking J.L. into protective custody. *See* RCW 13.34.065(1)(a) ("When a child is taken into custody, the court shall hold a shelter care hearing within seventy-two hours . . . .") By the day after Ms. Danner was assigned to the case, DSHS and Ms. Danner together conducted home visits and communicated with SCH providers, staff, and police. *See supra* § II.B.2. There is no dispute that several medical providers expressed great concern over J.L.'s condition and Ms. Chen's obstruction of his care before and while he was at SCH, including that Ms. Chen refused to take J.L. to emergency care on October 23, 2013, until a CPS social worker visited her home. *See id*. The day after Ms. Danner was assigned to the case, she prepared, signed and filed a dependency petition that is largely consistent with the providers' opinions and testimony at the shelter care hearing. (*See* Dependency Petition.) Moreover, after three days of testimony, including from several witnesses for Plaintiffs, Commissioner Hillman agreed with DSHS that there was reasonable cause to temporarily place J.L. in out-of-home care—even after taking into account J.L.'s autism diagnosis. (*See* 10/30/19 Hearing Tr. at 1-9.)

As "substantial evidence of serious negligence," *see Harper*, 429 P.3d at 1076, Plaintiffs identify four primary actions: (1) failing to interview key collateral sources, including Dr. Green and Dr. Gbedawo; (2) failing to review medical records concerning J.L.'s care, specifically records related to J.L.'s autism; (3) failing to obtain medical records that Plaintiffs did not have access to, which deprived the superior court of access to those records; and (4) representing to the court that J.L. faced "life-threatening injuries," a statement Plaintiffs contend is false (*see* Chen MFR Resp. at 4-9). The court considers each in turn.

1. Interviewing Collateral Sources

First, Plaintiffs raise State Defendants' failure to interview certain collateral medical sources, primarily Dr. Green and Dr. Gbedawo. (*See* Chen MFR Resp. at 6-7.) As the court has already held, any failure to interview Dr. Green and Dr. Gbedawo prior to the shelter care hearing cannot form the basis of Plaintiffs' negligent investigation claim, because they testified live at the shelter care hearing. (*See* MSJ Order at 51 ("The court further agrees that Ms. Danner cannot be held liable for negligent investigation if the information she is accused of omitting was before Commissioner Hillman through another witness.") (citing *Petcu*, 86 P.3d at 1246 ("Petcu suggests that for purposes of determining whether the court has been presented with all material information, we should consider only that information presented by DSHS, not by him. We disagree because to do so would presuppose a much broader cause of action for negligent investigation than has been recognized by our courts.")).) Although there would be a question of fact as to whether State Defendants were merely negligent in failing to

interview other collateral sources, including J.L.'s other medical providers (*see* MSJ

Order at 50), considering what State Defendants did, the timeline they were under, and

the fact that their position was largely consistent with the medical providers who had

most recently treated J.L., the court concludes that any alleged failure to interview other

collateral sources here does not constitute the "substantial evidence of serious

negligence" required to survive summary judgment on a gross negligence standard. *See*

*Harper*, 429 P.3d at 1078-79.

      2. <u>Failing to Review Medical Records</u>

      Next, Plaintiffs argue that State Defendants failed to review medical records

related to J.L.'s autism and its potential effect on his malnourishment. (*See* Chen MFR

Reply at 7-8.) For the same reasons that failing to interview Dr. Green cannot constitute

negligent investigation, failing to review his autism report or other medical records

regarding J.L.'s autism cannot as well. Dr. Green's report was entered into evidence at

the shelter care hearing. (*See* Dependency Records at 33-34 (listing "Report for [J.L.]

from Lakeside Center for Autism" as an exhibit).) Commissioner Hillman credited the

report and determined that J.L. had autism, yet still concluded that DSHS showed

reasonable cause to remove J.L. based on J.L.'s failure to gain weight for a year and his

promising weight gain after his admission to SCH. (*See* 10/30/13 Hearing Tr. at 7-9.)

Even if Commissioner Hillman had not credited the report, State Defendants would not

have failed to exercise slight care, because several medical providers testified that based

on their interactions with J.L., J.L.'s immediate medical issues were likely not caused by

autism. (*See, e.g.*, 10/29/13 Hearing Tr. at 8 (Dr. Migita testifying that J.L.'s behavior

could be explained by "reactive attachment disorder, anxiety related diagnoses, or PTSD, as well as autism," but "we've witnessed enough social engagement to become less concerned about autism and more concerned about a reactive attachment issue or an anxiety issue.").) State Defendants did not fail to exercise slight care when they relied on these medical providers' opinions—even if the providers' diagnoses later proved problematic or even incorrect.[16] *See Peterson*, 2019 WL 3430537, at *5 (holding that DSHS was not grossly negligent as a matter of law in part because "the CPS investigator had no way to definitively determine the accuracy of the allegations at the time law enforcement took T.P. into protective custody").

Finally, in the context of the gross negligence standard, it bears repeating that State Defendants had roughly a single day in which to obtain and review medical records from a plethora of providers and prepare the dependency petition. *See supra* § II.D.2. Considering what State Defendants did, as well as what they may have failed to do, the alleged failure to review certain medical records does not constitute gross negligence.

### 3. Failing to Provide Medical Records to Plaintiffs

Citing Ms. Chen's and Mr. Lian's declarations and an October 25, 2013, request

//

//

---

[16] To the extent Plaintiffs contend Commissioner Hillman or certain medical providers erred in either J.L.'s diagnosis or their conclusions regarding autism's effect on J.L.'s malnourishment, those alleged errors cannot be imputed to DSHS or Ms. Danner in the form of a negligent investigation claim. The court is unaware of any authority establishing tort liability based on a DSHS failure to conclusively pick the correct side in the face of competing medical testimony.

for medical records by Ms. Chen's attorney, Plaintiffs argue that State Defendants "failed to provide . . . critical medical reports to the Court or to Chen or Lian." (*See* Chen MFR Resp. at 8 (citing 2d Chen Decl. ¶¶ 68-73; Lian Decl. (Dkt. # 203) ¶¶ 30-32).)

However, the records Plaintiffs cite are again primarily concerned with J.L.'s autism which Commissioner Hillman credited (*see* 10/30/13 Hearing Tr. at 7-9), and J.L.'s care while at SCH, about which the providers testified at the hearing (*see id.* at 8). Moreover, Plaintiffs do not provide authority regarding DSHS's obligation to essentially provide discovery during an emergent shelter care hearing, or explain whether Plaintiffs raised this issue with Commissioner Hillman during any of the three days of the shelter care hearing. (*See generally* Chen MFR Resp.; Lian MFR Resp.) Substantial medical records were before Commissioner Hillman, Commissioner Hillman heard three days of testimony in what is normally a one-hour hearing, providers whose treatment is described in many of the medical records at issue testified at the hearing, and State Defendants had a single day to prepare the dependency petition. *See supra* § II.B.2. Even considered in the light most favorable to Plaintiffs, State Defendants' failure to provide additional medical records from several other providers to Plaintiffs under these circumstances does not constitute gross negligence.

4. Allegedly False Statements in the Dependency Petition

Finally, Plaintiffs contend that State Defendants made false statements in the dependency petition, including that J.L. faced "life-threatening physical conditions related to malnourishment" and that Ms. Chen failed to take J.L. to emergency care on October 20, 2013. (*See* Chen MFR Resp. at 9; Chen MSJ Resp. at 3.) The first of these

two statements was corroborated by medical professionals at the time. For example, Dr. Migita testified that upon admission to SCH on October 24, 2013, "lab values indicated that [J.L.] was potentially entering into acute renal failure presumably from lack of fluid intake." (*See* 10/29/13 Hearing Tr. at 2.) It was not a failure to exercise slight care to convey accurately what J.L.'s treating physician told State Defendants.

The second statement later proved to be incorrect. (*See* 2d Lo Decl. ¶ 18, Ex. 17 at 2.) However, this statement also originated from a medical provider, Dr. Halamay. (See RED00397 (stating that the Chen family "did not go to [the emergency department] as recommended" on October 20, 2013).) Although the inaccuracy of the statement could be potential evidence of negligence, as the court previously held (*see* MSJ Order at 50-51), it does not rise to the level of gross negligence under Washington law, *see Peterson*, 2019 WL 3430537, at *7 ("Viewing the facts in the light most favorable to Peterson, the CPS investigator's failure to conclude that O'Keefe and Calapp had fabricated the allegations of sexual abuse at the time [T.P.] was taken into protective custody and prior to the shelter care hearing does not constitute gross negligence.").

5. <u>Summary</u>

Plaintiffs fail to present the "substantial evidence of serious negligence" required to survive summary judgment in the face of RCW 4.24.595's gross negligence standard. *See Harper*, 429 P.3d at 1076. Although there may be areas in which State Defendants

//

//

//

could have done more, based the evidence in the record, no reasonable jury could conclude that State Defendants failed to exercise "slight care." *See id.*[17]

## IV.    CONCLUSION

For the reasons set forth above, the court GRANTS State Defendants' motion for reconsideration (Dkt. # 253); and GRANTS summary judgment in favor of State Defendants on Plaintiffs' remaining claim for negligent investigation.

Dated this 22nd day of January, 2020.


_____
JAMES L. ROBART
United States District Judge

---

[17] To the extent Plaintiffs argue that State Defendants were grossly negligent with respect to L.L. specifically, the court disagrees.  First, Plaintiffs provide no evidence of gross negligence with respect to L.L.  (*See generally* Chen MFR Resp.; Lian MFR Resp.)  Second, L.L.'s five-day removal pending the outcome of the shelter care hearing was pursuant to a court order that state officials are required to follow.  *See* RCW 4.24.595(2) (requiring DSHS to "comply with the orders of the court").  Third, DSHS's investigation of Ms. Chen's alleged medical neglect of J.L.—which the court has determined was not grossly negligent—was the basis for the court order temporarily removing L.L.  (*See* Dependency Petition ¶ 13 ("[DSHS] requests a pick-up order to be issued placing [L.L.] in state custody, due to ongoing concerns about [Ms. Chen's] mental health, the child's age and vulnerability, and the severe maltreatment that has been suffered by [J.L.,] the other child in the home."); Pickup Order.)